**JACK WINTER, INC., a corporation, Plaintiff,**

v.

**KORATRON COMPANY, INC., a corporation, Counterclaimant,**

v.

**JACK WINTER, INC., a corporation, Counterclaim Defendant.**

**Civ. No. 49392.***

United States District Court,
N. D. California.

March 6, 1974.

See also, D.C., 54 F.R.D. 44.

---

* And other cases, Nos. 47273, 49558, 49671, 49913, 50063, 50827, 50854, 51281, 51301, 51653, 51654, 51691, C–70–1252 and C–70–1443–CBR.

1

Marvin E. Klitsner, Timothy C. Frautschi, Foley & Lardner, Milwaukee, Wis., Carl Hoppe, Eckhoff, Hoppe, Slick, Mitchell & Anderson, San Francisco, Cal., for Jack Winter, Inc.

D. Carl Richards, V. Bryan Medlock, Richards, Harris & Hubbard, Dallas, Tex., for The Armory Garment Co. and Haggar Co.

David Rabin, Greensboro, N. C., for Blue Bell, Inc. and W. Koury Co., Inc.

Dayton R. Stemple, Jr., Browne, Beveridge & DeGrandi, Washington, D. C., for Salant & Salant, Inc. and Standard Romper Co., Inc.

Thomas V. Heyman, Albert Robin, Watson, Leavenworth, Kelton & Taggart, New York City, Harold C. Nachtrieb, Anthony G. Wilson, Miller, Groezinger, Pettit, Evers & Martin, San Francisco, Cal., for Henry I. Siegel Co., Inc.

Charles A. Legge, Bronson, Bronson & McKinnon, San Francisco, Cal., Irving Ostrow, Silverman & Kalnich, New York City, for Metro Pants Co., Inc.

Glen E. Keller, Jr., Phelps, Hall & Keller, Denver, Colo., Thomas V. Heyman, Albert Robin, Maxim H. Waldbaum, Watson, Leavenworth, Kelton & Taggart, New York City, for Bayly Corp.

William C. Clay, Jr., Clay & Marye, Mt. Sterling, Ky., Jack Corinblit, Los Angeles, Cal., for Cowden Manufacturing Co.

Jay Topkis, Bernard Ouziel, Paul, Weiss, Rifkind, Wharton & Garrison, Robert D. Spille, Curtis, Morris & Safford, New York City, for Deering Milliken, Inc.

John Izard, King & Spalding, Charles M. Kidd, Weltner, Kidd & Crumbley, Atlanta, Ga., for Oxford Industries, Inc. and Wright Manufacturing Co.

James M. Naylor, Naylor & Neal, San Francisco, Cal., Lawrence B. Biebel, Marechal, Biebel, French & Bugg, Dayton, Ohio, for Lion Uniform, Inc.

M. Laurence Popofsky, Stephen V. Bomse, Heller, Ehrman, White & Mc-

Auliffe, San Francisco, Cal., for Defiance Manufacturing Co., Inc.

M. Laurence Popofsky, Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, Willard L. Ellis, Ellis & Levy, Paul D. Flehr, Sherman O. Parrett, Flehr, Hohbach, Test, Albritton & Herbert, John P. Sutton, Limbach, Limbach & Sutton, San Francisco, Cal., for Levi Strauss & Co.

Hunton, Williams, Gay & Gibson, Lewis T. Booker, Richmond, Va., Morgan, Finnegan, Durham & Pine, John C. Vassil, New York City, for Dan River Mills, Inc. third-party defendant.

Brobeck, Phleger & Harrison, Moses Lasky, Robert S. Dagget, San Francisco, Cal., Lyon & Lyon, James W. Geriak, Los Angeles, Cal., for Koratron Co., Inc. and Koracorp Industries, Inc., defendant and counterclaimant.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

### INTRODUCTION

These seventeen consolidated [1] actions were tried to the Court in a lengthy and comprehensive trial.[2] All of the cases involve U.S. Patent No. 2,974,432 (the "'432 patent") issued March 14, 1961, to Koret of California ("Koret"), now known as Koracorp Industries, Inc. ("Koracorp"), as assignee, and thereafter assigned to Koratron Company, Inc. ("Koratron"), a wholly owned subsidiary of Koracorp.[3]

In 15 of the 17 cases Koratron seeks to recover from certain garment makers license royalties for the use of the patented process or damages for infringement of the patent after expiration of their respective licenses. Each of these garment makers contends in the alternative that the '432 patent is invalid for a multitude of reasons; that if valid, it has not been infringed by any use of the patented process for which royalties or damages are due; or that even if the patent is valid and infringed, Koratron is precluded from enforcing it because of its alleged misconduct before the Patent Office and by other patent misuse. Finally, they contend that Koratron has violated the antitrust laws.

In the *Levi Strauss* action,[4] Koratron also asserts an antitrust complaint against Levi Strauss and a third party complaint against Dan River Mills, Inc. ("Dan River").[5] Koratron contends that Levi Strauss conspired with other garment makers in violation of the antitrust laws to refuse to pay royalties due Koratron under their license agreements and to refuse to comply with and to perform their other obligations thereunder.

In the remaining cases, Koratron sued Deering Milliken Inc. ("Deering Milliken"), a mill which manufactures and sells fabric to garment makers, for common law interference with Koratron's business relations with certain of its licensed garment makers. Koratron charges that Deering Milliken unlawfully represented to garment makers that certain processed fabric offered for sale by Deering Milliken could be manufactured by '432 patent licensees into permanent press garments without incurring any royalty obligation to Koratron under the '432 patent. Deering Milliken denies the allegations and asserts the same defenses regarding the patent and its use as did the garment makers.

---

1. Consolidated pretrial proceedings in these cases were conducted pursuant to order of the Judicial Panel on Multidistrict Litigation under 28 U.S.C. § 1407. By pretrial order dated March 20, 1972, they were consolidated for trial.

2. The proceedings were reported in over 10,000 pages of reporter's transcript and nearly 1700 exhibits were received in evidence.

3. Since distinctions among these entities are not relevant to any of the issues herein, each of these entities will be referred to as "Koratron" throughout this opinion.

4. Civil Action No. 50063.

5. Since the commencement of this action, its name was changed to Dan River, Inc.

"Adversaries" (that is, all of the parties adverse to Koratron other than Dan River) claim that an agreement between Koratron and Dan River dated October 14, 1965, violates the antitrust laws. Dan River and Koratron both contend that the agreement does not violate the antitrust laws. Koratron contends that if such an antitrust violation were found Dan River would be liable in turn to Koratron. Koratron also claims that the fabrics manufactured by Dan River do not conform to the specifications contained in the October 14, 1965, agreement contrary to the representations of Dan River, and that Dan River thereby breached its contract with Koratron. The Court has heretofore ruled against Koratron that the agreement with Dan River is not void or voidable due to the common law principles of coercion,[6] and that ruling is hereby reaffirmed.

The parties to these cases were referred to throughout the trial and are referred to in this opinion as Koratron, Adversaries, and Dan River. This terminology is appropriate because the use of the normal labels of plaintiff and defendant could cause confusion. Several of the cases were commenced by Koratron for royalties and damages, to which Adversaries' defenses and claims described above were interposed, and the others were commenced against Koratron by Adversaries.

Koratron, Adversaries, and Dan River submitted hundreds of findings of fact and conclusions of law, and then each filed exceptions to those filed by the other parties. Two weeks of argument to the Court were heard on the proposed findings and conclusions. Based upon a review of the proposed findings, conclusions, exceptions thereto, all the arguments made in connection therewith, the testimony at trial, portions of designated depositions, exhibits received in evidence, opening trial briefs of Adversaries and Dan River, and argument of

counsel, the Court has reached its decision which is set forth in narrative form.

The trial was not designed to dispose of all the controversies among the parties. It was limited to the issues common to the consolidated cases relating to the legal bases for all affirmative claims set forth in the pretrial order dated March 20, 1972. The pretrial order which governed the trial expressly excluded other matters such as damages.

The Court has jurisdiction of each of the consolidated cases under 28 U.S.C. §§ 1331, 1332 and 1338, and venue is proper. This Court also has jurisdiction of all other claims under the doctrine of pendent jurisdiction.

All of the commerce involved in or affected by the matters in controversy is interstate.

### I. HISTORY OF KORATRON COMPANY, INC.

The predecessor of Koracorp Industries, Inc. ("Koracorp"), Koret of California, was founded as a sole proprietorship in 1938 by Joseph Koret. It manufactured and sold skirts designed to coordinate with sweaters produced by other manufacturers. A partnership was formed in 1939, and in 1944 Koret of California ("Koret") was incorporated.

Over the years Koret has marketed a variety of sportswear items, having particular success with pleated garments. In the late 1940's it sold a line of permanently pleated synthetic skirts under the names, Tub-pleets, Tubinyl and Nylura. By 1953 over 600,000 of such permanently pleated garments had been manufactured and sold. During the 1950's Koret successfully marketed its Pleetset line of pleated skirts made of resin-impregnated and heat-cured cotton. Subsequently Koret produced permanent press garments under the process which forms the subject matter of the '432 patent at issue here.

6. Order of Honorable William E. Doyle, dated October 8, 1971, based on his Memorandum of April 30, 1971, appearing in 329 F. Supp. 211 (N.D.Cal.1971).

Koret, now Koracorp, was the original assignee of the '432 patent, and in 1963 it began to license the patented process to garment makers. Subsequently, the corporation registered two trademarks dealing with this patented process: "KORATRON" (Reg. No. 764,009), for the chemically treated fabric used in the manufacture of permanent press garments, and "KORATRON" (Reg. No. 769,609), for permanent press garments.

In 1964 Koratron Company, Inc. ("Koratron"), was incorporated as a wholly-owned subsidiary of Koracorp, and the parent corporation transferred to Koratron the '432 patent, trademarks and existing licensing agreements. Koratron's only business consists of licensing and other activities relating to the '432 patent and its trademarks.

Koratron was also the owner of United States Letters Patent No. 3,268,915 (the '915 patent), which was issued on August 30, 1966, to Koratron as assignee and which disclosed and claimed an improvement upon the process of the '432 patent. By notice filed with the Patent Office on May 18, 1970, Koratron filed of record a formal dedication of the remaining term of the '915 patent.

The licensing of the patented process was a phenomenal commercial success. From the date of the first license under the '432 patent in 1963 through June 30, 1971, 281 garment makers had taken licenses with Koratron and paid it over 20 million dollars in royalties.

## II. BACKGROUND

Members of the chemical, textile and garment industries have long sought means for efficiently and economically manufacturing garments which retain creases normally obtained through pressing but which avoid creases and wrinkles otherwise arising through wear and washing.[7] There have also been substantial efforts made to manufacture wrinkle- or crease-free items such as napkins, tablecloths, pillowcases and sheets.

Generally speaking, there have been two separate but related methods for manufacturing garments or other items which retain their creases or wrinkle-free appearance. Both involve the use of plastic materials called resins. The resins are classified respectively as "thermoplastic" and "thermosetting." Thermoplastic resins soften upon application of heat and then can be molded into any desired shape, which is retained upon cooling. They can then again be softened by further application of heat and remolded to still different forms. Well-known examples of thermoplastic resins include nylon and polyesters such as dacron. Thermosetting resins become permanently set through complex chemical reactions promoted by application of heat. Once set, they are generally not softened by reapplication of heat and in most circumstances cannot. be remolded or reshaped by heat.[8] Bakelite is a well-known example of such a resin. Basically resins are substances composed of many single molecules, or "monomers," frequently in a water soluble state. When the resin is heated in the presence of certain catalysts (i. e., materials which control the rate of a chemical reaction without actually becoming a part of the reaction), the molecules become polymerized or linked together. When a resin is fully polymerized, it becomes a solid. The molecules of thermosetting resins, upon being heated, polymerize in several ways: by joining together to form chains, by branching and cross-linking with each other to form an intricate structure, and, if polymerized

7. In addition to these efforts, there have been substantial improvements made in the mechanical means by which the desired appearance can be obtained, e. g., the development and improvement of home and professional presses. See, e. g., Solinger, Apparel Manufacturing Analysis (N.Y., Textile Book Publishers, Inc., 1961).

8. There was . some evidence that even thermosetting compounds may be remolded after setting upon application of a sufficiently high degree of heat. However, this fact, even if true, is not material to any of the issues in this trial.

within a cellulosic fabric, by cross-linking with the cellulose molecules themselves.[9] The order in which these cross-linking processes occur and the ultimate fixed geometry of the cross-linked resin and cellulose molecules depends in part on the kind of thermosetting resin used. This metamorphosis, or polymerization, is accompanied by a change in the resin from a water soluble to a water insoluble state.

The first actual commercial exploitation of thermoplastic resins began with the introduction of nylon by du Pont in the late 1930's. Nylon, when formed into a fiber, has thermoplastic properties which give it some degree of crease retention or crease resistance upon application of sufficient heat. In the late 1940's and early 1950's fabrics were made from other synthetic fibers (called polyesters) and were used in the manufacture of garments. When first introduced to the public, garments made from all non-cellulosic synthetic fibers were advertised as requiring only minimum care and "touch-up" ironing when made into garments. They were not, however, without their faults. For example, garments made completely from synthetic fabrics were found uncomfortable by some wearers, principally because the garments did not absorb moisture. In the early stages, they were also very expensive. No thermosetting resins were used in the manufacture of these garments. Today, however, as the result of improvements in the industry, the knitted polyester garments which receive their shaping by the thermoplastic proc-

ess are among the most popular garments sold.

In the early 1930's Dr. John T. Marsh and his associates at Tootal, Broadhurst and Lee, Limited, in Great Britain engaged in efforts to produce a cotton fabric having crease-retaining or wrinkle-resistant properties. These properties were imparted in the bolt or flat state of the fabric by impregnating it with an aqueous solution of a thermosetting resin, squeezing out the excess resin, partially drying the fabric, and then heating it. The heating caused the resin to polymerize or "cure",[10] that is, produce the linking and branching between resin molecules and the rigidifying cross-linking between the resin and cellulose molecules. The cross-linking served to "set" the cellulose fibers. In other words, it imparted a "flat memory" to the fabric so that, after washing and drying, the fabric returned to its original flat state. This flat memory is sometimes termed "pre-cure" and refers to impregnated fabrics in which the resin is set, cured, or polymerized while the fabric is in its flat form before being cut and shaped into a garment. In contrast, "post-cure" refers to fabrics in which the resin is polymerized, cured, or set after a garment has been formed from impregnated fabrics and shaped into its desired form.[11] Between these extremes there has developed "partial cure," i. e., fabric in which some of the resins have been deliberately polymerized while the fabric was in flat form and further polymerization takes place

9. By contrast, thermoplastic molecules, upon being heated, form only long chains (which impart plasticity to thermoplastic compounds) but do not, upon further application of heat, cross-link to form branches either with themselves or with cellulose molecules, as do thermosetting molecules. Chemically speaking, it is this formation of intricate, cross-linked structures which distinguishes thermosetting from thermoplastic compounds and which rigidifies and renders thermosetting compounds relatively unaffected by subsequent applications of heat.

10. The terms polymerization, cure, set, and cross-linking are for purposes of this opin-

ion synonymous. The terms polymerizable and unpolymerized are also synonymous. See Reporter's Transcript (hereafter R.T.), pp. 1953–61, 3274.

11. As used by the Court throughout this opinion, "post-cure" requires impregnation of the fabric in the bolt or running form and cure or polymerization of the resin at the completed garment stage. As thus defined, "post-cure" does not include a process, such as that practiced by the Williamson-Dickey Co., in which both impregnation and cure occurred after completion of garment manufacture.

after the fabric has been shaped into a garment.[12]

In the late 1940's or early 1950's cotton fabrics were developed which would require only minimal care when converted into a garment. The textile manufacturers treated cotton fabrics at their finishing plants in much the same manner practiced earlier by Tootal, Broadhurst and Lee. That is, the thermosetting resin in the fabric was cured at the finishing plant to give the fabric a flat memory so that it would resist wrinkles. The garment maker employed the traditional garment-making techniques in making garments from such fabric; these garments were then generally sold under the designation "wash and wear." Wash-and-wear garments were widely publicized as requiring minimal care and no ironing and were initially well received by consumers. Wash-and-wear garments, however, sometimes resisted shaping and creasing and could become disfigured by puckering at the seams and cockling. Such garments did not live up completely to their promised performance, and the public became somewhat disenchanted. Wash-and-wear garments could, however, perform satisfactorily in some cases so long as and to the extent that the garment makers took care in sewing and designing the garments. The poor performance attributable to some wash-and-wear garments resulted in part from the fact that in some instances textile mills reduced the quantity of resin and in other instances some garment makers failed to exercise the proper degree of care in making the garments. Today wash-and-wear garments are still popular items, and most men's shirts are made from this process.

## III. SCOPE OF THE '432 PATENT

### A. Introduction

These cases begin and end with the '432 patent. The issues as to its scope and validity occupied the greatest part of the trial. Where a case involves questions as to both the validity and scope of a patent, there is a threshold determination regarding which question should be dealt with first. At trial the parties initially addressed the issues of patent validity and subsequently dealt with the issues underlying patent scope and infringement. Such a procedure was a practical one for trial; it was not known then whether any infringement issue would arise since a holding of invalidity would have mooted infringement issues. However, in this opinion the Court will deal first with the question of the scope of the patent, since both questions of validity and infringement can best be resolved with a clear understanding of precisely what the '432 patent covers.

### B. The Four Claims of '432

The '432 patent was issued with four claims on March 14, 1961, and was entitled "Press-Free Crease Retained Garments and Method of Manufacture Thereof" (A copy of the patent as issued is attached to this opinion as Appendix A). The applicants were William K. Warnock, then an employee of Koret of California, the original assignee, and Frank G. Hubener, a partner in the Ace Dye Works, an independent fabric finisher. When the application for the '432 patent was filed, it contained eight claims, four directed to a process of manufacturing press-free garments and the other four directd to garments made by the practice of the process. The inventors' attorney argued to the Patent Office that the desired garments and the process for making them were interrelated and that, if garments having the desired press-free characteristics were to be efficiently produced, it was necessary to practice the process disclosed in their patent application. Ultimately, only four process claims were allowed, each of which is involved in these consolidated actions.

All four claims differ from each other in certain respects. Claims 2 and 3 dif-

---

12. Dan River claims, and the Court finds, that the Dan Press fabric falls within this "partial cure" category.

fer from Claim 1 in part by specifying that approximately 70 per cent by weight of the resin should be retained in the fabric after the fabric is squeezed and before drying. Claims 2 and 3 also identify the temperature range in the garment-setting oven as from 350°F. to 400°F. Claim 3 differs from Claims 1 and 2 in part by calling for a mixture of polymerizable resins in the fabric. Claim 4 differs from the other three claims in part by specifying that only a "major amount by weight of the resin" be retained before final drying.

 "[E]ach claim is in theory a separate patent." Moon v. Cabot Shops, Inc., 270 F.2d 539, 544 (9 Cir. 1959), cert. denied, 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546 (1960); Walker v. General Motors Corporation, 362 F.2d 56, 58 (9 Cir. 1966); 4 Deller's Walker on Patents (2d ed. 1965), § 225, p. 69. The Court finds at the outset, that the four claims of the '432 patent define the same invention. Therefore, each finding and conclusion in this opinion relating to the patent applies to each claim individually, and the term " '432 patent" will be used, for convenience, as a collective reference to these claims.

### C. *Degree of Polymerization*

 The crucial claim is Claim 1, which is as follows:

"[In a process of manufacturing garments unrestricted as to style, size, design and type wherein a garment fabric is impregnated with an aqueous solution of a polymerizable resin and the fabric partially dried at a temperature below the polymerization temperature of the resin so as to maintain the contained resin in an unpolymerized state and approximately 2% to 8% of moisture is retained in the fabric,] the steps of cutting said fabric containing the resin in an unpolymerized state to the size, shape and style of desired garments, sewing said fabric to provide desired garment seams, finishing the cut and sewn fabric to completed garments of desired

styles and designs, thereafter imparting a crease in each of the completed garments at random locations therein consistent with the designs and styles of the completed garments, and thereafter curing the impregnated, partially dried completed garments to insolubilize the contained resin in situ so that the completed garments are press-free and the imparted creases therein are unaffected after repeated washings of the garments" (original text; brackets added).

Koratron argues vigorously that the portion of Claim 1 within brackets above is merely a preamble to the operative steps recited in the body of the claim which follows. Seizing upon the distinction between the preamble and body of the claim, Koratron asserts that the bracketed language in no way constitutes any limitation on the otherwise broad scope of the patent, which, in Koratron's view, teaches only that sufficient polymerizable resin must be retained in the fabric to impart adequate permanent press properties after completion of the garment. Adversaries and Dan River argue to the contrary that the scope of the patent is confined to the use of the fabric in which virtually none of the contained resins are polymerized, set, or cured before the garment is made. Preliminarily, it should be noted that the distinction between preamble and body of the claim may not be as significant as the parties suggest. The limiting reference in the preamble to drying the fabric "at a temperature below the polymerization temperature of the resin so as to maintain the contained resin in an unpolymerized state and approximately 2% to 8% of moisture is retained in the fabric" (See Appendix A, column 4, lines 60–64) is mirrored in the body of Claims 2, 3 and 4. See, respectively, column 5, lines 11–14; column 5, lines 33–36; column 6, lines 10–14. It is well established that "a patentee's broadest claim can be no broader than his actual invention, no matter how it may be expressed or what other claim his patent may contain", Kemart Corp. v. Printing

Arts Research Laboratories, 201 F.2d 624, 633 (9 Cir. 1953), Moon v. Cabot Shops, Inc., *supra*, 270 F.2d at 544, and, as indicated below, the Court finds that the "actual invention" disclosed in the '432 patent teaches that polymerization of resins be "deliberately avoided" prior to completion of garment manufacture.

■■ The Court feels that the better view in this case is that the preamble should be read together with the body of the claim. At the outset it is not clear here where the preamble stops and the body begins, nor is it clear that the inventors intended such a distinction in the patent. It is well established that the claims of a patent must be read in light of the entire document, including the specifications and drawings. Oregon Saw Chain Corp. v. McCulloch Motors Corp., 323 F.2d 758, 762 (9 Cir. 1963), cert. denied, 377 U.S. 915, 84 S. Ct. 1180, 12 L.Ed.2d 186 (1964); Doble Engineering Co. v. Leeds & Northrup Co., 134 F.2d 78, 84–85 (1 Cir. 1943); 4 Deller's Walker on Patents (2d ed. 1965) § 225, p. 66. Even if there were a clear distinction in a particular claim between body and preamble, the better rule would be that the body of the claim must be viewed in light of the entire language used within the four corners of the instrument itself, including any preamble.

■ In this case, moreover, the applicants themselves argued on behalf of their claims with respect to this very preamble (File Wrapper, Patent No. 2,974,432, (hereinafter F.W.), pp. 81–82) [13] that "[i]t is well settled, both by decisions of the tribunals of the Patent Office and by our federal courts that while the preamble is not an element of the claim, it (the preamble) may affect the enumerated elements so as to give life and meaning and vitality to them. Or, the preamble may be used to differentiate the invention sought to be patented from prior art references." *See*, *e. g.*, Marston v. J. C. Penney Company, 353 F.2d 976, 986 (4 Cir. 1965), cert. denied, 385 U.S. 974, 87 S.Ct. 515, 17 L. Ed.2d 437 (1966); Eversharp, Inc. v. Phillip Morris, Incorporated, 256 F. Supp. 778 (E.D.Va.1966), aff'd per curiam, 374 F.2d 511 (4 Cir. 1967). This argument was made by the applicants in connection with the rejection [14] by the Patent Office of the claims (which were eventually allowed) on the ground that the garment recited in the claims could be a wrap-around skirt, which could be produced under prior art by the Zinamon, et al., (No. 2,769,584) or the Brown (No. 2,817,468) patents (F.W., pp. 72–73). To overcome this rejection, applicants argued that the preamble in question referred to the manufacture of press-free garments "unrestricted as to size, shape, style or design" (F.W., p. 81, lines 23–24). Since the claims in question were granted only after applicants made this argument, they should not be permitted now to urge that the entire preamble not be read in conjunction with the claims in question.[15]

■ Rather than merely specifying the use of a fabric which contains "sufficient polymerizable resins," the '432 patent, read as a whole, clearly teaches the use of fabrics in which polymerization has been "deliberately avoided" at all stages prior to the baking of the completed garment. The patent teaches throughout that before garment completion the temperatures for drying and handling the fabric are kept below the polymerization temperature of the resin and that the step of polymerization—*i.*

---

13. Any invention must be construed in light of its prosecution history as revealed in the file wrapper. Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

14. Claims as allowed must be read with reference to rejected claims. Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Schriber Co. v. Cleve-

land Trust Co., 311 U.S. 211, 220–221, 61 S.Ct. 235, 85 L.Ed. 132 (1940).

15. Since the applicants' argument above was made to overcome a rejection based on prior art, file wrapper estoppel applies as to this issue against Koratron. Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

*e.*, baking at a temperature high enough to set the resin—occurs only after the entire garment has been completed. In discussing the tenter frame to be used, the specification states: "It is to be understood that a drying atmosphere of approximately 200° F. is maintained as the fabric is passed along the tenter frame; such drying atmosphere being substantially below the temperature required to cure, set or polymerize the resins in the fabric. That is to say, polymerization of the copolymers of the two resin forming ingredients of the solution with which the fabric is impregnated is *deliverately* [*sic*] *avoided* in our improved method during the stages of padding, stretching, finishing and drying" (Column 3, lines 42–51).[16] Where a mechanical finish is desired, the specification indicates that a flat nip calendar can be used, but even in this process the suggested temperatures for the calendar rolls (250° F. to 300° F.) are below the 350° F. to 420° F. temperature range specified in the patent for curing relatively light-weight cotton garments (Column 3, lines 37–42, and Column 4, lines 7–9). Further, the specification contains repeated references to manufacture of completed garments before polymerization of the resins: "A primary object of our invention is to provide a method of manufacturing press-free crease retained garments having thermosetting resins therein which includes *the step of polymerization of the contained resins after the garments have been completely finished* and are otherwise ready to wear" (Column 1, lines 51–56); "A still further object of our present invention is to provide a method of the indicated nature for manufacturing press-free crease retained garments which is additionally characterized by controlling the quantity of the introduced non-polymerized resins so that the material of the garments can be easily handled during *the cutting, sewing, pressing and otherwise finishing of the garments prior to the polymerization of the resins* contained in the finished garments"

(Column 1, lines 62–70); "[T]he treated fabric is cut, sewed, finished and pressed *to provide the completed garment prior to the final step* of subjecting the finished garment to the action of heat in a garment-setting oven *to effect polymerization and setting* of the resins in the garment *as an entirety*" (Column 3, lines 23–27); and, "After garments have been completed by cutting, sewing, finishing and pressing, which may include pleating by a mechanical pleating step, the entire garments are disposed in a garment-setting oven operating at a temperature with the garments contained therein for a sufficient time to effect complete polymerization and setting of the resin in the garments to a water-insoluble state" (Column 3, line 69—Column 4, line 2).

To support its contention that the patent teaches only that a sufficient quantity of uncured resins need remain in the fabric, Koratron points out that the specification refers to the heating of a final or "take-off" roller: "The final or take-off roller upon which the fabric is rolled after passage through the tenter frame and flat nip calendar, if used, may or may not be heated depending upon the degree of crease resistance desired in the fabric and this is dependent upon the type of fabric being processed; heating of this final or take-off roller usually effecting an increase in the crease resistance of the treated fabric" (Column 3, lines 52–59). Koratron's expert, Dr. Herman Mark, stated that this taught him that the patent contemplates a partial cure of some but not all of the resins.

Contrary to the testimony of Dr. Mark, however, no such claim is made in the patent; indeed each claim specifically teaches to the contrary. The deliberate avoidance of polymerization until the cure of the completed garment is not only contained in the preamble to Claim 1, in which reference is made to drying the fabric at "a temperature below the polymerization temperature of the resin

16. Unless noted to the contrary, emphasis is supplied throughout this opinion.

so as to maintain the contained resin in an unpolymerized state", but in the claim itself: "the steps of cutting said fabric containing the resin in an *unpolymerized* state to the size, shape and style of desired garments, sewing said fabric to provide desired garment seams, finishing the cut and sewn fabric to completed garments * * * and thereafter curing the impregnated, partially dried completed garments to insolubilize the contained resin in situ so that the completed garments are press-free and the imparted creases therein are unaffected after repeated washings of the garments" (Column 4, line 64—Column 5, line 2). Similar language is also found in Claims 2, 3 and 4. Claims 2 and 3 refer to fabric drying "at a temperature insufficient to polymerize the contained resin" (Column 5, lines 11–12 and 33–34), and Claim 4 refers to "a temperature below the polymerization temperature of the contained resin" (Column 6, lines 11–12). Claims 2 and 3 go on to speak of curing the garments "to polymerize and set the contained resin to a water-insoluble state" (Column 5, lines 19–20 and 42–43), and Claim 4 "to insolubilize the resin in situ" (Column 6, lines 19–20).

In summary, from a reading of the specification, preamble and bodies of all claims together, it is clear that the '432 patent teaches that polymerization of the resins in the fabric prior to final garment completion is to be, in the patent's own words, "deliberately avoided".

### D. *Moisture Limitation*

#### (1) *File Wrapper Estoppel*

 Adversaries and Dan River argue at length that the "metes and bounds" of the '432 process are restricted to a resinated fabric having a moisture content of 2 to 8 per cent above its natural moisture content prior to garment manufacture. They contend not only that the claims are so limited but also that these limitations were added to the original claims in order to avoid rejection due to prior art, and thus operate as a file wrapper estoppel binding Koratron. The Court finds, however, that their contention is not supported by either the language of the patent or the patent prosecution history as revealed by the file wrapper. First, they overlook that the patent's references to moisture content in each instance are qualified by the significant modifier "approximately".[17] Second, the inventors claim no more for that approximate range of moisture content than that it was preferable to other methods of controlling the drying of the resin-impregnated fabrics[18] (Column 3, lines 59–62). Third, the prior art which Koratron sought to overcome itself contained moisture restrictions which overlap the range suggested in the '432 patent. For example, the Brown patent, No. 2,817,468, showed, *inter alia,* the steps of treating a fabric "with a crease setting or holding liquid such as a resin" followed by drying "to an approximate 8 percent to 15 percent moisture content"[19] (Brown patent, Column 2, lines 30–37). Similarly the patent issued to Zinamon, et al., No. 2,769,584, calls for a "preliminary heating" of the impregnated fabric, with an "important feature" of this step being "that the fabric at the end of the preliminary heat treatment should still contain from 5 to 10% of moisture" (Zinamon et al. patent, Column 2, lines 47–51). A fabric's

17. Words such as "approximately" or "substantially" cannot be read out of a patent, but must be read together with more specific terms. Borg-Warner Corporation v. Paragon Gear Works, Inc., 355 F.2d 400, 403–404 (1 Cir. 1965), cert. dismissed, 384 U.S. 935, 86 S.Ct. 1461, 16 L.Ed.2d 536 (1966).

18. Patent applicants need disclose only the mode of practice conceived to be best for practicing the patent, not all conceivable modes. The patent, however, "is not confined to the precise mode outlined." Chicago Pneumatic Tool Co. v. Hughes Tool Co., 97 F.2d 945, 946 (10 Cir. 1938), cert. denied, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415 (1938), rehearing denied, 305 U.S. 673, 59 S.Ct. 242, 83 L.Ed. 436 (1938).

19. Claim 1 of Brown specified a 6 to 15 per cent range for moisture content (Column 6, line 1).

natural moisture content is the amount of moisture which it will absorb from the atmosphere expressed as a percentage of the weight of the dry fabric, and this amount varies with the composition of the fabric and with the ambient temperature and humidity (R.T., pp. 1968–1969, 2011; Solinger, *Apparel Manufacturing Analysis*, p. 50). For example, cotton fabric (which is referred to in the '432 patent) has a natural moisture content of approximately 6 per cent. Adding the 2 to 8 per cent moisture content referred to in the '432 patent (Column 3, lines 61–62) results in a range of approximately 8 to 14 per cent for '432, clearly within that of the Zinamon and Brown patents each of which presumably includes the natural moisture content within its specified moisture range.

Adversaries and Dan River misconstrue the thrust of the arguments advanced by Koratron to overcome the Zinamon and Brown patents. Referring the Court to various portions of Paper No. 9 of the File Wrapper (White to Patent Office, June 16, 1958), they note that it was in this letter, in response to the rejection based on Zinamon and Brown of the product claims 5–8, that the quantitative description of moisture limitation first appeared; and it was this moisture limitation, they contend, that Koratron stressed in its attempt to distinguish its claims from Zinamon and Brown. This argument either overlooks or misunderstands the distinction which Koratron in fact offered. After admitting to a "similarity" between their disclosure and that of Zinamon and Brown in that all three taught the impregnation of a fabric with polymerizable resins and the drying of the fabric "to the extent of retention of approximately 8% moisture therein * * *," the inventors continued:

"From that point on, applicants make an abrupt departure from the methods disclosed and taught by Zinamon and Brown which, as pointed out above relate specifically to the textile manufacture art and not to the art of manufacturing garments. * * * Spe-cifically, there is no disclosure or teaching in either Brown or Zinamon, et al. that the garments be made up from the resin-impregnated fabric containing the specified amount of moisture. There is nothing at all in these cited references relating to the garment manufacturing art. Nor is there any suggestion in either of these references that such garment manufacture be carried on with moist resin-impregnated fabric" (F.W., pp. 51–52).

The vital distinction asserted was that the Zinamon and Brown patents did not teach that *garments,* as distinguished from fabric, were to be made from the moist fabric. See also F.W., pp. 68–69. Thus Koratron argued to the Patent Office that "[a]pplicants [*sic*] process claims are directed to the steps of * * * drying the impregnated fabric to an extent so that it retains approximately 2–8 percent of its moisture content, while leaving the resin unpolymerized, thereafter making completed garments from the moist fabric * * *" (F.W., p. 49, lines 20–27). When the Patent Examiner rejected the application for the second time and cited, among other things, the Zinamon and Brown patents (F.W., p. 57), Koratron again emphasized the importance of moisture content by asserting "approximately 2% to 8% moisture" limitations into every method claimed (F.W., pp. 59, 60). However, the patent process claims were not accepted until Koratron was able to persuade the Examiner that the distinction between its claims and those of Zinamon and Brown was that its claims were without restrictions as to size, shape, style or design of completed garments as distinguished from possible wrap-around garments which, according to the Examiner, could be produced from fabric permanently pleated by the Zinamon or Brown methods (F.W., pp. 81–82).

In sum, Koratron sought to distinguish its process from Brown and Zinamon primarily on the basis that '432 taught a process by which an unrestrict-

ed range of garments could be produced, not on the basis of any fixed range of moisture content. Thus, no file wrapper estoppel operates as to moisture limitations in the '432 process.

### (2) *Relationship Between Moisture Content and Cure*

The patent does not, by any reasonable construction of its terms, teach a process in which efforts are made to cure resin-impregnated fabric to any degree prior to manufacturing a garment in its final shape. The specification of the patent (Column 1, lines 50–56) states that "[a] primary object of our invention * * * includes the step of polymerization of the contained resins *after* the garments have been *completely finished* and are otherwise ready to wear." Some polymerization undoubtedly does occur prior to final garment manufacture, either by design to impart fixed creases or from auto-polymerization of some resins, but the thrust of the patent, and an aspect of it which rendered it really novel, was that the maximum amount of the resin (no specific percentage was taught nor can one be determined due to differences in fabrics, resins, catalysts, and manufacturing and drying conditions) in the fabric should remain unpolymerized until after the garment had been completed.

▆▆ There was evidence that a resin-impregnated fabric under normal circumstances will start self- or auto-polymerization even before it is baked. It is in this context that the suggested moisture content is significant. Moisture content and degree of polymerization are related in two ways. First, the moisture content during drying may provide a control to prevent undesired premature polymerization. While moisture is present in the fabric, the temperature of the fabric will generally not exceed 212°F., the boiling point of water, even though the temperature of the drying chamber may be higher. 212°F. is below the temperature at which resins normally polymerize. To prevent polymerization, moreover, the '432 patent specification suggests (Column 3, line 43) that the drying should take place in an "atmosphere of approximately 200°F." Second, moisture content provides some indication of non-polymerization. As long as substantial moisture remains, polymerization probably has not taken place to any significant degree. The fabric containing a solution of polymerizable resin and dried to approximately 2% to 8% above normal regain is not dry to the touch. Rather, it feels slightly damp—at least to someone familiar with fabric finishing. Rather than constituting a limitation on the scope of the '432 patent, therefore, the range of moisture content suggested in the patent is merely a preferred method for avoiding as much polymerization as possible before the cure of the completed garment. Since the moisture content range is not a limitation on the scope of '432, it is not necessary to discuss Koratron's contention that it is entitled to a range of equivalents beyond the numerical recitations about moisture content in the claims.

### E. *Alleged Admissions Regarding Patent Scope*

▆▆ Adversaries and Dan River introduced considerable evidence tending to show that Koratron and its predecessors conceived of the process as requiring approximately 2–8% above normal moisture content in the fabric and also deliberate avoidance of curing or polymerization of resins prior to garment completion.[20] The evidence showed that:

1. The Process Consultant of Koratron's Research and Development De-

---

20. Although an inventor's own statements or admissions made subsequent to the issuance of the patent about pertinent facts underlying the patent cannot be used to broaden the scope of the patent, they may be some evidence of its scope if they tend to show the meaning he gave to words used in the application when filed. *Ellipse Corporation v.*

partment and an officer of the corporation, Richard Tomaselli, testified that he considered that the patent required fabric which "essentially remains totally uncured" (R.T., pp. 4155–4156);

2. In the specification of their subsequently issued Patent No. 3,268,915 (the '915 patent), the '432 inventors, Warnock and Hubener, stated that the "essence" of the '432 concept was "that the solution remains unset or uncured until after the completion of the garment" (Patent No. 3,268,915, column 6, lines 37–40);

3. In 1961 Koratron obtained British Patent No. 862,653, a counterpart of '432 which contained no specific moisture limitation. However, when faced with the expense of litigating a claim of patent opposition threatened by Tootal, Broadhurst and Lee, Ltd., a large British textile firm, Koratron expressly limited its British patent by including a restriction to a moisture content of approximately 2–8% above normal [21] (R.T., pp. 4860–4863);

4. Koratron advised its mill licensees in its textile mill manuals that fabric for the '432 process should contain above-normal moisture concentrations, the specific percentage depending upon the type of fabric produced. These manuals advised that an excessive drying temperature could "induce a precure" and should therefore be avoided. The garment maker manuals initially specified that the garment makers use "chemically treated, but uncured, quality controlled fabric from a Koratron licensed fabric mill" (R.T., pp. 5995–5996);

5. Louis Hochstaedter, then a Koratron vice-president in charge of licens-

ing mills and garment makers, delivered a speech in New York in 1964 to the American Association for Textile Technology, Inc., emphasizing that the '432 process generally involved no precuring (R.T., pp. 5928, 5953–5956);

6. An article published in *Women's Wear Daily* in March, 1962, stated that the Koratron fabric was "dried at a temperature low enough to prevent polymerizing of the resin contained in the fabric." Copies of this article were subsequently sent to some potential garment-maker licensees (A–893, A–804b);

7. To combat Dan River's then new "Dan Press" process in 1965 Koratron ran advertisements in trade papers read by garment makers and fabric manufacturers, among others, attempting to distinguish Koratron from "partial cure" processes. One advertisement, known to Koratron's advertising personnel as "The Threat" ad, concluded that "[a] garment made from cured or partially cured fabric is not the real (Koratron) thing. Not at all" (R.T., pp. 4622–4623); and

8. In an agreement concluded with Dan River on October 14, 1965 (see p. 50, *infra*), Koratron in effect acknowledged that fabrics defined by reference to their moisture content and degree of polymerization were critical to a determination of the scope of the '432 patent. Herman A. Greenberg, who as the president of Koratron negotiated the Dan River agreement, testified that it was his understanding that these factors, and the related element of avoiding excessive heat, were central concepts in the '432 patent.. Based on this understanding and on the technical advice of John F. Barry, one of Koratron's technical experts, Greenberg concluded during

Ford Motor Company, 452 F.2d 163, 169 (7 Cir. 1971), cert. denied, 406 U.S. 948, 92 S. Ct. 2041, 32 L.Ed.2d 337, rehearing denied, 409 U.S. 898, 93 S.Ct. 99, 34 L.Ed.2d 157 (1972). Further, the actions and statements against interest of the inventor or owner of a patent may properly be considered in construing the scope of the patent Canadian Ingersoll-Rand Co. v. Peterson Products, 350 F.2d 18, 25 (9 Cir. 1965).

21. A patentee's appraisal of his own invention made during the prosecution of a corresponding foreign patent may be relevant to the issue of scope. Sarazin v. Wright Aeronautical Corporation, 54 F.Supp. 244, 251 (S.D.N.Y.1944), aff'd sub nom. Clark v. Wright Aeronautical Corporation, 162 F.2d 960 (2 Cir. 1967); Intermountain Research Co., Inc. v. Hercules, Inc., 163 U.S.P.Q. 390, 394 (C.D.Cal.1969).

the negotiations that Dan Press was "an animal * * * different than Koratron" (R.T., pp. 3770–3774).

This evidence [22] uniformly supports the overall view that the '432 patented process, as construed by Koratron, teaches that prior to final garment completion, (1) polymerization is to be deliberately avoided, and (2) an approximate 2–8% above-normal moisture content should be maintained in order to avoid the undesired premature curing. However, the Court finds that moisture content limitation does not constitute a limitation of the scope of the patent but rather the preferred methodology for avoiding polymerization.

### F. Garments Covered

The Court finds that the '432 patent, by its own terms, is "unrestricted" as to the style, size, design and type of garments to be produced. Unlike many of the prior processes which generated only *pleated* skirts, or skirt sections, '432 is applicable to a wide range of garments, both in maintaining creases and pleats and in rendering them wrinkle-free.

### G. Fabrics

The patent teaches that "a variety of different textiles" may be used to practice the invention (Column 2, line 50). It is not to be limited "to any precise fabric" (Column 2, line 5). Nevertheless, because of the underlying chemistry set forth above, there must be at least some cellulose fibers in the fabric with which polymerizable resins may interact, since the resins contemplated will not cross-link with, for example, certain synthetic fibers during formation of the poly-

mers which generate permanent press characteristics.

The initial 100% cotton garments made by the process encountered abrasion problems and were later replaced by fabric blends such as nylon and cotton and polyester and cotton to provide abrasion resistance and to enhance permanent press characteristics.

The Court finds that the patent covers any fabric or fabric blend which will absorb and retain an aqueous resin solution and in which some of the fibers will cross-link appreciably with resin polymers formed during cure to give the desired permanent press characteristics.

### H. Resins

The patent specification discloses the use of a mixed urea formaldehyde-melamine formaldehyde resin system, but it further states that "there are a plurality of resins suitable for our purpose" (Column 2, lines 42–43), and that the use of commercially available resins is contemplated. The claims do not specify any particular resin or resin mixture.

Dan River argues that the patent does not contemplate the use of a glyoxal resin known as DMDHEU, which is currently used by Dan River and other mills, an example of which is "Permafresh 183" sold by Sun Chemical. Fabrics impregnated and cured with DMDHEU have a longer shelf life and are less odor-producing than fabrics impregnated with the urea-melamine formaldehyde resins.

Dan River stresses that DMDHEU has been known and used for some time in Europe, and that the chemistry underlying DMDHEU-cellulose cross-linking is different from that underlying

---

22. At trial Koratron failed to present any evidence that prior to the filing of these cases it construed the '432 patent to teach that only "sufficient" uncured resins need be retained before baking the completed garment. It would appear that Koratron's position at trial as to the scope of the patent is more the product of able trial counsel than the teaching of the inventors. Warnock, one of the co-inventors, in his deposi-

tion first testified that, in practicing the '432 process, the resins must be completely uncured but subsequently changed his testimony and stated that there need be only "sufficient uncured resins" in the fabric to make a satisfactory permanent-press garment. He conceded that he discussed this change in his deposition testimony with his lawyers.

the urea-melamine formaldehyde cross-linking process.[23]

Nevertheless, the '432 patent teaches merely that resins as a class may be used. Although the chemical metamorphosis which various resins undergo may vary upon application of heat, the overall cross-linking results, at least as far as garment makers are concerned, are practically the same.

'432 teaches a process of manufacturing garments, not an intricate chemical reaction. Broadly speaking, the essential factor here is that the resins are applied to the fabric and then cured in the completed garment; the particular resin which is employed is not crucial. The inventors were not sophisticated chemists and could not themselves have appreciated these highly technical differences between resins.

Although use of DMDHEU may in fact improve the '432 process somewhat, it does not alter it significantly for patent purposes. The Court finds that the practice of the '432 process contemplates the use of fabric impregnated with all types of resins, including DMDHEU, and is not limited to an urea formaldehyde-melamine formaldehyde resin.

## I. *Catalysts*

Organic acid-type catalysts are suggested in the patent (Column 2, line 60). But as with resins, the patent suggests only that some catalyst be added so as to ensure the acceleration of polymerization when desired. The applicants were not

sophisticated chemists and the state of the art was rudimentary when the patent issued in 1961. A strikingly different catalytic agent, perhaps combined with other significant process changes, might be outside '432. However, to limit '432 to "organic, acid-type" catalysts and no others, as Dan River argues, would be practially equivalent to limiting the patent to the use of gas heat rather than electric heat for curing. Therefore, the Court finds that the '432 patent is unrestricted as to the type of catalyst used in the aqueous resin solution.

## J. *Summary of Scope Findings*

Based upon the '432 patent's claims read in light of the specification, the positions taken by the inventors and their counsel during the prosecution of the application as revealed in the file wrapper, and the conduct and admissions of both Koratron and the inventors subsequent to the issuance of the '432 patent, this Court finds that the scope of the '432 patented process is defined as follows:

1. The '432 patent teaches a "post-cure" method for the manufacture of durable press garments. A complete garment is manufactured from a fabric which has been impregnated with a thermosetting resin, and after this completed garment is shaped and pressed, it is cured in an oven to set the resin thereby imparting durability to the shape and press of the garment.

2. The patented process is practiced only when the garment maker *uses*[24] a

---

23. Technically speaking, DMDHEU does not polymerize like urea and melamine formaldehyde resins. The latter resins polymerize by reacting with each other and cross-linking with cellulose. DMDHEU cross-linking, on the other hand, often occurs by reaction with the cellulose at two or more reactive sites on the DMDHEU molecule and not through another molecule of DMDHEU to which cellulose is attached. That is, the urea and melamine formaldehyde monomers link up with cellulose molecules and with each other to form polymers, effectively bonding the cellulose fiber together in fixed shapes. But DMDHEU does not form poly-

mers. Rather, each already complex DMDHEU molecule cross-links with several cellulose molecules and, upon curing, fixes them in a restorable shape.

24. It must be emphasized that the '432 patented process does not include the *manufacture* or *finishing* (*i. e.* impregnation) of this fabric. The *use* by the garment maker of the specific fabric defined in this subheading (2) constitutes the first step in the practice of the patented process. Koratron has acknowledged that its patented process "is practiced only when garments are made" and not by a textile mill in treating or sensitizing fabric (Pretrial Order, p. 42).

fabric having the following characteristics:

(a) impregnation, in the bolt form, with an aqueous solution containing a thermosetting resin (not limited to an urea formaldehyde-melamine formaldehyde resin), any appropriate catalyst, and suitable softeners and deodorants;

(b) deliberate avoidance of as much polymerization as possible during all stages of fabric impregnation and handling and at all times prior to the completion of garment manufacture;

(c) moisture content of the uncured fabric not limited to a fixed range, although the approximately 2%–8% range is suggested as a preferred methodology for avoiding polymerization; and

(d) composition not limited to any specific fiber or blend of fibers except that the fabric must be capable of absorbing and retaining an aqueous resin solution and that the fabric must contain a sufficient amount of cellulosic fibers so that cure will result in appreciable cross linking between these fibers and the resin polymers or molecules.

3. The patented process is unrestricted as to the style, size, design and type of garments which can be produced.

## IV. VALIDITY OF THE '432 PATENT

■■■ One of the focal points of this litigation is the validity of Koratron's '432 patent.[25] Adversaries vigorously argue that the process in issue here fails to meet the conditions for patentability set forth in 35 U.S.C. §§ 102, 103 and 112 and that Koratron's fraudulent prosecution of the patent application renders the patent invalid and unenforceable on nonstatutory grounds. Adversaries' statutory arguments are fourfold.[26] First, they contend that because the disputed process was anticipated in the numerous prior patents, published materials and processes cited by Adversaries, subsection (a) of Section 102 barred the issuance of a valid patent. Second, the commercial activities of Koratron (especially Pleetset) and of The Ideal Pleating Co. of New York which were carried on for more than one year prior to the '432 application date are said to constitute prior public use under § 102(b). Third, these same prior art references and commercial processes are claimed to render the '432 process obvious, and therefore nonpatentable, under the standards of § 103. Fourth, Adversaries contend that the patent is too indefinite to meet the requirements of § 112. Finally, Adversaries argue that Koratron's failure to disclose fully to the Patent Office these prior art references and Koratron's misrepresentations to the Patent Office constitute a fraud on the Patent Office and that such inequitable conduct renders the patent invalid and unenforceable.

■■ After careful consideration of all the relevant argument and testimony

25. It has been consistently held in this Circuit that the question of the validity of a patent is one of fact. Stauffer v. Slenderella Systems of California, 254 F.2d 127 (9 Cir. 1957), and the cases cited therein at p. 127 n. 1.

26. Traditionally the statutory conditions for patentability have been expressed in the three terms, " 'novelty, utility and nonobviousness' ". Reeves Instrument Corp. v. Beckman Instruments, Inc., 444 F.2d 263, 271 (9 Cir.), cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971); Jeddeloh Brothers Sweed Mills, Inc. v. Coe Manufacturing Co., 375 F.2d 85, 87 (9 Cir.), cert. denied, 389 U.S. 823, 88 S.Ct. 57, 19 L.Ed.2d 76 (1967). Novelty and utility are required by 35 U.S.C. § 101, and the standards for attaining novelty are set out in § 102. Obviousness is discussed in § 103.

Adversaries do not challenge the utility of the '432 patent. Their attack focuses on novelty, which the Court discusses below under the headings of "Anticipation–§ 102(a)" and "Prior Public Use–§ 102(b)," and on obviousness, considered below under a separate heading for § 103. The Pretrial Order indicates that at one time Adversaries asserted a fifth statutory ground for invalidity, prior invention by others under 35 U.S.C. § 102(g). The Court finds that because of the absence of argument and proposed findings as to this contention, Adversaries have abandoned it.

on this issue, the Court finds that the novelty of the '432 patent was not foreclosed by the prior art or by prior public use nor was the patent obvious in the light of the cited prior art. The Court also finds that the patent, as construed above, is not so indefinite that it cannot be enforced or practiced. In addition, while the prosecution of this patent application was not an exemplar of candor, the Court finds that Koratron's conduct did not amount to an intentional misrepresentation of material facts nor to dishonesty or bad faith, and therefore it does not constitute a fraud on the Patent Office. Thus the Court finds that the '432 patent is valid.

Before considering in detail each of Adversaries' asserted grounds for invalidity, it is necessary to determine what burden of proof rests upon those alleging that a patent is invalid. The issuance of a patent creates a presumption of validity and places the burden of establishing invalidity on the party asserting it. 35 U.S.C. § 282. There is much confusion, however, as to the degree of proof required to overcome this presumption. This confusion stems both from the variety of standards applied by the courts and from the generality of the language used to define such standards.[27] Standards expressed in such terms give more weight to the presumption of validity than is warranted either by the statute or the policy behind the presumption. § 282 provides that, once a patent has been issued, it is the alleged infringer who must plead and prove invalidity as a defense.[28] This section merely specifies the party who has the burden of persuasion; it does not dictate that the weight of this burden is any greater than the basic preponderance standard applicable in all civil suits. The statutory presumption is based on the expertise of the Patent Office. Neff Instrument Corporation v. Cohu Electronics, Inc., 298 F.2d 82, 86 (9 Cir. 1961). Due deference should be

---

27. The following standards have been invoked:

(1) The presumption can be overcome only by proof establishing invalidity beyond a reasonable doubt. Deering v. Winona Harvester Works, 155 U.S. 286, 301, 15 S.Ct. 118, 39 L.Ed. 153 (1894); The Barbed Wire Patent, 143 U.S. 275, 285, 12 S.Ct. 443, 36 L. Ed. 154 (1892); Cantrell v. Wallick, 117 U. S. 689, 695–696, 6 S.Ct. 970, 29 L.Ed. 1017 (1886); Bianchi v. Barili, 168 F.2d 793, 795 (9 Cir. 1948).

Koratron has stressed this standard in its argument on § 102(b). See Koratron's Memorandum on the Standard of Proof, filed May 26, 1972. This standard has been specifically rejected in this Circuit for cases involving a claim on invalidity based on prior public use, § 102(b). Tucker Aluminum Products, Inc. v. Grossman, 312 F.2d 293, 294 (9 Cir. 1963). See also Canadian Ingersoll-Rand Co. v Peterson Products of San Mateo, Inc., 223 F.Supp. 803, 815–816 (N.D.Cal.1963), aff'd in part and rev'd in part, 350 F.2d 18, 21–22 (9 Cir. 1965).

(2) Not only must "reasonable doubts * * * be resolved in favor of validity," the evidence of invalidity must be "clear and convincing." Moon v. Cabot Shops, Inc., 270 F.2d 539, 541 (9 Cir. 1959), cert. denied, 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546 (1960); Patterson-Ballagh Corp. v. Moss, 201 F.2d 403, 406 (9 Cir. 1953).

(3) The burden "is not satisfied by a mere preponderance of the evidence, but is borne successfully only if the evidence is clear and satisfactory—perhaps beyond a reasonable doubt." Whiteman v. Mathews, 216 F.2d 712, 716 (9 Cir. 1954).

(4) There must be "'substantial evidence,' which is 'clear and satisfactory'" although the proof need not be beyond a reasonable doubt. Tucker Aluminum Products, Inc. v. Grossman, supra, 312 F.2d at 294; Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corporation, 316 F.2d 459, 462 n. 7 (9 Cir.), cert. denied, 375 U.S. 902, 84 S.Ct. 191, 11 L.Ed.2d 143 (1963).

(5) The proof must be "clear and convincing," with no mention of reasonable doubt. Purer & Company v. Aktiebolaget Addo, 410 F.2d 871, 879 (9 Cir.), cert. denied, 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1969); Neff Instrument Corporation v. Cohu Electronics, Inc., 298 F.2d 82, 86 (9 Cir. 1961).

(6) The party alleging invalidity "bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance." Radio Corporation of America v. Radio Laboratories, Inc., 293 U.S. 1, 8, 54 S.Ct. 752, 755, 78 L.Ed. 1453 (1934).

28. "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." 35 U.S. C. § 282.

given to the expert determination of the patent examiner, and the patentee should be protected from the burden of establishing affirmatively the validity of his patent in every infringement action. A presumption which merely shifts the burden of persuasion to the party alleging invalidity clearly fulfills these limited objectives.

 Use of phrases such as "clear and convincing" or "clear and satisfactory" adds nothing but confusion to the application of this basic preponderance standard. These phrases imply that there is a murky middle ground of proof between preponderance and reasonable doubt, but there are in fact only these two levels of proof. Whichever standard is being applied, no court would pronounce judgment unless it was convinced and satisfied that the evidence clearly justified the decision. While proof beyond a reasonable doubt is required in criminal cases to overcome the presumption of innocence, there is no talismanic significance in the use of the word "presumption" which necessitates the application of the reasonable doubt burden in this civil case or which justifies the creation of some undefined intermediate burden of persuasion.

 Nor does the "clear and convincing" terminology prevent the Court from considering all forms of evidence. Oral testimony, even if it deals with events and circumstances long past, is not excluded as a matter of law. The same standard of probative value is to be applied in patent cases as is applied in any other kind of case, civil or criminal. Whiteman v. Mathews, 216 F.2d 712, 716 (9 Cir. 1954); Paraffine Companies v. McEverlast, Inc., 84 F.2d 335, 341 (9 Cir. 1936). See also Kiva Corporation v. Baker Oil Tools, Inc., 412 F.2d 546, 553 (5 Cir.), cert. denied, 396 U.S.

927, 90 S.Ct. 262, 24 L.Ed.2d 226 (1969). Nor is circumstantial evidence excluded in questions of validity. Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Reeves Instrument Corp. v. Beckman Instruments, Inc., 444 F.2d 263, 271–272 (9 Cir.), cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971). Use of such terminology, therefore, merely injects needless confusion into the well-accepted and understood usage of the preponderance burden. The purpose and the effect of the presumption of validity is simply to indicate which party bears the ultimate burden of persuasion; it does not nor was it intended to increase the quantum of proof required to meet the burden above the familiar preponderance of the evidence standard.[29] But see Hobbs v. United States, Atomic Energy Commission, 451 F.2d 849, 856 (5 Cir. 1971).

 This presumption of validity is, of course, largely dissipated if the most pertinent of the prior art references were not brought to the attention of the Patent Office. Cool-Fin Electronics Corporation v. International Electronic Research Corporation, 491 F.2d 660, 661 n. 2 (9 Cir. 1974); Westinghouse Electric Corp. v. Titanium Metals Corp. of America, 454 F.2d 515, 516 n. 2 (9 Cir. 1971), cert. denied, 407 U.S. 911, 92 S.Ct. 2439, 32 L.Ed.2d 685 (1972); Aerotec Industries of California v. Pacific Scientific Company, 381 F.2d 795, 803 (9 Cir. 1967), cert. denied, 389 U.S. 1049, 88 S.Ct. 788, 19 L.Ed.2d 843 (1968); Jaybee Mfg. Corp. v. Ajax Hardware Mfg. Corp., 287 F.2d 228, 229 (9 Cir. 1961). Adversaries contend that, in this case, the presumption has been dissipated by Koratron's failure to disclose all of the prior art references cited by Adversaries in this litigation.

29. The use of a preponderance standard was impliedly upheld in Ethicon, Inc. v. Handgards, Inc., 432 F.2d 438 (9 Cir. 1970), cert. denied, 402 U.S. 929, 91 S.Ct. 1525, 28 L. Ed.2d 863, rehearing denied, 403 U.S. 912, 91 S.Ct. 2204, 29 L.Ed.2d 690 (1971). The appellate court observed that "we have a case that could have been decided either way." Despite this equilibrium in the evidence, the appellate court affirmed the trial court's holding that there had been a prior public use and that, therefore, the patent was invalid under 35 U.S.C. § 102(b).

The Court in no way approves of Koratron's inadequate disclosure to the Patent Office. However, in light of this Court's findings that none of Adversaries' prior art references in fact invalidates the '432 patent, none of these references was pertinent enough to the issuance of the patent to nullify the presumption of validity. Moreover, the Court also finds, *infra,* that the Pleetset process, potentially the most pertinent reference and the one on which Adversaries have relied most heavily, was marginally disclosed to the Patent Office. Therefore, the presumption of validity remains in effect, and the burden of proving invalidity rests on Adversaries.

Before beginning the detailed consideration of the asserted grounds of invalidity, it would also be helpful to highlight briefly those three elements of the '432 process which the Court finds differentiate it from the prior art references. First, it is a process in which thermosetting resins, upon the application of sufficient heat, actually polymerize and cross-link with themselves and with the cellulose fibers. Second, the '432 patent teaches a true "post-cure" process in which the garment made from a resin-impregnated fabric is baked to cure the resins only after all of the garment-manufacturing, shaping, and pressing steps have been completed. Third, the '432 process is unlimited as to style, size, design and type of the finished, durable press garment.

### A. *Anticipation—§ 102(a)*

Adversaries' first attack on the validity of the '432 patent rests on 35 U.S.C. § 102(a).[30] As prior art, Adversaries have cited the following U. S. patents:[31] Heaton (No. 1,784,285, patented December 9, 1930); Vaala (No. 2,455,198, November 30, 1948); Benger (No. 2,365,931, December 26, 1944); Marsh (No. 2,739,908, March 27, 1956); Thomas (No. 2,829,072, April 1, 1958); Zinamon et al. (No. 2,769,584, November 6, 1956); and Brown (No. 2,817,468, December 24, 1957); and the following publications: page 1029 of the Matthews' book, *Textile Fibers* (6th ed., 1954); the John M. Roughan article, "The Pleating and Pleat Retention of Woven and Knitted Fabrics Containing Acrilan, Rayon, Nylon, Acetate and Other Fibers," in the September, 1954, edition of the *Papers of the American Association for Textile Technology, Inc.*; and Chapter 5, "Synthetic Fibers from Condensation Polymers" by W. W. Heckert, of the book, *Technology of Synthetic Fibers,* edited by Samuel B. McFarlane (1953).[32]

The proper test of "anticipation" under § 102(a) is well established in this Circuit:

" 'Anticipation is strictly a technical defense. Unless all of the same elements are found in exactly the same situation and united in the same way to perform the identical function in a prior pleaded patent, there is no anticipation.' Stauffer v. Slenderella Systems of California, 254 F.2d 127, 128 (9th Cir. 1957); National Lead Company v. Western Lead Products Company, 324 F.2d 539, 544 (9th Cir. 1963)." Kockum Industries, Inc. v. Salem Equipment, Inc., 467 F.2d 61, 63 n. 1, (9 Cir. 1972), cert. denied, 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed. 2d 68 (1973); Cool-Fin Electronics

---

30. 35 U.S.C. § 102 provides in relevant part: "A person shall be entitled to a patent unless—(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent * * *."

31. All of these references are set out in full in Adversaries' Exhibit A–925.

32. Adversaries also contend that the Pleetset process and the activities of Ideal Pleating Co. both "anticipated" the '432 patent and constituted a prior public use under § 102(b). However, since the Court finds, *infra,* that neither Pleetset nor the Ideal activities constituted prior public use of the '432 process under § 102(b), *a fortiori,* neither can be anticipatory under the stricter standards of identity required when applying § 102(a).

**32**

Corporation v. International Electronic Research Corporation, *supra*, 491 F.2d at 661–662; Ceramic Tilers Supply, Inc. v. Tile Council of America, Inc., 378 F.2d 283, 284–285 (9 Cir. 1967); Digital Sensors, Inc. v. Wems, Incorporated, 310 F.Supp. 678, 680 (C.D.Cal.1969); Schlumberger Limited v. Douglas Furniture of California, 275 F.Supp. 73, 75 (C.D.Cal. 1957).[33]

This statement of the § 102(a) standard clearly indicates that the focus of the section is on *individual* prior references. *See* Rawlings v. National Molasses Co., 328 F.Supp. 913, 918 (C.D.Cal.1971); Filon Plastics Corporation v. H. Koch & Sons, 243 F.Supp. 636, 644 (N.D.Cal. 1965). Although Adversaries have apparently abandoned a strict anticipation argument based on the references listed above in favor of an obviousness contention,[34] the Court feels that the better course here is to make specific findings on each reference as it relates to validity under § 102(a).

■ Adversaries' prior art references fall into three categories. The first group consists of the Heaton and Vaala patents. Both teach a method of waterproofing, especially for use in making raincoats, by means of coating —not impregnating—a substrate fabric either with rubber (Heaton) or a film-forming plastic (Vaala) and then heat-curing the coating material to make it waterproof. Neither patent involves impregnation or cross-linking between the coating and the fabric, and neither is aimed at crease resistance, retention, or durability after repeated washings. These two patents lack the critical thermosetting element of the '432 process, and their fundamental purpose in no way relates to the durable-press goals of '432. As such neither Heaton nor Vaala constitute an anticipation of the '432 patent.

■ The second group consists of the Benger patent and the Matthews, Roughan and Heckert publications. These are Adversaries' thermoplastic references. All involve non-cellulosic synthetic fibers which have thermoplastic qualities; that is, they can be given some degree of crease retention or resistance by the application of heat. However, such fibers tend to flow or "relax" when heat is reapplied. Such thermoplastic teachings do not anticipate the thermosetting elements of the '432 patent.[35] Moreover, the drawing

33. Although both subsections (a) and (b) of § 102 relate patentability to the existence of prior patents or descriptions in printed publications and although the cited cases do not refer specifically to subsection (a) when they enunciate the test for "anticipation," it is clear that the "technical" defense of "anticipation" by prior patented or published references is based principally on § 102(a). Frantz Manufacturing Co. v. Phenix Manufacturing Co., 457 F.2d 314, 318–319 (7 Cir. 1972); Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc., 436 F.2d 1180, 1182–1183 (7 Cir.), cert. dismissed, 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971). *But cf.* Walker v. General Motors Corporation, 362 F.2d 56, 58 (9 Cir. 1966). Subsection (b) focuses principally on the "public use" criterion for novelty, and, because it is directed primarily at prior use by the inventor, § 102(b) must have a less exacting standard of comparison than the strict identity required in the anticipation defense of § 102(a). See Dix-Seal Corporation v. New Haven Trap Rock Company, 236 F.Supp.

914, 917–919. (D.Conn.1964) and the discussion *infra* at pp. 33–35.

34. *In response to the Court's question on* Adversaries' precise position counsel indicated: "Well, anticipate is a word of art in patent law which means that * * * the invention has to fall within the four corners of a single reference. At least that is one reading of the cases * * *. And we don't contend that they [sic] entire invention of the '432 patent is incorporated in any one of those [*i. e.*, the references in A–925]. Our contention is, rather, that by combining the teachings of these arts, it is just a perfectly obvious evolution * * * *"" (R.T., p. 5697). This issue of obviousness is discussed below in the context of § 103.

35. In their opening trial brief Adversaries' also cited as a § 102(a) reference the process used by Koratron to manufacture its Tubinyl, Tub-pleets, and Nylura lines. In the Pretrial Order, on the other hand, this "Tubinyl" process was listed by Adversaries

which is part of the Benger patent indicates clearly that Benger and Matthews (which merely applies Benger's process to polyester) teach only the finishing of a flat fabric in a continuous length. Roughan and Heckert pertain to thermoplastic pleating in the bolt (Heckert) and in skirt-sized pieces (Roughan). Thus no reference in this second group anticipates the '432 concept of heat curing of thermosetting resins in a finished garment.

▇▇ The third group contains four thermosetting processes, but each lacks a key element of the '432 process. Both the Marsh and Thomas patents are essentially "pre-cure" methods in which the resin-impregnated fabric is cured in the flat form to impart crease resistance. Both patents tangentially mention the use of their process on a manufactured garment, but all of the examples in both patents mention only the treatment of flat fabric and neither patent fully develops the "post-cure" concept [36] defined in the '432 process. Moreover, in so far as they may teach cure of a completed garment, the Marsh and Thomas practice of applying the resin to the completed garment is clearly unlike the '432 method of making up a garment from already impregnated fabric and then curing the finished garment. Zinamon et al., and Brown, both of which were cited to the Patent Office, merely teach thermosetting pleats in running or bolt fabric in a "pre-cure" process

and have no relevance to the cure of a completed garment, especially one unlimited as to style, size, design and type. No single prior art reference contains the same elements found in the same situation and united in the same way to perform the identical function taught by the '432 process, and therefore, none of these references invalidates the '432 patent under § 102(a).

### B. *Public Use—§102(b)*

Adversaries next contend that the commercial activities of Koratron, especially the sale of skirts made by the "Pleetset process," [37] and of the Ideal Pleating Co. of New York constitute a prior public use of the '432 process thereby rendering the patent invalid under § 102(b).[38]

▇▇ Although it has been suggested that the opening language of § 103 impliedly sets a standard of precise or exact identity for the application of § 102(b), those courts which have squarely faced the application of § 102(b) have "uniformly rejected" such a "strict identity" test. Frantz Manufacturing Co. v. Phenix Manufacturing Co., 457 F.2d 314, 320–321 (7 Cir. 1972); Tri-Wall Containers, Inc. v. United States, 408 F. 2d 748, 751, 187 Ct.Cl. 326, cert. denied, 396 U.S. 828, 90 S.Ct. 78, 24 L.Ed.2d 79 (1969); Dix-Seal Corporation v. New Haven Trap Rock Company, 236 F.Supp. 914, 917–919 (D.Conn.1964).[39] *But see*

---

as an alleged prior public use. Since this process is solely a thermoplastic one, it in no way constitutes an anticipation of the thermosetting '432 process.

36. See n. 11, p. 17, *supra*.

37. Koratron vigorously argues that there is no "Pleetset process." Pleetset, it contends, is simply the tradename for a variety of goods made in various ways at various times. The evidence indicates, however, that a significant portion of these tradenamed goods was pleated skirts produced by means of the resin-impregnation and heat-curing process described more fully below. Thus the Court adopts the "Pleetset process" phraseology not only for convenience but also because such a designation is supported by the evidence.

38. "A person shall be entitled to a patent unless—* * *

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States" (35 U.S.C. § 102(b)).

39. By holding that an article can constitute a prior public use of the claimed invention where the differences between the two are not patentable, i. e., where they are mere variations obvious to one skilled in the art, the Ninth Circuit has also effectively rejected a "strict identity" standard for § 102(b). See Tool Research and Engineering Corp. v. Honcor Corp., 367 F.2d 449, 454 (9 Cir. 1966), cert. denied, 387 U.S. 919, 87 S.Ct.

Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 267 (2 Cir. 1967). The purpose of § 102(b) is to require an inventor to exercise diligence in applying for his patent and to prevent him from extending the period of his exclusive control of the invention either by means of applying for new patents on successive minor improvements, each arguably supporting a new patent claim, or by commercially exploiting his invention before his application for a patent. Frantz Manufacturing Co. v. Phenix Manufacturing Co., *supra*, 457 F.2d at 320; Pickering v. Holman, 459 F.2d 403, 406 (9 Cir. 1972); Tool Research and Engineering Corp. v. Honcor Corp., 367 F.2d 449, 454 (9 Cir. 1966), cert. denied, 387 U.S. 919, 87 S.Ct. 2032, 18 L.Ed.2d 972, rehearing denied, 389 U.S. 893, 88 S.Ct. 17, 19 L.Ed.2d 203 (1967); Kraus v. Emhart Corporation, 320 F.Supp. 60, 64 (N.D.Cal.1970). To require exact identity between the alleged prior use and the challenged patent would make § 102(b) a "paper defense, for then what is earlier put in use with minor changes later could be patented and that which the law intended the public to have would be considered an infringement." Dix-Seal Corporation v. New Haven Trap Rock Company, *supra*, 236 F.Supp. at 919. Moreover, where a process patent is involved, one sale of a product made by the process is sufficient to constitute a public use even though the process is not disclosed by the product. Pickering v. Holman, *supra*, 459 F.2d at 406; Tool Research and

Engineering Corp. v. Honcor Corp., *supra*, 367 F.2d at 453–454.

■■■■■ As under § 102(a), subsection (b) compares the patent with individual prior public uses, but in order to constitute a prior public use the standard is less exacting than that required by § 102(a). Under § 102(b) the two processes being compared either have to be " 'substantially the same' " or the advance made from one to the other must not amount to " 'invention' ". Dix-Seal Corporation v. New Haven Trap Rock Company, *supra*, 236 F.Supp. at 919. In this Circuit the "invention" concept has been emphasized in stating the test for comparing the alleged prior use to the patented article or process. Thus, "the invention should fall within 102(b) if the differences between the claimed thing and the sold or used thing are obvious to one skilled in the art. * * * [U]nless the improvements would be patentable, the inventor has used or disclosed his invention contrary to the purpose of Section 102(b)." Tool Research and Engineering Corp. v. Honcor Corp., *supra*, 367 F.2d at 454.[40] Therefore, if the very process patented or one substantially the same but not identical to it or one which differs only in ways obvious to persons skilled in the art is put into public, nonexperimental use more than one year before the application date for the patent, the patent is rendered invalid under § 102(b). Applying this standard, the Court finds that none of the alleged processes is substantially the same as the '432 process and that, in

2032, 18 L.Ed.2d 972, rehearing denied, 389 U.S. 893, 88 S.Ct. 17, 19 L.Ed.2d 203 (1967); Cataphote Corporation v. DeSoto Chemical Coatings, Inc., 356 F.2d 24, 27 (9 Cir.), cert. denied, 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966).

This conclusion is reinforced by the *Tool Research* court's observation that the holding in Stauffer v. Slenderella Systems of California, 254 F.2d 127 (9 Cir. 1957)—which set forth an exact identity standard—is not contrary to the statement of the standard in *Tool Research*. 367 F.2d at 453. Rather than being mere dictum, as the *Tool Research* court suggests, the language in *Stauffer* court was discussing "anticipa-

tion" which strictly speaking arises under § 102(a) while *Tool Research* dealt with prior public use under § 102(b). See footnote 33, *supra*.

40. This use of the "obviousness" concept in the statement of the standard applicable to § 102(b) should not blur the distinction between §§ 102(b) and 103. As indicated above, under § 102(b) the patented process or article is compared against each alleged prior use *individually* while under § 103 the question of the obviousness of the patent claim is determined with reference to the prior art as a whole. Worthington v. Southern New Jersey Newspapers, Inc., 323 F.Supp. 443, 458–459 (D.N.J.1970).

each case, the '432 process is more than a mere obvious advance over the alleged prior public use.

§ 102(b) does allow public use for a period of one year prior to the date of the patent application.[41] The parties here have vigorously contested the issue of the exact filing date for the '432 application. Koratron argues that the application date was December 27, 1955, the date the application was first received by the Patent Office (F.W., p. 12). However, the Patent Office informed the inventors that the application could not be given a filing date until a drawing was filed with it. The inventors were advised by the Patent Office that "[t]his incomplete application will have no standing before the Patent Office until it is completed by the filing of the [drawing]" and that the "filing date will be that on which such drawing is received" (F.W., p. 12).

35 U.S.C. § 111 states that a patent application must include a specification meeting the requirements of § 112 as to definiteness, a drawing as and when prescribed by § 113, and the applicant's oath as prescribed by § 115. § 113 specifies that "[w]hen the nature of the case admits, the applicant shall furnish a drawing." Whether the '432 application at issue "admit[ted]" of a drawing is a question solely within the discretion of the Patent Office. Adversaries introduced the Patent Office Manual of Patent Examining Procedure, regulations §§ 506, 608.02 and 608.-02(d), which were certified to be "in effect between April 1955 and June 1956" by S. W. Cochran, Patent Office Solicitor (Exhibit A–1057), and which conferred such discretion. Koratron argues that patent office procedures sometimes

in fact departed from these written regulations, and that written changes evincing such departures often did not appear until sometime after the actual procedures had been changed due, in part, to publication delays. Upon this shaky and imprecise foundation, Koratron urges that written changes in the regulations after 1956 (appearing in the revision to § 608.02 of 3 June, 1957), purportedly exempting certain applicants from filing drawings, mirrored similar filing practices in effect by oral direction of the Patent Office in 1955 and 1956.

However, Koratron's expert witness, Harold B. Whitmore, former Superintendent of the Patent Office's Examining Corps, testified, "I don't know when the oral direction was actually given" (R.T., p. 1381). There was no other evidence of when such an oral departure from the written rules, if any, might have occurred. Under these circumstances, Koratron has failed to adduce sufficient evidence to overcome the official certification that the written regulations regarding drawing requirements were in effect at the time the requirement for a drawing was made.

Without seeking any review within the Patent Office, patent counsel for the inventors then inquired as to the nature of the drawing which the Patent Office required, stating in a letter of January 17, 1956: "Applicants are willing to abide by any decision reached by the Examiner as to illustrated drawings. They only desire clarification as to what should be illustrated and in what detail" (F.W., p. 14). After being advised by the Patent Office as to the type of drawing required, such a drawing was received on February 20, 1956 (F.W., p. 16), and that date was given to the ap-

---

41. The section, as construed, also allows for "experimental" use of the invention without regard to the one year limit. Smith and Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 257, 8 S.Ct. 122, 31 L.Ed. 141 (1887); Robbins Company v. Lawrence Manufacturing Company, 482 F.2d 426, 430 (9 Cir. 1973); Pickering v. Holman, *supra*, 459 F.2d at 406; Cataphote Corporation v. DeSoto

Chemical Coatings, Inc., *supra*, 356 F.2d 24, 25–26; and Paraffine Companies v. McEverlast, Inc., *supra*, 84 F.2d at 340. By contesting the alleged identity or similarity of '432 and Pleetset, however, Koratron has not, nor could it, argue that Pleetset was merely an experimental use of the patented process.

plication (F.W., p. 1). No question was raised about this filing date until February 22, 1971,[42] over fifteen years after the filing date given the application by the Patent Office and over three years after this litigation had commenced. Koratron first challenged the filing date of February 20, 1956, in 1971 in an effort to defeat claims of prior art and prior public use.

 In light of the record in this case, the application date issue is not as significant as the parties believe. The processes alleged by Adversaries to constitute public use are sufficiently dissimilar that no matter when they were conceived or practiced, they could not have constituted invalidating prior public use. Thus, the exact application date is not pivotal. However, the Court finds that the '432 patent application bears the date February 20, 1956.[43] This is the date relied upon by patent counsel when examining the file wrapper. It is the date to which Koratron did not object for over fifteen years, and it is the date which the inventors failed to challenge by use of the administrative and judicial procedures [44] available to contest the Patent Office decision that the application needed a drawing for completion.

Adversaries' main challenge to the '432 patent under § 102(b) relies on the process used by Koratron to produce Pleetset pleated skirts, i. e., the "Pleetset process." [45] Sometime in 1954 William K. Warnock became interested in developing a cotton pleated skirt which would have permanent press characteristics. He worked with Frank G. Hubener of Ace Dye Works on a process which utilized resin-impregnated fabrics. Most of the technical information about this process apparently was disclosed to Hubener in a letter from a representative of du Pont. This process was used to produce what Koratron called its Pleetset line of goods. Essentially, the process commenced with moist resin-impregnated fabrics, obtained from Ace Dye Works, which were then cut into skirt-sized pieces. In some instances the pieces were then hemmed by sewing. The skirt-sized pieces were pleated and then baked in an oven or a heat box to cure the resin. Specific garment making operations were then performed after the pieces had been pleated and cured. Such operations included shaping the skirt panel by running a stay stitch across the top to fix the size of the waist, manufacture of the waistband, attachment of a lining to the waistband and the waistband to the skirt panel, top stitching of the waistband, insertion of the zipper, and installation of a fastener at the top of the waistband.

By December, 1954, Koratron was in commercial production of Pleetset skirts. It appears from the records of Koratron that the sale of Pleetset skirts to the public commenced on December 27, 1954. Were Koratron to have followed its general practice, the business decision to commence commercial production would have been made approximately one month before the selling date of December 27, 1954. Production of the garments would then follow with the sales-

---

42. See Koratron memorandum, dated February 22, 1971, in opposition to Adversaries' motion for partial summary judgment.

43. February 20, 1956, was also assumed to be the correct filing date by Judge Doyle in his Memorandum Opinion on summary judgment, Jack Winter, Inc. v. Koratron Company, 327 F.Supp. 206, 207 (N.D.Cal.1971).

44. 35 U.S.C. § 141 et seq., and see current 37 C.F.R. §§ 1.181 et seq., §§ 1.191 et seq., and §§ 1.301 et seq. Koratron's patent office expert Whitmore testified that several administrative avenues existed for challenging an application date when the '432 patent

drawing requirement was made in 1956 (R. T., pp. 1552–1556).

45. In the Pretrial Order Adversaries also cite as a prior public use the process used to make Koratron's Tubinyl garments. These garments, however, were made by means of a conventional thermoplastic process in which garment sections made of non-resinated synthetic fabric were pleated, rolled in bundles and heated before the final steps of garment manufacture. Such a thermoplastic process in no way constitutes a prior public use of the '432 process.

men being sold samples approximately 4 to 7 days before December 27, 1954. Its salesmen displayed the sample garments to customers to obtain orders. If that practice were followed in the case of Pleetset garments, and there was no evidence that it was not followed, then the salesmen would have been sold Pleetset garments prior to December 27, 1954.

The "on sale" provision of § 102(b) does not require an accomplished sale; it can be satisfied by an offer for sale—even to a single customer before commercial production has begun and even though no actual sale is ever accomplished, Chromalloy American Corp. v. Alloy Surfaces Co., 339 F.Supp. 859, 869 (D.Del.1972)—or by other " 'activity by the inventor or his company in attempting to sell the patented idea' ", Robbins Company v. Lawrence Manufacturing Company, 482 F.2d 426, 431 (9 Cir. 1973); Amphenol Corporation v. General Time Corporation, 397 F.2d 431, 433 (7 Cir. 1968); Tucker Aluminum Products, Inc. v. Grossman, 312 F.2d 293 (9 Cir. 1963); and Kraus v. Emhart Corporation, supra, 320 F.Supp. at 63. In each of these cases, however, the inventor's "activity * * * in attempting to sell" involved dealings with the actual trade customers for his product rather than with intermediaries in the patentee's own distribution system. It has been said that sales of commercial samples to the patentee's sales broker, in the absence of actual sales to the trade, do not constitute "sales" within the terms of the statute. Baker-Cammack Hosiery Mills v. Davis Co., 181 F.2d 550, 558 (4 Cir.), cert. denied, 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605 (1950). Similarly, it has been held that the shipment of the patented article from one corporate division to another does not constitute a "sale" within § 102(b). Union Carbide Corp. v. Filtrol Corp., 170 U.S. P.Q. 482, 521 (C.D.Cal.1971).

The record does not indicate that Koratron's salesmen displayed the samples or made any offers for sale prior to December 27, 1954, and since the sales of samples to the salesmen do not constitute statutory sales, the Court finds that Pleetset was "on sale" as of December 27, 1954, slightly less than fourteen months before the February 20, 1956, application date of the '432 patent.

By February 18, 1955, Koratron had taken orders for more than $137,500 worth of Pleetset skirts and by January 1, 1960, Pleetset sales totaled over $1,800,000.00. Pleetset was a very successful marketing program for Koratron.

Adversaries pointed out, and Koratron concurred, that there was no substantial difference in appearance or performance between pleated sections of pleated skirts made in accordance with the Pleetset process and those skirts made in accordance with Koratron's '432 patent. Pleetset garments were advertised by Koratron to be "permanently pleated," "press-free", and machine washable and machine dryable, which claims were also made with respect to garments manufactured by the '432 process.

Adversaries place great emphasis on these similarities, but their argument misses the mark. The ultimate question in this case is not whether the '432 process is the *only* method of producing permanent pleats or durable press garments; the focus of this aspect of the litigation is on the specific *elements* of the '432 process as compared to each individual prior reference and process. The fact that '432 and Pleetset may produce similar results in pleated garments does not justify a conclusion that the specific steps of the two processes are "substantially the same" or that the differences between these processes are "obvious." Moreover, even if one were to accept this product comparison argument, Adversaries have not demonstrated that Pleetset was capable of producing desirable results in a broad range of garments unlimited in style or design. The Court has found this breadth of application to be one of the hallmarks of '432, and therefore Ad-

versaries' product comparison approach is unpersuasive.[46]

Adversaries had moved in the consolidated pretrial proceedings for summary judgment of the invalidity of the '432 patent on the ground that the '432 process and the Pleetset process were not substantially different and that products manufactured by the Pleetset process had been "in public use or on sale in this country more than one year prior to the filing date of the application" for the '432 process (February 20, 1956). The motion for summary judgment was denied. While the Court noted that there was a vast amount of testimony and evidence pertaining to both the use of Pleetset and the similarity of the two processes, it concluded that there were remaining questions which ought to be tried. The Court specifically stated that an important element at the trial "would be presentation of expert patent testimony as to the significance in fact and in law of the similarities on the one hand or, on the other, differences between Pleetset and the patent process in the light of the history and background of the developments of this kind of fabric treating." Jack Winter, Inc. v. Koratron Company, 327 F.Supp. 206, 209 (N.D.Cal.1971).

Following the Court's suggestion, Koratron offered at trial the testimony of three experts on this subject: Jacob Solinger, a management consultant to the apparel and textile industries with over 40 years of experience; Mahlan R. Saibel, Vice President of Industrial Products Division of Singer Sewing Company and formerly the director of Textile Information Service of Kurt Salmon Associates, consultants to garment manufacturers; and Julius B. Goldberg, a chemical engineer and consultant to the textile and allied industries with over 40 years of experience. Collectively, these men had over one hundred years of experience in the area of garment manufacturing and the textile

and allied industries. Each testified that the '432 process was not obvious in light of the Pleetset process (Goldberg, R.T., pp. 6258–6259; Solinger, p. 6812; and Saibel, p. 6897). Ignoring the Court's suggestion as to the type of testimony which would be valuable on the issue of the similarity of Pleetset and the '432 process, Adversaries inexplicably failed to question their expert, Dr. Weaver, on this issue.

Based on all the evidence, the Court finds that the Pleetset process is different from the process claimed and described in the patent in two significant particulars. First, Pleetset is clearly limited to the treatment and cure of what might be described as yard goods, albeit in skirt-sized pieces, for use in a skirt; it does not comprehend the curing of a completed garment. Second, it is not suitable for the manufacture of garments unlimited as to style, size, design and type. Therefore, Pleetset and the '432 process are not substantially the same nor are their differences merely "obvious" changes. As a result, Pleetset does not constitute a prior public use of the '432 patent.

Adversaries also contend that, even if the Pleetset process is not similar to that claimed by the '432 patent, the process practiced by the Ideal Pleating Company ("Ideal") constituted a prior public use of the '432 process. Ideal, located in New York City, was probably the largest pleating company in the United States during the period in question. Its business was and is essentially pleating fabrics for garment makers.

Prior to 1950 Ideal pleated nylon fabrics which were used in the manufacture of washable pleated garments. In approximately 1952 Ideal began to investigate the possibility of making permanently pleated cotton garments or sections of garments. Ideal's plant foreman, Sam Eisner, was the person responsible for Ideal's efforts. Ideal contacted a representative of Monsanto

---

**46.** This same error appears in Adversaries' argument based on the "simulated garments" made by Dr. Weaver according to the suggestion in the Marsh and Thomas Patents of impregnation at the finished garment stage.

Chemical Company who worked with Eisner to develop a process for imparting permanent pleats to cotton fabric. By the summer of 1954 Ideal had experimentally impregnated cotton fabrics with resin and catalysts similar to those used by Koratron, dried the fabric to a moist condition, assembled the fabric into either pleated skirts, as Adversaries contend, or pleated sections, as Koratron contends, and baked the garments or garment sections in an oven at Lydon Brothers in Hackensack, New Jersey. Whether completed garments were baked was fiercely contested at trial. Ideal produced some pleated aprons which were given to salesmen for demonstration purposes and to certain other persons. In the summer of 1954 Ideal ordered an oven from Lydon Brothers which was delivered in the latter part of August, 1954. Thereafter, the oven was used to cure pleated fabrics which were sold commercially commencing in September, 1954. The initial oven installation was inadequate for large-scale production, and additional heating elements were installed sometime in or about March, 1955. Ideal continued to use resin-impregnated cotton fabrics to make permanent pleats until the spring of 1956, when it discontinued this process and the use of the oven.

Neither Ideal, Eisner, nor anyone else applied for a patent on the basis of Ideal's activities. There was some evidence that Ideal may have expressed an interest to Koratron in the '432 process. However, it did not take out a license nor did it ever cure resin-impregnated fabrics after 1956.

The crucial issue is whether Ideal manufactured and sold pleated garments during the fall of 1954, as Adversaries contend, or merely pleated fabric panels for later use by others in making garments, as Koratron argues. If the latter, the Ideal process was essentially the same as the Pleetset process. If the former, the Ideal activities could be said to constitute a prior public use of the process disclosed and claimed in the '432 patent.

Adversaries' claim ultimately comes to rest solely on the unsupported testimony of Eisner. Although relatively uneducated (eighth grade and one year of night school), Eisner regularly lectured on the subject of pleating at the Fashion Institute of Technology in New York City, which offers a bachelor's degree to its graduates. His integrity and devotion to his employers is unquestioned. He commenced employment at the age of 12½, and during one period slept at the plant in order to avoid detection by the authorities for working unlawfully long hours. While Koratron raised a question as to his age and health and the possible effects they may have on his memory, it is not for this reason that the Court finds that his testimony simply does not support Adversaries' contention. Eisner withstood vigorous cross-examination and was dogged in his insistence that Ideal baked and sold completed garments during the crucial time period. However, the Court finds that such an assertion is not supported by a preponderance of the evidence.

Preliminarily, the unsupported testimony of any witness which purports to fix precisely an event within a short and critical span of time eighteen years earlier is to be viewed with caution,[47] particularly where, as here,

47. The Barbed Wire Patent, 143 U.S. 275, 284–285, 12 S.Ct. 443, 36 L.Ed. 154 (1892); Kiva Corp. v. Baker Oil Tools, Inc., *supra*, 412 F.2d 546, 551–552 (5 Cir. 1969); Zachos v. Sherwin-Williams Co., 177 F.2d 762, 763 (5 Cir. 1949) (stating the Fifth Circuit rule that "as a practical matter, * * * oral testimony alone, unsupported by writings, has not been and will not be accepted as sufficient"); A. J. Industries, Inc. v. Dayton Steel Foundry Co., 394 F.2d 357, 361 (6 Cir. 1968) ("oral testimony alone, unsupported by any contemporaneous documents, is not the best type of evidence to show anticipation by a prior art device * * * [but its use] is not necessarily fatal to defendant's case"). See also Jones Knitting Corporation v. Morgan, 361 F.2d 451, 455–456 (3 Cir. 1966). Unlike the Fifth Circuit, the rule in this Circuit is that such oral evidence is not insufficient *as a matter of law* in all cases. Whiteman v.

the outcome of this trial may depend in large part upon its accuracy. Eisner made equally positive assertions concerning other dates which were shown to have been in error; thus even greater caution is demanded before crediting his testimony. For example, Eisner was positive that the additional heating elements had been installed and utilized by November of 1954. The documentary evidence established, and the Court finds, that these heating elements were not even shipped to Ideal until the end of March, 1955. Similarly, Eisner was in error by over a year as to the date on which he first met a representative of Monsanto to discuss the possible manufacture of resin-impregnated fabrics. There were also other discrepancies in Eisner's testimony and inconsistencies between his testimony and that of others which discredited his testimony. These discrepancies, especially his errors in placing specific events, have a significant effect on the Court's consideration of Eisner's testimony as to the commercial production of the item in question.

However, the most incredible part of Eisner's testimony was that Ideal baked and sold *completed* garments prior to December 27, 1954. Viewing the evidence as a whole, the Court finds that only garment sections, not completed garments, were made in the oven at Ideal during the critical period.[48] Ideal was a contract pleater and not a garment-making house. It lacked both the know-how and the equipment to make complete garments of quality. Eisner testified that Ideal did not even have facilities for placing zippers in skirts until

sometime in 1956. He also testified that during the critical period Ideal did not resinate a stiffener inside the belts and waistbands of the garments. The only customers to which Eisner could recall making sales of completed garments were House of Jameson and Haymaker Sports Division of David Crystal. Both customers were high-quality houses selling expensive garments. The testimony of Robert Bodzin, the production manager of Haymaker Sports in 1954 and 1955, is inconsistent with that of Eisner. Bodzin testified that Haymaker purchased only garment sections from Ideal (R.T., pp. 5254, 5258, 5261). There were no records of sales of completed garments by Ideal, and Eisner disclaimed any duties or responsibilities with respect to management, records or sales. The absence of any testimony of others at Ideal who had such responsibilities or controlled such documents is significant.

The Court does not credit Eisner's testimony that he was able to identify a particular apron as an experimental apron which he fully constructed, with the waistband attached, before it was cured in the oven. No foundation had been laid as to the custody of the apron during the period from its purported manufacture in 1954 to date. Eisner's testimony was based solely upon its appearance. The Court finds that no such conclusion could be drawn fairly from the appearance of the apron. The Court also does not credit Eisner's testimony concerning the manner in which the completed garments were purportedly manufactured by Ideal or the quantity

Mathews, 216 F.2d 712, 716 (9 Cir. 1954). As suggested by *A. J. Industries* and *Jones Knitting, supra*, however, the Court should subject such testimony to close scrutiny.

48. While there is evidence that Ideal did make and distribute aprons to its salesmen and others prior to December 27, 1954, the Court finds that these aprons were not garments as that term is used generally and as used specifically in the '432 patent. *Webster's Third New International Dictionary* (1971 ed.) defines a garment to be an article of outer clothing such as a coat or dress,

exclusive of accessories. An apron is simply not an article of clothing, as that term is ordinarily used. It is a flat fabric and, even if pleated, is nothing more than pleated fabric. The garment shown in the drawing filed with the '432 patent application is 3-dimensional and not 2-dimensional as is an apron. Moreover, the aprons in question were not baked in the oven nor sold to the public. They were used solely for demonstration purposes and were made during the experimental stages of the development of the Ideal process.

which he claims to have made. He testified that, with respect to the completed garments, he alone did all of the work with the oven. The Court relies upon the testimony of Koratron's expert, Solinger, that the manner and schedule of operations described by Eisner were not physically possible as applied to the quantity of completed garments claimed (R.T., pp. 6770–6775).

■ In summary, all of the evidence with respect to Ideal establishes that the work done at Ideal Pleating prior to the '432 patent invention was merely the curing of completed fabric panels for later use by others in making garments. The curing of pleated fabric panels was the same as the so-called Pleetset process and did not in any way amount to a prior public use of the process of curing completed garments to obtain permanent press characteristics as disclosed and claimed in the '432 patent. Under these circumstances it is not necessary to discuss Koratron's claims that the Ideal process was practiced in secrecy and later abandoned. Nor is it necessary to consider Koratron's claim that, if Ideal were found to have cured completed garments, such use was merely "experimental" and therefore would not defeat the subsequent '432 patent. Accordingly, Adversaries' claim of invalidity based on § 102(b) fails.

## C. Obviousness—§ 103

Adversaries' third statutory argument is that under § 103 the '432 patented process was obvious to one skilled in the art.[49] The group of patents and publications (Exhibit A–925) discussed above

and the commercial processes of Ideal Pleating and Koratron, especially Pleetset and Tubinyl, are cited by Adversaries as indicating a level of skill in the fabric production, finishing and garment making art [50] which made the '432 process merely an obvious evolution.

■ For a century prior to the enactment of § 103 in 1952, the courts had tested patents not only against the specific provisions of the Patent Act but also against an "invention" test first enunciated in Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1850), in which a patent was invalidated because "the improvement [was] the work of the skilful mechanic, not that of the inventor." 52 U.S. at 266. The patent in *Hotchkiss* involved a mere substitution of materials in the manufacture of doorknobs. The judiciary soon learned, however, that applying this test was a verbal and conceptual nightmare. The wording of the test instructed only that an "invention" was patentable if it constituted an "invention." This circularity was further confused by the Supreme Court's observation that "the word [invention] cannot be defined in such a manner as to afford any substantial aid in determining whether a particular device involves an exercise of the inventive faculty or not." McClain v. Ortmayer, 141 U.S. 419, 427, 12 S.Ct. 76, 78, 35 L.Ed. 800 (1891). As a result the courts and commentators searched for other ways to put meaningful content into the "invention" concept, using such phrases as an '"inventive act", 2 Deller's Walker on Patents (2d ed., 1964) § 103, p. 5; a "flash of creative genius", Cuno Corp. v. Automatic De-

---

49. 35 U.S.C. § 103 provides: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

50. Koratron urges that the relevant "art" be limited to the garment making trade, citing the separation of the fabric and garment making industries. Adversaries have demonstrated, however, that garment makers, including Koratron, often sought technical advice from chemical companies such as Sun Chemical, du Pont and Monsanto and from finishers like Ace Dye Works. The Court finds that a more accurate assessment of the relevant level of skill requires that the "art" must include fabric production and finishing as well as garment making.

vices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58 (1941); or "unusual or surprising consequences", A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950). Particularly close scrutiny was required in considering so-called "combination" patents which had to meet a "rather severe test" in which the whole in some way had to exceed the sum of its parts to constitute a patentable "invention." A. & P. Tea Co. v. Supermarket Corp., supra, 340 U.S. at 152, 71 S.Ct. 127.[51]

Responding to this confusion, Congress enacted § 103. While the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), held that this section was a mere codification of the judicial precedents interpreting Hotchkiss, the Court clearly indicated that this codification was not of the "invention" label but rather of the essence of the Hotchkiss formulation which is its "functional approach to questions of patentability * * *, [i. e.] a comparison between the subject matter of the patent, or patent application, and the background skill of the calling." 383 U.S. at 12, 86 S.Ct. at 691. To highlight this change of emphasis Congress specified " 'nonobviousness' as the operative test of the section, rather than the less definite 'invention' language of Hotchkiss * * *." 383 U.S. at 14, 86 S.Ct. at 692.

■ The section itself spells out the criteria to be used in determining obviousness so that "the crucial question in determining obviousness is whether the differences between the subject matter sought to be patented, as a whole, and the prior art are obvious to a man of ordinary skill in the art." Reeves Instrument Corp. v. Beckman Instruments, Inc., 444 F.2d 263, 271 (9 Cir.) cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L. Ed.2d 268 (1971). This emphasis on

viewing the subject matter "as a whole" is an indication of a Congressional desire to move away from the severe treatment of "combination" patents required by the A. & P. case and as a realization of the logical problem inherent in such a strict test of patentability, namely, that most "inventions" involve the construction of some new device or process from old elements. Reeves Instrument Corp. v. Beckman Instruments, Inc., supra, 444 F.2d at 270. Despite the introduction of the new phrase "synergistic result" in Anderson's Black Rock v. Pavement Co., 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), that decision merely reaffirms the interpretation of § 103 set out in Graham v. John Deere Co., supra. See Reeves Instrument Corp. v. Beckman Instruments, Inc., supra, 444 F.2d at 271; Application of Fielder, 471 F.2d 640, 645 (C.C.P.A.1973).

■ The approach to be used by federal courts in answering this crucial question has been definitively set forth in this statement:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be determined; and the level of ordinary skill in the pertinent art resolved. Against. this background, the obviousness or nonobviousness of the subject matter is determined." Graham v. John Deere Co., supra, 383 U.S. at 17, 86 S.Ct. at 694; Walker v. General Motors Corporation, 362 F.2d 56, 59 (9 Cir. 1966).

The relevant level of ordinary skill is that prevailing at the time the invention was made. Neff Instrument Corporation v. Cohu Electronics, Inc., supra, 298 F.2d at 87; Union Carbide Corp. v. Filtrol Corp., supra, 170 U.S.P.Q. at 519.

■ The prior art relied on by Adversaries was described in detail in the two preceding subsections on anticipa-

---

51. This Court concludes that § 103, as interpreted in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), has supplanted the A. & P. doctrine of stricter scrutiny for "combination" patents.

See pp. 42–43, infra. Even if this more severe standard were applied to the '432 patent, however, the Court would find this patent nonobvious and, therefore, valid.

tion and public use. Those subsections also indicated the key advance made by '432 over these prior art references, namely, the use of fabrics, impregnated with a thermosetting resin, to manufacture garments, but deliberately avoiding polymerization of these resins until the garment was completed and then oven-cured. The use of expert testimony about the significance of the similarities and differences between the patent and the prior art is of acknowledged value in determining the level of ordinary skill in the art. Northrup Architectural Sys. v. Lupton Mfg. Co., 437 F.2d 889, 891 (9 Cir. 1971); Malsbary Manufacturing Co. v. ALD, Incorporated, 447 F.2d 809, 811 (7 Cir. 1971).

All three of Koratron's experts[52] testified specifically that the '432 process would not have been obvious to skilled textile and garment technicians familiar with all of the prior art references cited in Adversaries' Exhibit A–925 (R.T., Goldberg, pp. 6257–60; Solinger, pp. 6811–12; Saibel, pp. 6868, 6897). It was pointed out by Goldberg, for example, that the basic thermoplastic reference, the Benger patent, cautions against the use of ovens and long exposure of the fabric to heat, thus pointing away from the essence of the '432 process (R.T., pp. 6239–47). Similarly, these experts considered the Marsh patent's garment-dipping process impractical, despite its brief development by Williamson-Dickey Co., and both Gold-

berg and Solinger testified that the post-manufacture impregnation concept actually pointed away from '432 (R.T., Goldberg, pp. 6251–52; Solinger, pp. 6781–86; Saibel, pp. 6891–94).[53] Each of Koratron's experts also testified that the '432 process would not have been obvious to one familiar with Pleetset (R. T., Goldberg, pp. 6258–59; Solinger, p. 6812; Saibel, p. 6897). Adversaries inexplicably failed to question their expert, Dr. Weaver, about his opinion of the specific relevance of Pleetset to the obviousness of '432.

■ Beyond the use of such expert testimony it is difficult to establish any meaningful qualitative evaluation of the level of skill in the art. The Supreme Court has noted, however, that "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." Graham v. John Deere Co., supra, 383 U.S. at 17–18, 86 S.Ct. at 694. Such factors have been found to be helpful in Cool-Fin Electronics Corporation v. International Electronic Research Corporation, supra, 491 F.2d p. 663; Reeves Instrument Corp. v. Beckman Instruments, Inc., supra, 444 F.2d at 271–273; Jones Knitting Corporation v. Morgan, 361 F.2d 451, 458 (3 Cir. 1966) and cases cited therein; and Maschinenfabrik Rieter A. G. v. Greenwood Mills, 340 F.Supp. 1103,

---

52. Their qualifications are described at p. 38, supra.

53. It is instructive to note there that Dr. John T. Marsh, the inventor of this particular patent and the very originator of resin setting, observed in a 1968 article that:

"The final condensation [i. e., polymerization or cure] in garment form as opposed to fabric form, may be described as an obvious step, but why did not one think of it before?" Textile Manufacturer, July, 1968 (Exhibit K–3455).

The court in Reeves Instrument Corp. v. Beckman Instruments, Inc., supra, 444 F.2d at 273, found this same kind of expert reaction to be noteworthy in reaching the conclusion that the patent in dispute there was nonobvious.

Further, the Court notes Adversaries' emphasis on the commercial usage of the Williamson-Dickey process as well as Dr. Weaver's simulated garments made according to the Marsh patents. Even if the Court ignored the abandonment of the Williamson-Dickey process by Levi Strauss and the questionable relevance of simulated garments made under laboratory conditions, the Court finds that Adversaries' product-comparison argument misses the point just as it did in their analysis of Pleetset. See p. 37, supra. The fact that another process may produce durable press garments does not indictate that the specific elements of that process make those of '432 obvious, especially when that other process actually points away from the '432 method of post-cure.

1115 (D.S.C.1972). Moreover, Associate Judge Giles S. Rich of the Court of Customs and Patent Appeals has observed that the Supreme Court's use in the *Graham* opinion of the word "secondary" was unfortunate since these factors are in fact *"circumstantial evidence of the highest probative value."* [54] The position of the Court of Customs and Patent Appeals is "that such evidence must *always* be considered in connection with the determination of obviousness." Application of Fielder, *supra*, 471 F.2d at 644 (emphasis in the original).

Koratron urges that the commercial success of the '432 process—over twenty million dollars in license revenues through June, 1971—is clear evidence of nonobviousness. While the Court does find that the '432 process is nonobvious, its commercial success may not be entirely the result of the nonobviousness of the process. The '432 process was not an instant success. It did not take hold in the garment industry until nine years after it was first used commercially by Koratron and then only after a substantial investment (over one million dollars) in further development by Levi Strauss, including significant changes in resins and fabric blends carried out in conjunction with Sun Chemical and Graniteville Mills, and a costly "hard sell" promotional campaign by Levi Strauss.

▆▆▆▆ "Energetic promotion may make successful a product that has lingered in commercial limbo for years. The needs and attitudes of potential buyers often change, so that a product which did not meet with great demand in one year—or decade—may be eagerly sought by customers in another." Dymo Industries, Inc. v. Com-Tech, Inc., 391 F.2d 335, 345 (9 Cir. 1968). These activities of Levi Strauss clearly limit the probative value of '432's commercial success, and for this reason alone the Court declines to consider that success as sufficient circumstantial evidence of nonobviousness. On the other hand, the evidence indicates a genuine "long felt but unsolved" need for acceptable durable press garments; the very number of references cited by Adversaries demonstrates that the industry was expending considerable effort in the attempt to discover a workable and marketable process. The '432 process was the first of these methods to meet this need. Even without considering the commercial success of the process, this fact corroborates the conclusions of the experts called by Koratron that the '432 process was nonobvious.

▆▆▆▆ In short, this Court finds that the differences between Koratron's '432 process and the pertinent prior art are so significant that the '432 process was not obvious to persons of ordinary skill in the art at the time of its invention by Warnock and Hubener. Therefore the '432 patent is not invalid under § 103.

### D. *Indefiniteness—§ 112*

Section 112 of Title 35 requires that the invention claimed by the patent be described "in such full, clear, concise and exact terms as to enable any person skilled in the art * * * to make and use the same * * * ." The objectives of § 112 are twofold:

"* * * first, that in return for the grant of a patent monopoly the patentee must make sufficient disclosure to enable one skilled in the art to reconstruct the invention; and, second, that the patentee describe his invention with sufficient definiteness to ernable others to discern the boundaries beyond which experimentation and invention are undertaken at the risk of infringement. United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232 (1942); General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 (1937)."

---

54. Remarks of Associate Judge Giles S. Rich before the Patent Law Associations of Los Angeles and San Francisco, September 18 and 20, 1972 (pp. 16–17) (emphasis in the original).

Norton Company v. Bendix Corporation, 449 F.2d 553, 555 (2 Cir. 1971); Jones Knitting Corporation v. Morgan, *supra*, 361 F.2d at 453–454.

If the '432 patent taught merely that there must be "sufficient uncured resins" retained in the fabric to give the desired permanent press characteristics after completion of the garment, then the patent would be invalid for indefiniteness. The only test as to whether the process was used would be the actual performance characteristics of the completed garment.

The indefiniteness of "sufficient uncured resins" was amply demonstrated at trial. Warnock, one of the co-inventors of the '432 process, testified that he did not know what constituted a "sufficient" amount of uncured resins; he had never conducted any tests to determine what would constitute a sufficient amount, nor did he know whether anyone at Koratron ever did. Koratron did conduct laboratory tests at Products Development Laboratory to determine the percentage of resin fixation or polymerization prior to baking. These tests showed that satisfactory permanent press garments can be produced when resin fixation or pre-cure is in the range between 14.9 per cent to 81.5 per cent. In some cases resin fixation in the range of 50 to 60 per cent produced satisfactory results; other times it did not. The results of these tests conducted at the request of Koratron clearly show that there is no guide as to what constitutes "sufficient" unpolymerized resin. Were this to be the scope of the claim '432 would be invalid for indefiniteness.

In United Carbon Co. v. Binney Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232 (1942), the Court held a patent invalid for indefiniteness because the term "substantially pure carbon black" was used to define the product made by the patented process. Similarly, in Norton Company v. Bendix Corporation, *supra*, 449 F.2d 553, a patent was held to be invalid for indefiniteness where the patentee sought to use the terms "closely spaced" and a "substantial distance" to

distinguish the claimed invention from the prior art. See also Long Manufacturing Co. v. Lilliston Implement Co., 328 F.Supp. 268, 275–277 (E.D.N.C. 1971), aff'd on other grounds, 457 F.2d 1317 (4 Cir.), cert. denied, 409 U.S. 874, 93 S.Ct. 119, 34 L.Ed.2d 126 (1972), which holds the words "relatively large" and "relatively low" to be indefinite.

However, since this Court has found the scope of the '432 patent to be narrower than that claimed by Koratron, it is not invalid for indefiniteness. Since the process "deliberately avoids" polymerization, this patent meets the standard of § 112 for the courts have recognized that:

" * * * patentable inventions cannot always be described in terms of exact measurements, symbols and formulae, and the applicant necessarily must use the meager tools provided by language, tools which admittedly lack exactitude and precision. If the claims, read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more. See Lever Bros. Co. v. Proctor & Gamble Mfg. Co., 4 Cir., 1943, 139 F.2d 633, 639; H. H. Robertson Co. v. Klauer Mfg. Co., 8 Cir., 1938, 98 F.2d 150, 153. That an area of uncertainty necessarily exists in such a situation cannot be denied, but the existence of an inescapable area of uncertainty is not sufficient justification for denying to the patentee the fruits of his invention." Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 136 (2 Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

When the specification, the specific example, and the four claims are read together, the invention is so plainly defined that no one skilled in the art should have any difficulty in practicing it or in determining the limits of the patent. The "deliberate avoidance" of polymerization is a simple, clear instruc-

tion for the garment maker to follow, and it is one which does not require extensive tests or experimentation in order that precise critical limits be ascertained in a particular case. See Locklin v. Switzer Brothers, Inc., 299 F.2d 160, 166 (9 Cir. 1961), cert. denied, 369 U.S. 861, 82 S.Ct. 950, 8 L.Ed.2d 18, rehearing denied, 369 U.S. 891, 82 S.Ct. 1157, 8 L. Ed.2d 291 (1962).

In conclusion, this Court finds that the '432 patent meets the conditions for patentability set forth in the Patent Act, 35 U.S.C. §§ 101–103 and § 112, and therefore is valid. It is not anticipated under § 102(a) by any of the cited prior art references. Neither Pleetset, Tubinyl nor the Ideal Co.'s activities constitute a prior public use under § 102(b). None of these processes or references, alone or as a group, would have made the '432 process obvious to one of ordinary skill in the art under the standards of § 103. Nor is the patent claim, as defined by this Court, so indefinite that it violates the requirements of § 112. As a result Adversaries' statutory attacks on the validity of the patent fail.

### E. Fraud on the Patent Office

 In addition to these claims of statutory invalidity, Adversaries contend that the '432 patent is invalid and unenforceable because it was procured through Koratron's inequitable conduct in misrepresenting and failing to disclose material facts to the Patent Office. Lacking independent research facilities of its own, the Patent Office must rely heavily on the prior art references and evidence cited by patent applicants. Our patent system requires that such persons approach the Patent Office in a spirit of candor rather than as arm's length adversaries. Beckman Instruments, Inc. v. Chemtronics, Inc., 439 F.2d 1369, 1378–1379 (5 Cir.), cert. denied, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970), rehearing denied, 400 U.S. 1025, 91 S.Ct. 580, 27 L.Ed.2d 638 (1971). All patent applicants are under an "uncompromising duty" to make a full and candid disclosure to the Patent Office of all facts and circumstances relating to their claimed invention. Precision Co. v. Automotive Co., 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Monsanto Company v. Rohm & Haas Company, 456 F.2d 592, 599–600 (3 Cir.), cert. denied, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817; rehearing denied, 409 U.S. 899, 93 S.Ct. 108, 34 L.Ed.2d 158 (1972); Beckman Instruments, Inc. v. Chemtronics, Inc., supra, 439 F.2d at 1379; Charles Pfizer & Co. v. F. T. C., 401 F.2d 574, 579 (6 Cir. 1968), cert. denied, 394 U.S. 920, 89 S.Ct. 1195, 22 L. Ed.2d 453 (1969); Chromalloy American Corp. v. Alloy Surfaces Co., 339 F. Supp. 859, 873 (D.Del.1972); SCM Corporation v. Radio Corporation of America, 318 F.Supp. 433, 449 (S.D.N.Y.1970).

 When an applicant breaches its duty, he defrauds the Patent Office, and the court can declare the patent invalid or unenforceable. Monsanto Company v. Rohm & Haas Company, supra, 456 F.2d at 600–601; Beckman Instruments, Inc. v. Chemtronics, Inc., supra, 439 F.2d at 1380; Chromalloy American Corp. v. Alloy Surfaces Co., supra, 339 F.Supp. at 876; and SCM Corporation v. Radio Corporation of America, supra, 318 F.Supp. at 449–450. The party asserting invalidity on the ground of fraud, however, must prove not only that the applicant breached his duty, either by intentionally withholding relevant information or by making affirmative misrepresentations, but also that such misrepresentations were material, "i. e., that if the Examiner had known the true facts, he would not have authorized the issuance of the patent." SCM Corporation v. Radio Corporation of America, supra, 318 F.Supp. at 448; Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461, 469 (D.Del. 1966), rev'd in part on other grounds, 374 F.2d 473 (3 Cir.), cert. denied, 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967). See also Jack Winter, Inc. v. Koratron Company, supra, 327 F.Supp. at 210.

Adversaries' allegations of Patent Office fraud are threefold: (1) Koratron

failed to disclose the process used to make its Tubinyl and Nylura garments, a process which was the subject of a patent application (Serial No. 149,454) and which had been in use for more than one year prior to the filing of the '432 application; (2) Koratron failed to disclose fully the Pleetset process; and (3) Koratron submitted certain fabric samples which, Adversaries contend, were inaccurately described and which, therefore, exaggerated the importance of oven curing in achieving the result specified in the patent application.

As to the first two allegations, the evidence discloses neither the intentional non-disclosure nor the materiality which are required to warrant a finding that the '432 patent was obtained by fraudulent conduct. During the prosecution of the '432 application Koratron did not advise the Patent Office of the filing of application Serial No. 149,454 (for the Tubinyl process) nor of the statement in that application that Koratron had sold over 600,000 garments under the Tubinyl name. However, this information about Tubinyl sales had been transmitted to Koratron's then patent attorney, Arlington C. White, and it was his decision not to disclose that information in the '432 application.[55] The Court finds no evidence that such nondisclosure was the result of an intentional scheme on the part of Koratron to withhold information from the Patent Office. While the Patent Office was not informed of the precise steps involved in the Pleetset process nor of the fact that Koratron had successfully produced and sold garments made by that process, the evidence shows, as Judge Doyle noted in denying Adversaries' motion for summary judgment,

> "that the examiner was aware that the process of pleating and subsequently curing which is essentially Pleetset was revealed, although the ex-

tensive activities were not mentioned." Jack Winter, Inc. v. Koratron Company, *supra*, 327 F.Supp. at 210.

Harold B. Whitmore, who served for nearly thirty-five years in the Patent Office as an examiner, primary examiner, and superintendent of the examining corps, testified that a patent attorney was under a duty to disclose all material which, in the attorney's honest belief, was material, but he was not required to "encumber the record" with "cumulative" information about disclosures already made. (R.T., pp. 1455–1459; 1514–1515). Having described the duty in these terms, Mr. Whitmore testified that, in his opinion, the disclosure in the '432 file wrapper that Koratron and other manufacturers had used "flat treated or crease-resistant fabrics as well as pleated crease-resistant (permanently pleated) fabrics in the manufacture of garments" (F.W. p. 48) would be a "clear disclosure" of the Pleetset process, as it had been described to Whitmore in counsel's hypothetical question (R.T., pp. 1510–1513). Each of Koratron's experts testified that, while the pleating of skirt-sized pieces differentiated Pleetset from the bolt or continuous length pleating of the Zinamon and Brown patents, all three references were the same in that the fabric was pleated and the cure effected before completion of garment manufacture. (R.T., Goldberg, pp. 6257, 6259; Solinger, pp. 6810–6811; Saibel, pp. 6895–6896). Both the Zinamon and the Brown patents were disclosed to the Patent Office. Thus, the evidence does not support a finding that there was complete non-disclosure of Pleetset or that this limited disclosure of the substance of Pleetset was the result of a deliberate plan of withholding information. Nor can the Tubinyl or Pleetset references be found to have been "material." This Court has already found that the '432 process

---

55. White testified that he does not believe he actually considered referring to the Tubinyl information in the '432 application but that if he had considered it, the Tubinyl reference would have been "a very irrelevant matter" and he would never have included it (R.T., p. 4904).

was in fact patentable over the prior art, including Tubinyl[56] and Pleetset.

"Since the patentee was legally entitled to the patent, any misrepresentation directed to overcoming the prior art, assuming arguendo there were some, could not be material." Corning Glass Works v. Anchor Hocking Glass Corp., *supra*, 253 F.Supp. at 469–470.

In their third allegation of fraud Adversaries contend that Koratron submitted to the Patent Office fabric and garment samples which were inaccurately described by Koratron and which, therefore, falsely represented that the claimed permanent press garments could only be produced by means of the claimed process and not by using a hand iron, buck press or hothead press to set the resin. Thus, they contend, there was an intentional misrepresentation of facts on which the Patent Office relied when it issued the patent.

The Court finds that the evidence does not support Adversaries' position. The actual samples submitted to the Patent Office were not before the Court,[57] and therefore no direct comparison could be made between these samples and the description of them in the File Wrapper (F.W., pp. 23–27). Adversaries' expert, Dr. Weaver, attempted to simulate the submitted samples to prove that they had been inaccurately described, but these simulated samples were not shown to have been made with the same fabrics, resins, temperatures, or pressing times or under the same production conditions as those submitted to the Patent Office, and accordingly, these simulations are of little probative value in support of Adversaries' claims of misrepresentation. Based on the Court's observation of these simulated samples, moreover, it finds that garments having the appearance and permanent press characteristics of Dr. Weaver's samples would not be commercially acceptable. While Koratron did claim in its discussion of the samples that its claimed process was "essential" in order to produce the claimed permanent press garments, it did not deny that the methods suggested by the Examiner could produce some crease retention. Instead, Koratron claimed that these suggested methods were highly impractical and would not produce garments which were *entirely* press-free.[58]

In addition, it must be recognized that the Patent Office had issued a restriction requirement under which the applicants were required to withdraw their original claims 1 to 4 (process claims) or their original claims 5 to 8 (article claims), since the two types of claims could not be presented in one application (F.W., pp. 20–21). The samples were submitted not in support of the merits of the claims, but rather in an attempt to show that the restriction requirement was in error (F.W., pp. 22–29, 34–37, and 42–47).[58a] Since such a restriction requirement is not an action on the merits of a patent application, the Court

56. There is no question that the process used to make both Tubinyl and Nylura garments, as a thermoplastic reference, was in no way material to the issuance of the '432 patent.

57. The actual samples submitted by the inventors have apparently been lost by the Patent Office.

58. The Examiner's method of impregnating and curing only the creased area was considered by Koratron to be "so costly and so impractical from a production standpoint as to be prohibitive" (F.W., pp. 25, 27), dangerous to the fabric because of the "elevated temperatures" required when using a pressing iron (F.W., p. 36), and incapable of pro-

ducing entirely press-free garments (F.W., pp. 36, 44). Similarly, Koratron considered the suggested method of impregnating the completed garments one at a time to be "entirely impracticable" (F.W., p. 37).

58a. Adversaries cite the second sentence of the concluding paragraph of Paper No. 9 of the File Wrapper (F.W., p. 55) in support of their contention that Koratron also used the samples to demonstrate the merits of its claims. Based on a reading of this entire document (Paper No. 9) and the whole File Wrapper, however, the Court finds that the purpose for the submission of the samples was to oppose the restriction requirement.

would have some difficulty in finding that a response to that requirement had a material impact on the issuance of the '432 patent, absent a strong showing that the response was also used as a demonstration of the merits of the process. The Court does not reach that issue here since it finds that Adversaries have not established that the samples or their descriptions were misrepresentative.

■ While there were isolated incidents of a lack of candor in the prosecution of the patent application, considered in the context of the entire history of the application Koratron's actions do not exhibit the requisite intent to constitute fraud on the Patent Office nor were these oversights material.

■ Even absent findings of intentional nondisclosure and of materiality, however, this Court, as a court of equity, can and should refuse to enforce a patent if it can be shown that the patentee came into court with unclean hands. SCM Corporation v. Radio Corporation of America, *supra*, 318 F.Supp. at 449–450. "Absolute honesty and good faith disclosure is necessary" to avoid such a finding. Corning Glass Works v. Anchor Hocking Glass Corp., *supra*, 253 F.Supp. at 470. Although Koratron could have exhibited greater candor in its dealings with the Patent Office, especially with respect to the details and success of the Pleetset process, the evidence does not warrant a finding that Koratron's actions were either dishonest or in bad faith. Thus, the '432 patent cannot be declared invalid or unenforceable by reason of Koratron's prosecution of the patent application.

## V. DAN RIVER AGREEMENT

### A. *Statement of Facts*

Dan River, a Virginia corporation, is a diversified textile manufacturer with executive offices in Danville, Virginia, and Greenville, South Carolina, and with sales offices in New York City and other cities across the United States. It ranks approximately eleventh in sales volume among American textile manufacturers and has occupied that position for about the past five years. Beginning in 1947, Dan River has been an active participant in the development of crease-resistant fabric. In about 1957, a research chemist for Dan River experimented with essentially a "partial" cure method of obtaining permanent creases, a method which was found to be commercially impractical. New developments in technique in the industry motivated Dan River to begin new research in 1964, work that culminated in the process which is referred to herein as the Dan Press process.

In 1964 Dan River received legal opinions to the effect that the Dan Press process did not infringe Koratron's '432 patent. Because Dan River was considering taking a mill trademark license from Koratron, it wanted to demonstrate to Koratron that it had independently developed the Dan Press process, especially since it might receive "know-how" later from Koratron as a licensee. The Dan Press process as then developed was therefore disclosed confidentially to an agent of Koratron. Koratron refused to state to Dan River whether it thought that Dan Press was within the scope of '432, and Dan River contends that it believed that Koraton, by certain advertisements and speeches of its personnel, was acquiescing in the view that Dan Press was not within '432.

On July 9, 1964, Dan River formally announced its marketing of Dan Press fabrics. The next day, July 10, 1964, Dan River became a mill licensee of Koratron, but it had informed Koratron that it would also sell fabric manufactured through the Dan Press process.

Dan River's first customer for Dan Press fabric, Casual Sportswear, Inc., insisted upon an indemnification agreement by which Dan River would agree to indemnify it for all patent infringement claims brought by Koratron against it for use of Dan Press fabric. Several of Dan River's competitors were offering indemnification agreements, and Dan River realized that it would

have to meet their offers. Thus Dan River did indemnify Casual Sportswear, Inc., and by October, 1965, it had indemnified approximately forty other customers. Indemnities were given by Dan River to all customers who requested them, but it did not offer such indemnities to those not requesting them.

On September 24, 1965, Koratron filed a lawsuit for infringement of its '432 patent in Los Angeles in the United States District Court for the Southern District of California against Swede Sportswear, Inc., a minor garment maker in Los Angeles. Swede had never been a Koratron licensee, but it had used Koratron-trademarked fabric in manufacturing garments. It also had manufactured garments made of Dan Press fabric. Koratron alleged generally that Swede had infringed the '432 patent. It did not specify the use of any particular fabric by Swede as constituting the infringement. Swede had previously been indemnified by Dan River and therefore called upon Dan River to defend it in the lawsuit.

Dan River received another legal opinion that found Dan Press not to be within '432 and which also indicated that '432 might be invalid. Dan River resolved to decide this issue either by bringing suit for a declaratory judgment against Koratron or by reaching an agreement with Koratron, and it decided to try to reach an agreement before filing suit. Dan River and Koratron then entered into a formal Stand-By Agreement on October 9, 1965, which provided that Dan River would postpone filing suit for a few days while Koratron studied the situation, with Koratron agree-

ing to give Dan River the right to priority in time for filing suit in the controversy. Having received an equivocal legal opinion on the validity of '432, Koratron's President, Herman A. Greenberg, assisted by John F. Barry, a Koratron technical expert, entered into negotiations with Dan River on October 14, 1965. An agreement was reached that day.[59] By the agreement, Dan River disclosed the Dan Press process to Koratron[60] and agreed not to attack the validity of '432 through a lawsuit. Koratron released and agreed not to take legal action against Dan River and users of Dan Press (as defined by Annex I of the agreement) based upon any claims for royalties or for patent infringement under its patents. At that time, Koratron claims, it believed that the Dan Press process was not within its '432 patent. It now contends that Dan River misrepresented the Dan Press process to it.

Greenberg insisted that the agreement be kept secret; he did not want the advantages of Dan Press to be "booted about" the industry. Dan River agreed because the annexes disclosed the elements of the Dan Press process. The agreement provided, however, that it could be used in defense by Dan River if Koratron brought a patent infringement suit against it or users of Dan Press.

After the agreement was reached, Koratron and Swede entered a consent decree in the Swede litigation. In that decree, entered on October 18, 1965, Swede acknowledged that the '432 patent was valid and that it had infringed that patent.[61] Swede had indeed used Kora-

---

59. That agreement is attached hereto as Appendix B, pp. 77–79, *infra*.

60. See Appendix B, pp. 79–80, *infra*.

61. The language of the consent decree is in pertinent part as follows:
"* * *
"(f) Subsequent to March 14, 1961, defendants, without plaintiff's knowledge or consent, infringed said Letters Patent No.

2,974,432 by making, selling, causing to be sold and/or offering for sale durable press garments in accordance with the invention of said Letters Patent;
"AND the plaintiff and defendants having reached a settlement of the issues herein, and defendants having consented to the making and entry of the following judgment, and no just reason existing for any delay in the entry of this judgment, and the Court being fully advised in the prem-

tron-trademarked fabric in producing garments, and the damages that Swede paid to Koratron were apparently determined from the patent royalties due as a result of that use and perhaps use of other non-Dan Press fabric. But the language of the consent decree did not specify that the use of Dan Press fabric by Swede had not infringed '432 nor that Swede had paid no damages resulting from that use.[62] Dan River was never publicly identified with the Swede litigation, and, of course, the Swede consent decree was never publicly linked to the secret agreement between Koratron and Dan River.

After its agreement with Koratron, Dan River gave indemnifications to thirty-six additional garment makers, and these indemnifications had a broader scope than the earlier ones in that they covered claims for royalties as well as suits for patent infringement.

Subsequent to their 1965 agreement, Dan River and Koratron in effect reaffirmed it: once when it was extended to Koratron's '915 patent and again when Koratron gave Dan River a new trademark license.

Koratron did accept royalties during the tenure of the secret Dan River agreement based on the use of Dan Press fabric or fabrics similar to Dan Press by some garment manufacturers. Koratron's practice during this period was to accept any royalties tendered. If any question arose about the payment of royalties for the use of Dan Press material in garment manufacture, Koratron instructed its auditors not to insist upon payment.

In the spring of 1967, Dan River and Koratron entered into negotiations for modifications of their secret agreement. These were unsuccessful.[63] Negotiations resumed in early 1968, again with no success. On March 20, 1968, Koratron issued a press release announcing the existence of the agreement and giving a general description of its view of the agreement's terms.

The Dan River agreement and attendant Swede settlement and consent decree satisfied major interests of both Dan River and Koratron. Dan River was able to market Dan Press vigorously without fear of legal action by Koratron. It could offer indemnifications to its customers without concern for making actual damage payments. It thus protected these interests without the necessity of a costly and perhaps risky law-

---

*ises*, as between the plaintiff and defendants, it is

ORDERED, ADJUDGED AND DECREED:

"* * * *

"2. That, as between the parties, plaintiff is the owner of the patent in suit No. 2,974,432, that said patent was duly and legally issued and, as against defendants, said patent is valid and enforceable;

"3. That defendants have infringed said patent by making, selling and/or offering for sale, durable press garments made in accordance with the invention disclosed and claimed in said Letters Patent No. 2,974,432;

"* * * *

"5. Defendants have paid plaintiff damages for past infringement; * * *

"* * * * "

62. The following press release was issued after the entry of the consent decree:

"In Koratron Co., Inc. a suit for patent infringement. A consent decree has been entered in the U. S. District Court for the Southern District of California against Swede Co., Inc. and ten other defendants named by Koratron Co., Inc. The suit was based on Koratron's Patent No. 2,974,432 covering the use of garment curing ovens in the manufacture of durable press garments. The decree upholds the validity of Koratron's patent and provides for a permanent injunction against further infringement. Damages were paid to Koratron."

Time magazine, in an article on Koratron in its December 17, 1965, issue, reported that "[t]he company moves swiftly against patent infringements. [It] recently won a consent decree against Los Angeles' Swede Co. for selling Koratron-processed goods without paying royalties."

63. Koratron's president at the time of these negotiations, Herman A. Greenberg, testified that Koratron offered Dan River, as "an outside figure, subject to all sorts of conditions" (R.T., p. 3947), $2 million dollars for a termination of the Dan River agreement.

suit. Koratron was able to eliminate the risk of a legal attack on the scope and validity of its patent by a substantial participant in the market. But it was also able to maintain in the market an impression of strength and breadth in its patent. The generality of the Swede consent decree was required if that impression were to be maintained.

B. *Dan River Agreement and Per Se Violations of the Sherman Act*

 Adversaries claim that the agreement between Dan River and Koratron constituted a horizontal division of the product market and is, therefore, a *per se* violation of § 1 of the Sherman Antitrust Act.[64] *See* United States v. Topco Associates, Inc., 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (horizontal territorial division of markets); United States v. Associated Patents, Inc., 134 F.Supp. 74, 82–83 (E. D.Mich.1955), aff'd per curiam sub nom. Mac Investment Co. v. United States, 350 U.S. 960, 76 S.Ct. 432, 100 L.Ed. 834 (1956) (horizontal division of product market).[65] This Court finds, however, that the evidence presented at trial does not establish that Dan River and Koratron entered into a contract, combination or conspiracy to divide the product market by agreeing not to compete with each other in certain product lines.

One case in which an illegal division of product market was found, United States v. Associated Patents, Inc., *supra*, 134 F.Supp. 74 (E.D.Mich.1955), aff'd per curiam sub nom. Mac Investment Co. v. United States, 350 U.S. 960, 76 S.Ct. 432, 100 L.Ed. 834 (1956), involved strong evidence of an express division of the product market. There several manufacturing companies in the machine tools industry formed a new corporation, the sole function of which was as a pat-

ent holding and licensing company. The companies agreed to pool all their patents in the new corporation. Each company was then assigned particular lines of products within which it alone of the associated companies would manufacture machine tools, and each was licensed by the new corporation to use the pooled patents within those product lines. Each company also agreed that it would turn over to the holding corporation any improvements it made on the patents that it had originally held. See 134 F. Supp. at 76–82. Along with this arrangement, the companies agreed (but not through a written agreement) that they would not compete with each other in manufacturing machine tools regardless of whether pooled patents were involved. 134 F.Supp. at 80.

The situation in this case does not involve an express division of a product market. Nothing in the Dan River agreement prevents Koratron from entering the market with a product similar to Dan Press. There are, however, aspects of the agreement which tend to support a finding of such a division. Dan River agreed not to challenge the validity or scope of Koratron's '432 patent through a lawsuit. Dan River also confidentially disclosed the elements of the Dan Press process; this disclosure could have been a means of defining Dan River's exclusive sector of the product market. Koratron agreed not to bring suits for patent infringement or for the collection of royalties against *anyone* using Dan Press fabric. Moreover, Dan River proceeded after the agreement to concentrate almost entirely on the manufacture of Dan Press fabric, and its manufacture of Koratron-trademarked material accordingly diminished greatly.

Other evidence in the record, however, convinces the Court that Adversaries

---

64. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *." 15 U.S.C. § 1.

65. Although the opinion of the district court in the *Associated Patents* case speaks in terms of an unreasonable restraint of trade, a horizontal division of a product market is so closely analogous to cases of horizontal territorial division that *per se* treatment is clearly required.

have not proved by a preponderance of the evidence that a division of the product market can be found here. Dan River thought, and with some foundation, that Dan Press was a superior product.[66] There is, therefore, a reasonable explanation for its concentration on Dan Press. The evidence presented at trial does strongly show that Koratron was mainly concerned with the scope and validity of its '432 patent during the time in question and that Dan River was chiefly concerned with protecting the Dan Press process from challenge. The main motivation behind the Dan River agreement was clearly not horizontal market division.

Adversaries' contention on this point is reduced to reliance on "conscious parallelism" by Dan River and Koratron; their argument really is that these companies' actions are consistent with the possibility of a conspiracy to divide the market. Without other facts which strongly support a finding of such a conspiracy, this Court will not find a *per se* violation of the antitrust laws. *See* United States v. Container Corp., 393 U.S. 333, 335–337, 89 S.Ct. 510, 21 L.Ed.2d 526 (majority opinion), 338–340 (Fortas, J., concurring) (1969); United States v. General Motors, 384 U.S. 127, 144–145, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Theatre Enterprises v. Paramount, 346 U.S. 537, 540–542, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Interstate Circuit v. United States, 306 U.S. 208, 221–227, 59 S.Ct. 467, 83 L.Ed. 610 (1939).

## C. *Dan River Agreement and the Rule of Reason*

Although the Dan River agreement is not a *per se* violation of § 1 of the Sherman Act, Adversaries maintain that, all things considered, it was an unreasonable restraint of interstate commerce. They point to the secrecy clause of the agreement, and they contend that the secrecy prevented other participants in the market from making informed business judgments about the scope and validity of Koratron's '432 patent. They also argue that Dan River used the agreement to increase its share of the market by expanding its indemnification program when it knew that in fact it would not have to indemnify anyone against Koratron. It, as a consequence, no longer had to maintain a reserve fund to meet any liability arising from its indemnifications. Koratron protected its '432 patent by keeping Dan River from publicly challenging that patent and thereby maintaining the impression of the patent's legal strength and breadth. Adversaries point to the generality of the language of the Swede consent decree which added to that impression. Because Koratron received royalties on the use of Dan Press and similar fabrics from some garment makers but not from others that also used such material, Adversaries maintain that Koratron conducted a system of unlawful price discrimination. Other facts cited by Adversaries in support of their antitrust claim are that Dan River ceased giving advice to its customers on the validity of '432 and that Koratron followed a policy of refusing to advise garment makers whether fabrics similar to Dan Press were within the scope of '432.

Koratron and Dan River argue that their agreement is pro-competitive in that Dan River no longer had to fear a patent infringement action by Koratron and thus could market Dan Press mate-

---

66. Dan River contends that Dan Press fabrics are superior to Koratron-trademarked fabrics in the following respects: Dan Press fabrics have no shrinkage problem, in contrast to Koratron-trademarked products; Dan Press fabrics are drier and thus easier to handle; they do not have an offensive odor; they have a virtually unlimited shelf life; they need less time in the final oven, the likelihood of over-baking thus being slight if not non-existent, and in fact they can be cured without a final oven baking; and finally, a larger volume of Dan Press fabrics can be processed in a much shorter time.

rial vigorously.[67] Even if this were true, it would not foreclose the Court's investigation of the entire context of the agreement:

> "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby · promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

■■■■ The mere secrecy of the agreement does not amount to an antitrust violation even though it was a secret contract between competitors. There are, undoubtedly, often good justifications for confidentiality in agreements between competitors. For instance, one party may not wish the fact generally known that it purchases most of the parts for its product from a competitor. Secrecy in these circumstances does, however, require a court to analyze closely the purpose of the contract and its effects on commerce. Secrecy in some instances may be an important factor in bringing about an unreasonable restraint of trade.

■■■■ Adversaries contend that the secrecy of the agreement deprived them of crucial information necessary for the exercise of their best business judgment. Information as to how Koratron and Dan River viewed the scope and validity of '432 would indeed have been valuable to other parties in the industry. But Dan River and Koratron had no duty to disclose an otherwise lawful agreement simply to facilitate those parties' business judgment. These other companies are substantial firms with ready access to legal advice. There is no good reason why they could not have followed Dan River's course in obtaining expert legal advice and acting upon it.[68]

■■■■ Dan River argues that the Dan River agreement and Swede consent decree are settlements of existing and possible future litigation and thus are favored by the law, citing Williams v. First National Bank, 216 U.S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625 (1910). This principle generally holds, but in some instances the litigants, in adjusting and protecting their own interests, may injure the public's interest, a factor perhaps not often stressed in private negotiations. There thus is a counter policy at stake:

> "[T]he settlement of an interference in which the only interests at stake are those of the adversaries, as in the case of a dispute over relative priority only and where possible invalidity, because of known prior art, is not involved, may well be consistent with the general policy favoring settlement of litigation. But the present case involves a less *innocuous* setting. Singer and Gegauf agreed to settle an interference, at least in part, to prevent an open fight over validity. There is a public interest here \* \* \* which the parties have subordinated to their private ends—the public interest in granting patent monopolies only when the progress of the useful arts and of science will be furthered because as the consideration for its grant the public is given a novel and useful invention." United States v.

---

67. The uncontroverted evidence reveals that Dan River's sales personnel did not know of the agreement and thus, Dan River argues, could not have taken advantage of it. This argument against a finding of unreasonable restraint of trade may also be a concession that the agreement was not as significantly pro-competitive as Dan River suggests.

68. Indeed the record indicates that at least several companies did obtain legal advice concerning the scope and validity of '432.

Singer Mfg. Co., 374 U.S. 174, 199, 83 S.Ct. 1773, 1786, 10 L.Ed.2d 823 (1963) (White, J., concurring). *Cf.* Massillon-Cleveland-Akron S. Co. v. Golden State Adv. Co., 444 F.2d 425, 427 (9 Cir. 1971).

 In this case the Swede consent decree, in its failure to reflect the actual settlement in which Dan Press fabric and Koratron-trademarked fabrics were to be treated very differently, was an abuse of the judicial process. If parties are to resolve their differences through a court and receive the imprimatur of that court on their settlement, they must be conspicuously honest and explicit in their representations. The Court does not find, however, that this settlement was an unreasonable restraint of trade. It will be considered, however, on the questions of an attempt to monopolize and patent misuse by Koratron.

██ Dan River's extension of its indemnification program after the agreement was reached also did not contribute to an unreasonable restraint of trade in that, again, its competitors had the opportunity to make the same sort of business judgment based upon legal advice. Dan River initially faced the same uncertainty and risk that confronted its competitors. Any advantage which it gained from the agreement resulted from its willingness to challenge Koratron and resolve the uncertainty while its competitors failed to take similar action. Dan River, in addition, did not have a legal obligation to advise its customers of its opinion of the legal status of '432. Moreover, since Dan River did not disclose the existence or terms of the agreement to its sales personnel, it is unlikely that it utilized the agreement to any great competitive advantage in the marketplace.

██ Adversaries have contended that, as a result of the agreement, Koratron accepted royalties based on the use of Dan Press and similar fabrics when tendered but did not demand royalties from those not so tendering who also used those materials and that this constitutes price discrimination in violation of § 1 of the Sherman Act. They argue that discriminatory effects were "inherent" in the Dan River agreement. The Court disagrees. The differing practices among the garment makers with respect to royalty payments arose directly from their different judgments as to the scope and validity of '432. The agreement was a factor only in that disclosure of it would have resulted most probably in no royalty payments to Koratron resulting from the use of those fabrics. But Koratron had no legal duty to disclose it. The manufacturers had the responsibility of making their own business judgments on the legal status of '432. The main motivation behind the agreement was not to effectuate a scheme of price discrimination by Koratron.[69]

██ In an attempt to buttress their claim that the agreement was an unreasonable restraint of trade, Adversaries point to Dan River's own data showing that its share of the market for permanent press men's and boys' woven slacks and jeans rose from 2.6% in 1964 to 12.7% in 1965, the implication, at least, being that this rise and the stability of its share after that year demonstrate the effect of the agreement.[70] The cause-effect relationship is at best speculative. It would appear that much of the rise preceded the agreement. Adversaries have not shown that the rise was concentrated in the last three months of 1965. Indeed, after 1965, the

69. The cases cited in support of their position by Adversaries (La Peyre v. F.T.C., 366 F.2d 117, 121 (5 Cir. 1966); Peelers Company v. Wendt, 260 F.Supp. 193, 197–198 (W.D.Wash.1966); Laitram Corporation v. King Crab, Inc., 244 F.Supp. 9, 17 (D.Alaska 1965)) each involved an explicit practice of price discrimination. Here the real gravamen of Adversaries' complaint is that Ko-ratron received royalties for the use of materials not within its patent. Adversaries have made a procrustean attempt to force this claim into an antitrust mold.

70. Dan River's approximate figures for its share of the market: 1964—2.6%, 1965—12.7%, 1966—12.5%, 1967—10.9%, 1968—9.9%, 1969—10.4%, and 1970—6.7%.

share declined to some extent. Dan River argues, with some basis, that the rise should be attributed to the introduction of Dan Press in 1964. The market-share evidence does not tend to establish the agreement as an unreasonable restraint of trade.

Having considered all relevant aspects of the Dan River agreement and the arguments and evidence presented by Adversaries, the Court finds that Adversaries have failed to show by a preponderance of the evidence that the agreement was an unreasonable restraint of trade in violation of § 1 of the Sherman Act. First, any restraint that may have developed was caused not by the Dan River agreement, but rather by Adversaries' failure to take action similar to Dan River's action in challenging Koratron and by the inconsistency of Koratron's public position respecting the scope of its '432 patent and the position it took in the Dan River agreement, an inconsistency exemplified by the Swede consent decree. Second, since the Dan River agreement did not itself cause a restraint of trade, the improper intention of Koratron to mislead the industry as to the scope of '432 does not make the agreement an unreasonable restraint of trade. *Cf.* United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). Third, Koratron's motives with respect to the Dan River agreement are best viewed in the total context of Koratron's activities designed to exploit its patent through a li-

censing system. The Court does find below (pp. 70, 71) that the Dan River agreement and Swede consent decree are evidence of an attempt to monopolize and of patent misuse by Koratron.

### D. *The Most Favored Licensee Clause*

■ Adversaries claim that, if Dan Press were within the scope of '432, the Swede settlement would have been a violation of the most favored licensee clause [71] of Koratron's contracts with its garment-maker licensees in that it would amount to a royalty-free license to Swede to use the '432 process. See St. Joseph Iron Works v. Farmers Mfg. Co., 106 F.2d 294, 296 (4 Cir. 1939). Since the Dan Press process deliberately induces some polymerization in the flat fabric, it is not within the scope of '432.[72] Therefore, there is no substance to this claim. As a result, Koratron had no duty to disclose the terms of the Dan River agreement and Swede settlement to its licensed garment makers.

### VI. KORATRON'S LICENSING SYSTEM

Beginning in 1963 with the first license given to a garment maker to utilize the '432 process, Koratron created and enforced a licensing system in which the right to use its '432 patented process was tied to the use of unpatented Koratron-labled fabrics and accessories. Garment makers were required under the terms of their patent licenses

---

71. An example of a most favorable royalty clause is the following section from a license agreement between Koratron and Henry I. Siegal Co., Inc., dated August 1, 1964:

"VIII. MOST FAVORABLE ROYALTY

"1. In the event LICENSOR shall by any agreement grant to others, in the same territory and specific fields of this license, any license to use said PROCESS to practice the inventions of said Letters Patent and said pending application on more favorable terms, LICENSEE shall be entitled to and LICENSOR hereby covenants and agrees to give LICENSEE the benefit of such more favorable terms from the date of such more favorable license, or retroactive to the date of this agreement in the case of a more favorable license

granted by LICENSOR to another within two years of the date of' this agreement, provided LICENSEE accepts and can meet all of the terms, conditions and considerations of such more favorable license agreement.

"2. LICENSOR hereby agrees promptly to notify LICENSEE in respect to any such more favorable license agreement executed by LICENSOR, and LICENSEE shall have thirty (30) days after the date of said notice within which to accept the terms and conditions of the more favorable royalty license; said acceptance shall be in writing and served as hereinafter provided."

72. See pp. 17, 27, *supra.*

to use Koratron-labeled fabrics and accessories made by textile mills and manufacturers licensed to use the Koratron trademark and "know-how." These mills and manufacturers were themselves required to sell their Koratron-labeled fabrics and accessories only to those garment makers licensed to use Koratron's patented process. The garment makers were also obligated to use the Koratron trademark on all garments which they produced by the patented process.

## A. *Licensed Garment Makers*

For the right to use Koratron's patented process, licensed garment makers paid Koratron a royalty of 1% of the net sales of all garments manufactured and sold under the license. The following clause appeared in each of the license agreements between Koratron and its licensed garment makers during the years 1964 to 1967:

"LICENSOR hereby grants LICENSEE the right to acquire chemically treated woven fabrics from mills or converters licensed under and in respect to said [Koratron] trade mark by independent agreement with LICENSOR, for the purpose of manufacturing garments under the licensed PROCESS * * *."

Though the meaning of this provision, on its face, is ambiguous, other evidence in the record demonstrates that it was intended and understood to *require*

the licensed manufacturers to acquire such fabrics.

The technical service manual, for instance, given to its licensees by Koratron included the following direction:

"B. *The Garment Manufacturer is responsible for*: * * * * *

"2) Acquiring approved fabrics bearing the KORATRON mark from KORATRON fabric suppliers for use in KORATRON garments." [73]

Koratron also told its garment-maker licensees that they had to buy Koratron-labeled fabrics from its licensed textile mills. Melvin L. Bacharach, vice president of Levi Strauss, an important garment maker, testified that several Koratron officers had stated that requirement, and that Levi Strauss "tried to live within the explanation" given by Koratron even after it was realized that the language of the license was ambiguous.[74]

No provision in the license agreements between Koratron and its licensed garment makers required that the latter use Koratron-labeled accessories. The manual given to garment makers by Koratron stated, however, that in producing garments which would meet Koratron quality standards, it was required that zippers bearing the Koratron trademark and pocketing made of Koratron fabric be used. Several letters are in evidence written by Koratron officers to licensed manufacturers stating these requirements emphatically. An advertisement in evidence which appeared in the Daily News Record of March 22, 1965, and

---

73. A subsequent edition of the manual contained similar instructions:

"Basically, to illustrate the manufacturing steps in relation to the process, a garment manufacturer purchases chemically treated but uncured quality controlled fabric from a KORATRON licensed fabric mill."

In 1966 the manual was changed so that garment manufacturers were instructed to acquire fabrics which had been "tested and approved" by Koratron.

74. "In 1963, 1964, 1965 we were faced with two things: first of all, the statements of

Mr. Tomaselli and Mr. Hochstaedter, that you had to buy not only fabrics but Koratron treated sundry items in order to make a Koratron treated good. Subsequent and some place along in that time it became apparent that this was not the language of the license. I couldn't tell exactly when I became aware of that. Even when we did become aware of it, we tried to live within the explanation that was given to us by Mr. Weil that we had to buy a Koratron labeled good." R.T., p. 420.

which was "[c]ompiled, edited and published" by Koratron stated that:

"All garments with the Koratron seal are Koratron all the way through: pockets, waistbands, zippers, everything" (Exhibit A–906).

Another advertisement published by Koratron appearing in Women's Wear Daily on March 17, 1965, stated that:

"*All* garments made by Koratron licensees to carry the Koratron seal have to be made from Koratron fabrics, with Koratron findings (i. e., zippers, pockets, plackets, belt linings, etc.)" (Exhibit A–907) (emphasis in original).

Melvin L. Bacharach of Levi Strauss also testified that Koratron officers had told his company that Koratron-labeled sundries were required.[75]

Based upon its consideration of all the evidence, the Court finds that Koratron required its licensed garment makers, as a condition of their licenses to use the patented process, to acquire only unpatented·Koratron-labeled fabrics and accessories (e. g., zippers and pocketing).

Until late 1967, the standard license agreement which Koratron used with its licensed garment makers also contained the following provision:

"LICENSEE also hereby covenants and agrees that each garment manufactured and sold by it under this license shall have affixed thereto for retention thereon during the life of the garment a label bearing said trade mark, KORATRON and the notation 'Lic.U.S. Pat. No. 2,974,432', a copy of which label will be furnished to LICENSEE by LICENSOR."

Officers of licensed garment makers testified that Koratron officers, through communications to the licensees, had made it clear that the use of the trademark was a requirement of the license. Louis Hochstaedter, Koratron's vice president in charge of negotiating and enforcing licenses, enforced this provision by writing many letters during the 1965–1967 period to garment makers which Koratron had found not complying with the requirement.

The Court finds that, as a condition of a license to use Koratron's patented process, the licensed garment makers had to affix the Koratron trademark on all garments produced through the patented process. There is no evidence, however, that the licensees were prevented from affixing other trademarks to their finished garments.

### B. *Licensed Textile Mills*

Textile mills licensed by Koratron to use its trademark and confidential "know-how" agreed to pay Koratron royalties in the amount of 2% of their billing price on all trademarked fabrics, net of all allowable cash discounts, returns, and allowances. The license agreements between Koratron and its licensed textile mills contained provisions permitting the mills to sell Koratron-trademarked fabrics only to garment makers designated by Koratron, which would include those manufacturers licensed by Koratron to use its trademark on finished garments.[76] Henry B. Weil, then Kora-

75. See footnote 74, *supra.*

76. For example, a license agreement with Pepperell Manufacturing Company, effective July 7, 1964, contained the following provisions:

"I. SCOPE

" * * *

"2. LICENSEE agrees that it will use the licensed mark only in connection with the sale of said fabrics to such garment manufacturers as LICENSOR shall designate.

"3. LICENSOR agrees at LICENSEE'S request to designate as a proper purchaser under preceding paragraphs 1 and 2 hereof, any garment manufacturer that is licensed by LICENSOR to use said KORATRON trademark in connection with its commercialization of press-free or crease retained garments.

" * * * *

"6. Nothing in this Agreement and License shall be construed as limiting or otherwise affecting LICENSEE'S right to sell chemically treated fabrics of any nature or quality to others provided that, to insure quality garments made from said fabrics, chemically treated non-cured fabrics bearing said trademark shall not be made and sold by LICENSEE for use in the manufacture of crease retained gar-

tron's president, wrote to one licensed mill in November, 1964, that " * * * you are authorized to sell uncured chemically treated fabrics for the purpose of practicing our patented process only to garment manufacturers designated by us to you." Louis Hochstaedter wrote several letters to licensed mills in 1965 clearly expressing their obligation to sell Koratron-labeled fabric only to garment makers designated by Koratron.[77] These letters were efforts to enforce this license provision by emphasizing to the mills the importance which Koratron placed upon it.[78]

Officers of several licensed textile mills testified that they understood Koratron's position to be that they could not sell Koratron-labeled fabrics to garment makers not licensed by Koratron. There is evidence in the record that mills, such as J. P. Stevens & Co., Inc., did in fact refuse to sell Koratron-labeled fabrics to manufacturers not licensed by Koratron.

The Court finds that Koratron required its licensed textile mills, as a condition of their licenses, to sell Koratron-labeled fabrics only to Koratron's licensed garment makers.

### C. Licensed Manufacturers of Accessories or Sundries

Koratron required its licensed makers of accessories or sundries to pay a flat sum of money (e. g. $100) for the right to use the Koratron trademark on their products. Koratron included within its license agreements with these manufacturers of accessories a provision similar [79] to the following license with Conmar Products Corporation, effective August 13, 1964, for Conmar's use of the trademark on its zippers:

"Nothing in this Agreement and License shall be construed as limiting or otherwise affecting LICENSEE'S right to sell zippers and chemically treated zipper tapes of any nature or quality to others provided that, to insure quality garments incorporating said zippers and said chemically treated zipper tapes, sales of chemically treated non-cured zipper tapes shall not be made and sold by LICENSEE, for use in the manufacture of press-free or crease retained garments except to those garment manufacturers designated by LICENSOR * * *."

Louis Hochstaedter testified that this provision was a requirement that li-

---

ments except to those garment manufacturers designated by LICENSOR * * *."
Louis Hochstaedter, then Koratron's vice president, testified that during the period from 1964 through 1967 all license agreements between Koratron and textile mills contained a provision such as I(6) in the above agreement. R.T., pp. 5975, 5976.

77. Typical language in these letters, from a letter of August 12, 1965, to an officer of Cone Mills Corporation, is as follows:
"Under our Agreement and License, effective September 2, 1964, you are not authorized to supply uncured fabric to garment manufacturers unless designated to you by our Company.
"Heretofore, one of the fabric suppliers has ignored this provision to some extent. This may have been inadvertent and we elect to accept that explanation. Another mill has sold fabric manufactured under the Agreement and License in anticipation that negotiations being carried on by our

Company with a given garment manufacturer would be favorably concluded so that the prospective buyer of this fabric would be on our 'designated' list.
"The provision in question has not been amended or modified.
"We trust that we will not have to call your attention again to refrain from making fabric sales under our Agreement and License to garment manufacturing companies which are not designated by our Company."

78. Koratron has tried to undermine the significance of these letters by showing the disapproval which Weil expressed to Hochstaedter about them. But Weil's criticism was apparently directed at the use of the phrase "uncured fabrics" rather than "Koratron trademark fabric." See R.T., p. 6127. Koratron also tried to show that a major motivation for the letters was the desire to police the use of the patented process. See R.T., pp. 6129–6130.

79. See R.T., pp. 6010–6011.

censed manufacturers of accessories could sell Koratron-labeled accessories only to garment makers who were also licensees of Koratron.

The Court finds that Koratron required its licensed manufacturers of accessories or sundries, as a condition of their licenses to use the Koratron trademark, to sell Koratron-labeled goods only to garment makers licensed by Koratron.

### D. Subsequent Developments

On February 3, 1967, Koratron sent letters to its licensed garment makers informing them that they were not required to use Koratron-labeled fabrics in the production of garments by the licensed process.[80] Adversaries concede that the requirement that garment makers purchase only Koratron-labeled accessories and sundries also ended in early 1967. In December, 1967, Koratron began offering a new license agreement under which the licensed garment makers were no longer required to use the Koratron trademark on garments produced by the patented process. But if licensees did not take a new license, they were still required, under the terms of their continuing licenses, to use the trademark.

Adversaries also concede that, by early 1967, licensed textile mills and producers of accessories and sundries were no longer required, as a condition of their licenses, to sell their Koratron-labeled goods only to Koratron's licensed garment makers.[81]

### E. Koratron's Commercial Position

In 1969, Koratron estimated that durable-press garments constituted 75% of the market for men's and boys' dress and casual slacks. As of January 8, 1969, Koratron was receiving royalty payments from 56.4% of the sales of durable-press men's and boys' dress and casual slacks made from the "post-cure" process.[82] No figure has been offered as to the percentage of the durable-press slacks which were made from the "post-cure" process.

Though Koratron had been first to offer post-cure fabric for durable-press garments, by late 1964 other mills (e. g., Reeves, Dan River, Burlington) began offering such fabric, which they believed to be independent of Koratron know-how. Although these fabrics were generally sold at a lower price than Koratron fabrics, some of these mills found that, to sell their fabrics to garment makers licensed by Koratron, they often had to represent to them that use of their fabrics would not be within the '432 patent and that they also frequently had to indemnify the garment makers

---

80. The letters, signed by Herman A. Greenberg, then Koratron's president, included this paragraph:

"First, before the garment may be sold under the KORATRON ® trademark, it must pass the Quality Control Standards of Koratron Company. While it is possible for a licensed garment manufacturer to make garments which pass our Quality Control Standards although made from fabrics which do not bear the KORATRON ® trademark, we believe that the way to keep the risk of not passing our Quality Control Standards at a minimum is to use KORATRON ® trademark fabrics, since they are produced by fabric mills licensed to use our formulations and application methods which we know are thoroughly adaptable to our patented process."

Although Koratron included a sentence in a prospectus dated May 2, 1966, that there was no restriction on licensed garment manufacturers as to their source of appropriate fabrics, and although Koratron has indicated that over thirty manufacturers (less than one tenth of Koratron's licensed garment makers) were informed individually, mostly by letter, beginning (with the exception of one letter in July, 1965) in April, 1966, that there was no such restriction, these letters of February 3, 1967, mark the real change in Koratron's licensing practice.

81. A major reason for the new license offered to the textile mills in 1967 was Koratron's discovery that its "know-how" was not confidential; its mill manual had inexplicably been copyrighted in 1965 by its then patent counsel and thus placed in the public domain.

82. This figure is contained in a letter of that date from Moses Lasky, Koratron's retained attorney, to Howard T. Milman of the New York law firm, Sullivan & Cromwell.

from royalty or infringement claims by Koratron.

### F. *Additional Market Facts*

As of December 31, 1964, Koratron had 41 licensed textile mills, converters, and finishers, and 71 licensed garment makers. By April 1, 1966, these numbers had increased to 216 and 372, respectively.[83] The restrictions in Koratron's licenses were a significant factor in this great increase in Koratron licensees in the period 1964–1966. An unlicensed textile mill would find many potential customers—Koratron's licensed garment makers—effectively eliminated from its market. Similarly an unlicensed garment manufacturer would find that many potential sources of fabrics and accessories were also not available.

Koratron's gross royalty revenue, from mill and garment-maker royalties, over the period 1964 to 1969, was as follows:

| | |
|---|---|
| 1964—$1,048,589 | 1967—$5,571,440 |
| 1965—$5,624,770 | 1968—$4,532,085 |
| 1966—$8,695,612 | 1969—$2,655,872 |

In 1965, fabric producers accounted for 54% of Koratron's total royalties, and garment makers accounted for 46%.

## VII. ANTITRUST VIOLATIONS

### A. § *1 of the Sherman Act*

A tying arrangement is a *per se* violation of § 1 of the Sherman Act, 15 U.S.C. § 1, "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." Northern Pac. R. Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 519, 2 L.Ed.2d 545 (1958). Generally a "not insubstantial" amount of interstate commerce is affected if "a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie * * *." Fortner Enterprises v. U. S. Steel, 394 U.S. 495, 501, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969).

Koratron's licensing practice of requiring those garment makers licensed to use its patented process to buy only Koratron-labeled fabrics and accessories from textile mills and manufacturers also licensed by Koratron is challenged as an illegal tying arrangement, a *per se* violation of § 1 of the Sherman Act. The necessary elements of a tie-in were present in Koratron's licensing system. First, "[t]he requisite economic power is presumed when the tying product is patented or copyrighted * * *." United States v. Loew's Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L. Ed.2d 11 (1962). Thus, as a matter of law, Koratron had sufficient economic power in the market of its tying product, its patented process, to restrain to an appreciable extent competition in the markets of the tied products, Koratron-trademarked fabrics and accessories. Second, there clearly was a "not insubstantial" amount of interstate commerce affected by this tying arrangement. Since, in 1965, 54% of Koratron's total royalties of $5,624,770 was received from fabric producers, in that year alone over $3,000,000 was affected by

83.

| | Koratron Licensees | |
|---|---|---|
| | Textile Mills, etc. | Garment Makers |
| June 30, 1964 | 8 | 4 |
| December 31, 1964 | 41 | 71 |
| June 30, 1965 | 102 | 151 |
| December 31, 1965 | 137 | 267 |
| April 1, 1966 | 216 | 372 |

the tying arrangement. In Fortner Enterprises v. U. S. Steel, *supra,* 394 U.S. 495, 501–502, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), $190,000 was held to be "not insubstantial." Therefore, unless this tying arrangement is justified under the exception set forth in United States v. Jerrold Electronics Corporation, 187 F.Supp. 545, 555–556, 557–558 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), it is a *per se* violation of 15 U.S.C. § 1. *Cf.* Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653, 655 (1 Cir. 1961), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961); Switzer Brothers, Inc. v. Locklin, 297 F.2d 39, 43–44 (7 Cir. 1961), cert. denied, 369 U.S. 851, 82 S.Ct. 934, 935, 8 L.Ed.2d 9 (1962), rehearing denied, 369 U.S. 891, 82 S.Ct. 1157, 8 L.Ed.2d 291 (1962). Although some evidence in the record bears upon this question, the Court feels that another evidentiary hearing is required to determine whether the theory of *Jerrold Electronics* is applicable to this case and, if so, for what period of time.

■ Koratron's licensing practice of requiring its licensed textile mills and manufacturers of accessories to sell Koratron-labeled products only to its licensed garment makers also constitutes a tying arrangement. In this instance, the tying product is the Koratron trademark and the tied product is its patented process.[84] A textile mill wishing to utilize Koratron's trademark had to agree to sell Koratron-labeled fabrics only to Koratron's licensed garment makers. Pressure would thus be applied to garment makers inducing them to become or remain '432 patent licensees. Koratron's trademark[85] is presumed to have sufficient economic power as a tying product to cause an appreciable restraint in the market for the tied product.[86] Siegel v. Chicken Delight, Inc. 448 F.2d 43, 50 (9 Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972). Here also the amount of commerce affected, over $2,500,000 in 1965, is well above the $190,000 involved in Fortner Enterprises v. U. S. Steel, *supra,* 394 U.S. 495, 501–502, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). Thus, again, Koratron's licensing practice is, at least, *prima facie,* a *per se* violation of § 1 of the Sherman Act. The question of whether the *Jerrold Electronics* exception is applicable and, if so, for what period of time, will be pursued at a further evidentiary hearing.

■ Koratron's requirement that its licensed textile mills and manufacturers of accessories sell their Koratron-labeled products only to its licensed garment makers may also violate § 1 of the Sherman Act as an unreasonable restriction of the customers to which its licensees can sell their products. The use of trademark licenses to effect a horizontal territorial division of a market is a *per se* violation of § 1. *See* United States v. Topco Associates, 405 U.S. 596, 608–609, n. 9, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); United States v. Sealy, Inc., 388 U.S. 350, 354–358, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); Timken Co. v.

---

84. This reversing of the tied and tying products presents no conceptual or analytical difficulties under the theory of tying arrangements unless it is shown that the seller had such extensive economic power in one of the markets that further preclusion of competition could not result from the tie-in of its power in the other market. No such situation has been established here.

85. Although the tying product was the Koratron-trademarked fabric, the key part of that product, the source of Koratron's leverage in the market of the tying product, was the Koratron trademark.

86. Koratron also purported to give its mill licensees confidential "know-how," a factor which could have increased its economic power in the market for the tying product. That "know-how," however, was copyrighted in 1965 and thus was placed in the public domain. The Court need not resolve the question of whether the apparently mistaken notion of many licensed mills that they were receiving confidential "know-how" increased Koratron's leverage in the market for the tied product.

United States, 341 U.S. 593, 598–599, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). This rule also clearly applies to non-territorial customer restrictions. See United States v. Topco Associates, *supra*, 405 U.S. at 612, 92 S.Ct. 1126. This case, however, involves customer restrictions vertically imposed and thus requires a determination of whether *per se* illegality or the rule of reason is the appropriate approach.

▮▮▮ The Court holds that, for two related reasons, the rule of reason should be followed in determining whether customer restrictions imposed upon licensees by a trademark licensor violate § 1 of the Sherman Act.[87] First, "[s]ince the value of a trade-mark depends solely on the public image it conveys, its holder must exercise controls to assure himself that the mark is not shown in a derogatory light." Susser v. Carvel Corporation, 332 F.2d 505, 519 (2 Cir. 1964), cert. granted, 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); Denison Mattress Factory v. Spring-Air Company, 308 F.2d 403, 409–410 (5 Cir. 1962). Whether customer restrictions upon trademark licensees, rather than quality controls only, are justifiable is a question which can be best answered after detailed study of the facts of each case and not *a priori* on an abstract basis. Second, the same facts in this case form the basis of an unlawful tying arrangement (in which the Koratron trademark, as used by textile mills, is the tying product and Koratron's patented process the tied product) and of vertical customer restrictions. As a tying arrangement, Koratron's licensing practice may be justifiable under *Jerrold Electronics*, *supra*. It would be anomalous to allow a possible justification in that context but not when the same facts are viewed as vertical customer restrictions. *Cf.* United States v. Arnold, Schwinn & Co., 388 U.S. 365, 374–375, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Therefore, the question of the reasonableness of these customer restrictions will be considered at a future evidentiary hearing.

▮▮▮ The final question concerning the legality of Koratron's licensing system is whether the requirement it imposed upon its licensed garment makers to affix a Koratron label to all garments produced by the patented process constitutes an illegal tying arrangement.

---

87. There is language in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 379–380, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), which suggests *per se* treatment for territorial and customer restrictions imposed vertically by a manufacturer who has parted dominion over the goods in question. That case is distinguishable from this one in that it involved restrictions on resale of goods whereas this case concerns restrictions placed upon trademark licensees. Indeed, the Supreme Court expressly reserved the question of "whether a patentee has any greater rights * * *" over the sale of goods produced by its licensees. 388 U.S. at 379, n. 6, 87 S.Ct. at 1865. Clearly the question of a trademark licensor's right also falls within this reservation. Even if *Schwinn* were applicable here, it is not clear that it mandates *per se* treatment for all factual situations involving vertical customer restrictions. See Tripoli Company v. Wella Corporation, 425 F.2d 932, 936–937 (3 Cir. 1970) (en banc), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); Carter-Wallace, Inc. v. United States, 449 F.2d 1374, 1380–1382, 196 Ct.Cl. 35 (1971). But cf. Williams v. Independent News Co., 485 F.2d 1099, 1103 (3 Cir. 1973) (dictum). The Court of Appeals for this Circuit has not as yet held whether *Schwinn* requires *per se* treatment where the party imposing the vertical restraint does not itself provide a service or retain dominion over a good. *Compare* Anderson v. American Automobile Association, 454 F.2d 1240, 1244 (9 Cir. 1972), *with* Beverage Distributors, Inc. v. Olympic Brewing Co., 440 F.2d 21, 28, 30 (9 Cir. 1971) (dicta), cert. denied, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971). Whatever the proper interpretation of the ambiguous language in *Schwinn*, that case clearly did contemplate, in line with White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), that the rule of reason would apply to a "newcomer, seeking to break into or stay in the business" and to a "failing company." 388 U.S. at 374, 87 S.Ct. at 1863.

A patent-trademark tie-in has been held to be a *per se* violation of § 1 of the Sherman Act absent a showing of justifying circumstances under the theory of *Jerrold Electronics, supra*, and Dehydrating Process Co. v. A. O. Smith Corp. 292 F.2d 653, 655 (1 Cir. 1961), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed. 2d 194 (1961). *See* Switzer Brothers, Inc. v. Locklin, 297 F.2d 39, 43–44 (7 Cir. 1961), cert. denied, 369 U.S. 851, 82 S.Ct. 934, 935, 8 L.Ed.2d 9 (1962), rehearing denied, 369 U.S. 891, 82 S.Ct. 1157, 8 L.Ed.2d 291 (1962). *Switzer*, however, apparently involved a requirement that the licensee use *only* the tied trademark.[88] In this case, however, the evidence does not indicate that Koratron's patent licensees were required to affix the Koratron trademark alone to their finished garments. Koratron argues that this distinction from *Switzer* is sufficient to take its requirement outside the law of *per se* illegality. The Court disagrees.

■■■■■ "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are *conclusively presumed* to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. * * * Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are * * * tying arrangements * * *." Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). "Our cases have made clear that, at least when certain prerequisites are met, arrangements of this kind are illegal in and of themselves, and no specific showing of unreasonable competitive effect is required." Fortner Enterprises v. U. S. Steel, 394 U.S. 495, 498, 89 S.Ct. 1252, 1256, 22 L. Ed.2d 495 (1969). The prerequisites for *per se* illegality are present here. Koratron's patented process is presumed to have the required economic power as a tying product. *See* United States v. Loew's Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). Clearly, not an insubstantial amount of interstate commerce was affected. In 1965 *royalties* from garment makers accounted for 46% of Koratron's total royalties of $5,624,770, or over $2,500,000. The revenues from the sales of the completed garments bearing the Koratron label would obviously be much higher than that figure. The patent-trademark tie-in therefore does fall within the *per se* doctrine.[89]

The showing made by Adversaries of the existence of the tie-in also demonstrates a sufficient impact upon them to establish liability. See Hoopes v. Union Oil Company of California, 374 F.2d

---

88. Although nowhere explicitly stated in the opinion in *Switzer*, this requirement of exclusivity can be inferred from the language referring to "Day-Glo" marked goods. 297 F.2d 39, 41–42, 44, 48. The goods were identified in the opinion as "Day-Glo" goods, and the use of other trademarks was not mentioned.

89. Koratron argues that the requirement that a patent licensee use the Koratron trademark on completed garments is simply additional consideration, as a form of advertising, for the patent license. Koratron is correct in asserting that consideration is not limited to money, but it does not extend to a requirement that violates the antitrust laws. Every tying arrangement could, if Koratron were correct on this point, be justified in this way, since purchase of the tied product could always be characterized as additional consideration for the tying product.

Koratron also argues that "[a] person having a patent monopoly may lawfully create a good will therefrom and embody that good will in a trademark, which remains a lawful property right if not allowed to fall into the public domain as a generic term." Persons with lawful property rights, however, cannot use them to violate the antitrust laws. "A trademark cannot be legally used as a device for Sherman Act violation." Timken Co. v. United States, 341 U.S. 593, 599, 71 S.Ct. 971, 975, 95 L.Ed. 1199 (1951). *See also* United States v. Sealy, Inc., 388 U. S. 350, 356, n. 3, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); Standard Oil Co. v. United States, 337 U.S. 293, 306, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

480, 485 (9 Cir. 1967). Koratron restricted the competitive free choice of its licensed garment makers: They had to use the Koratron trademark. Koratron's argument that its licensees could also use other trademarks does not suffice on the question of liability, although Koratron can attempt to show at a future trial on damages that Adversaries are not entitled to compensatory damages as a result of this patent-trademark tie-in.[90] "By its own terms, Clayton Act recovery [under 15 U.S.C. § 15] is available only where actual injury has been suffered." Siegel v. Chicken Delight, Inc., 448 F.2d 43, 52 (9 Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972).

Koratron will also have the opportunity in future proceedings to present evidence of circumstances which would justify this tying arrangement under the theory of *Jerrold Electronics, supra.*[91]

## B. § 2 of the Sherman Act

Adversaries have also raised the claim that Koratron, either individually or in concert with Koracorp, engaged in activities in violation of § 2 of the Sherman Act.[92] Two general claims are asserted by Adversaries.

First, Adversaries claim that in procuring both the '432 and the '915 patents, Koratron had perpetrated a fraud on the Patent Office by failing to disclose certain information to that office. By licensing such a fraudulently procured patent, Koratron is charged by Adversaries with attempting to monopolize and actually monopolizing the durable press industry in violation of § 2 of the Sherman Act.

Second, Adversaries claim that Koratron and Koracorp, individually or in concert with one another, monopolized and attempted to monopolize interstate and export trade in the manufacture,

---

90. Koratron argues that "[n]o private claim can be based on antitrust law in the absence of adverse impact on the claimant's business or property," citing cases (Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 346 F.2d 1012, 1014, n. 1 (9 Cir. 1965), cert. denied, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965); Haverhill Gazette Company v. Union Leader Corporation, 333 F.2d 798, 802 (1 Cir. 1964), cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed. 2d 343 (1964), rehearing denied, 379 U.S. 984, 85 S.Ct. 645, 13 L.Ed.2d 578 (1965)) that seem to require proof of actual injury or damages as an element of liability under 15 U.S.C. § 15. The proceedings in this case have been bifurcated, however, with another trial, if necessary, to determine damages. In their stipulated pre-trial order, the parties described the antitrust question to be considered in the first trial: "Did Koratron and/or Koracorp, either singly or in concert, *perpetrate acts violative* of Section 1 and/or 2 of the Sherman Act?" Koratron expressed its general contentions on the issue of the alleged antitrust violations in its licensing practices in the following manner: "Nothing done or omitted in relation to the general subjects set out in adversaries' contentions (a) violated any of the antitrust laws, or (b) affected any party to the litigation in any way." The Court has proceeded on the basis that the first trial would determine whether as a matter of law Koratron had violated the antitrust laws and that the second trial would consider the issue of Koratron's ultimate liability to Adversaries for money damages. Koratron's apparent argument that Adversaries had to show actual damages in the first trial, beyond a showing of some impact on them resulting from Koratron's unlawful acts, is incorrect.

91. Adversaries included in their opening trial brief other alleged restrictions by Koratron (e. g., that garment makers had to agree, as a condition for renewal of their licenses, to an extension of the license agreement beyond the expiration date of the patent), but these claims were not pursued at trial and are deemed to have been abandoned.

92. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2. See also 15 U.S.C. § 15.

processing, and sale of resin-impregnated fabrics, related textile materials, and durable press garments in violation of § 2 of the Sherman Act. This was accomplished, Adversaries claim, by the Dan River agreement and also by implementation of a national and international licensing program of the '432 patented process and related trademarks.

### (1) *The Claim of Fraud Upon the Patent Office*

The Court has already noted the burden upon a patent applicant to make a full and complete disclosure of the facts and circumstances relating to the claimed invention to the Patent Office. Precision Instrument Mfg. Co. v. Automotive M. Machine Co., 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Lacking independent investigative facilities of its own, the Patent Office must rely to a great extent on the candor of the applicant in disclosing those facts and circumstances. *See* Beckman Instruments, Inc. v. Chemtronics, Inc., 439 F.2d 1369, 1378–1380 (5 Cir.), cert. denied, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970), rehearing denied, 400 U.S. 1025, 91 S.Ct. 580, 27 L.Ed.2d 638 (1971). Where such candor has been found lacking, the courts have been empowered to declare the patent at least unenforceable, and in some cases, invalid. Monsanto Company v. Rohm & Haas Company, 456 F.2d 592, 600–601 (3 Cir.), cert. denied, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817, rehearing denied, 409 U.S. 899, 93 S.Ct. 108, 34 L. Ed.2d 158 (1972); Chromalloy American Corp. v. Alloy Surfaces Co., 339 F. Supp. 859, 874–876 (D.Del.1972); SCM v. Radio Corporation of America, 318 F.Supp. 433, 446–450 (S.D.N.Y.1970).

In the instant case, Adversaries have alleged a serious breach of the duty of disclosure by Koratron and its predecessor in connection with both the '432 and '915 patents. Specifically, in the case of the '432 patent, Adversaries allege (a) that Koratron failed to disclose to the Patent Office the filing of patent application serial No. 149,454, and the use, more than one year before the filing date of the application which issued as the '432 patent, of the process described in that application to make garments sold under the names "Tubinyl" and "Nylura", hereafter referred to as the "Tubinyl process"; (b) that Koratron failed to disclose the Pleetset process, including the commencement of garment manufacture after resin impregnation and before curing; and (c) that Koratron submitted certain fabric samples which, it is claimed, were inaccurately described and which, therefore, exaggerated the importance of oven-curing in achieving the desired result.

In connection with the '915 patent, Adversaries contend that Koratron failed to disclose that the delaying catalyst, magnesium chloride hexahydrate and the technique of pre-setting the resin in the garment seams and crease areas during the pressing operation, the two allegedly novel features of '915, were both publicly known and in commercial use by Koratron and others in connection with the '432 patent.

These omissions or non-disclosures by Koratron are alleged by Adversaries to constitute a fraud upon the Patent Office, thereby giving rise to a § 2 violation of the Sherman Act, in light of the alleged exclusionary market power of Koratron in the relevant market, under Walker, Inc. v. Food Machinery, 382 U. S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), and Cataphote Corp. v. DeSoto Chemical Coatings, Inc., 450 F.2d 769, 771–773 (9 Cir. 1971).

In *Walker Process*, the Supreme Court held that allegations that a patent had been obtained by knowingly and willfully misrepresenting facts to the Patent Office, an attempt by the patentee to enforce the patent, for example, by a licensing system or a similar attempt by an assignee who has knowledge of the facts, constitute a violation

of § 2 of the Sherman Act if the other elements of an antitrust violation are present. These additional elements include the possession of monopoly power in the relevant market. Both Mr. Justice Clark for the majority and Mr. Justice Harlan in a concurring opinion were careful to limit the decision to cases involving the procuring of patents by "knowing and willful" misrepresentations to the Patent Office, and to negate specifically its application to cases involving patents invalid for some reason other than actual fraud. In order to find a violation of § 2 in enforcing a patent procured by nondisclosure, it must be shown that there was knowing and willful nondisclosure of material facts, and good faith would furnish a complete defense. *Walker Process, supra,* 382 U.S. at 177, 86 S.Ct. 347.

 The Court has already found that there was no fraud on the Patent Office in Koratron's procurement of the '432 patent. As indicated above (see pp. 45–49) the evidence does not establish that such nondisclosure as did occur, regarding either Tubinyl or Pleetset, was the result of an intentional or willful plan to defraud the Patent Office or that Koratron acted in bad faith before the Patent Office. Moreover, even if there had been any intentional misrepresentations directed toward overcoming the prior art, since the Court has found that the '432 process is legally patentable over the prior art, neither the Tubinyl nor the Pleetset references could have been material to the issuance of the patent. *Corning Glass Works v. Anchor Hocking Glass Corp., supra,* 253 F. Supp. at 469. The court in *Corning Glass* focused specifically on this materiality requirement in the context of an alleged *Walker Process* violation and concluded that "[i]f one were entitled to a patent under the legal tests of patentability, there is no illegal monopoly resulting from the statements on which to base an anti-trust action." Similarly, the Court has found that Adversaries' proof is insufficient to establish that the fabric samples sent to the Patent Office by Koratron and their descriptions were misrepresentative.

 While not in any way wishing to appear to condone the non-disclosure that did occur, this Court is not prepared to find it to have been knowingly and willfully done. As the Ninth Circuit noted in Cataphote Corp. v. DeSoto Chemical Coatings, Inc., *supra,* 450 F.2d at 772:

> " '[K]nowing and willful fraud' as the term. is used in *Walker,* can mean no less than clear, convincing proof of intentional fraud involving affirmative dishonesty, 'a deliberately planned and carefully executed scheme to defraud * * * the Patent Office.' Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 245, 64 S.Ct. 997, 88 L.Ed. 1250 * * * (1944)."

Adversaries have not met this burden and have not established a § 2 violation based on the procurement of the '432 patent.

With respect to Adversaries' claim that Koratron failed in the '915 application to disclose that the allegedly novel delaying catalyst, magnesium chloride hexahydrate, was both publicly known and in commercial use by Koratron and others, the Court finds that the specific catalyst was never claimed to be an invention and that the patent itself did not so indicate. It was recognized by all that the use of that catalyst was publicly known before the '915 application was filed. The invention which was claimed was the pre-setting step, and the use of the catalyst as an adjunct to that process was never claimed to be an independent invention.

 Finally, Adversaries claim that Koratron intentionally failed to disclose to the Patent Office that resin pre-curing of creases and seams during pressing had been used commercially by Koratron and others in connection with the '432 patent long before the '915 patent was conceived. It must be recognized, however, that the application for

the '915 patent cited the '432 patent and thus cannot be said to have concealed anything about that patent from the Patent Office. The evidence shows that while some pre-curing undoubtedly occurred when garments were pressed prior to the final cure under the '432 process, early in the life of the '432 patent it was not thought possible to obtain a complete cure of the resins using the hot-head press then in use by Koratron. The innovative feature of the '915 process was the intentional full cure of the resin in the creases and seams by means of a hot-head press prior to the final cure of the completed garment. Adversaries have not established that Koratron actually practiced this full pre-curing of selected areas of the garment under the '432 patent long before the '915 application was conceived and then willfully withheld such a practice from the Patent Office. As a result, Adversaries have failed to prove a § 2 violation based on the issuance of the '915 patent.

### (2) Licensing Practices and Dan River Agreement

Adversaries claim that Koratron has violated § 2 of the Sherman Act through its licensing practices and the Dan River agreement by monopolizing or attempting to monopolize the manufacture, processing and sale of resin-impregnated fabrics, related textile materials, and durable press garments.

 "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v.

Grinnell Corp., 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). "The existence of such power ordinarily may be inferred from the predominant share of the market." 384 U.S. 563 at 571, 86 S.Ct. at 1704.

In applying this market-share test to this case, the Court does not find monopolization by Koratron. In the pretrial order, Adversaries defined the relevant market for § 2 purposes as the "manufacture, processing and sale of resin-impregnated fabrics, related textile materials and durable press garments * * *." They presented no evidence at trial, however, of Koratron's share of that market. They did offer evidence of Koratron's market share of a submarket: the market for men's and boys' dress and casual slacks. Even if the Court accepted this evidence as defining a relevant submarket, the only evidence offered which bears on the question of Koratron's percentage share supports an inference that it was at most 42%.[93] This figure does not approach the percentage shares which have been held to be monopoly shares. See United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (87%); International Boxing Club v. United States, 358 U.S. 242, 249, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959) (81%); American Tobacco Co. v. United States, 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1945) (over 67%, over 80%); United States v. Aluminum Co. of America, 148 F.2d 416, 429 (2 Cir. 1945) (90%). Cf. United States v. DuPont & Co., 351 U.S. 377, 379, 381, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

 Market share is, of course, not the only potential evidence of monopoly or monopolization. Since monopoly power consists of "a power of controlling prices or unreasonably restrict-

---

93. This maximum figure is based upon Koratron's estimate that *in 1969* durable press garments constituted 75% of the market for men's and boys' dress and casual slacks and that it was receiving *royalty payments* from 56.4% of the sales of *durable-press* men's and boys' dress and casual slacks *made from*

*the post-cure process.* See p. 60, *supra.* The Court finds that this evidence on market share is very unclear and that it would be insufficient for a finding of monopolization even if the percentage derived from it were higher.

ing competition," United States v. Du-Pont & Co., 351 U.S. 377, 389, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956), evidence of that power is pertinent. But evidence of knowing and willful acts which were intended to exclude competition is insufficient to show monopolization in the absence of proof of "the exclusionary power" of such acts "in terms of the relevant market for the product involved." Walker, Inc. v. Food Machinery, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). Considering the evidence presented on Koratron's licensing practices and its share of the relevant market, the Court concludes that Adversaries have failed to prove that Koratron possessed such exclusionary power and thus violated § 2 of the Sherman Act by monopolization of that market.

An attempt to monopolize trade and commerce also violates § 2. In this Circuit, the definition of the relevant market is not required for a finding of an attempt to monopolize. Lessig v. Tidewater Oil Company, 327 F.2d 459, 474 (9 Cir. 1964), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).[94] See also Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1344 (9 Cir. 1970). In Lessig, supra, the Court also rejected the notion that probability of actual monopolization was a necessary element of an attempt to monopolize. 327 F.2d 459, at 474. In Industrial Bldg. Materials, supra, Lessig was interpreted as holding that "[i]n an attempt to monopolize situation, only intent to monopolize is in issue, and no proof as to relevant market is required." 437 F.2d 1336, at 1344.

Recent decisions by the Ninth Circuit have, however, moved away from that Spartan interpretation of Lessig. In Cornwell Quality Tools Co. v. C. T. S. Company, 446 F.2d 825, 832 (9 Cir. 1971), cert. denied, 404 U.S. 1049, 92 S. Ct. 715, 30 L.Ed.2d 740 (1972), Judge Hufstedler, writing for the Court, said in dicta that the elements of an attempt to monopolize were specific intent and "sufficient market power to come dangerously close to success." Judge Hufstedler, again writing for the Court, has very recently stated that "an attempt to monopolize under section 2 does not require proof of monopoly power. Proof that there is a 'dangerous probability of success' is certainly enough. [citing Lessig, supra] Evidence of market power is relevant, but not indispensable to a Lessig claim." Moore v. Jas. H. Matthews & Co., 473 F.2d 328, 332 (9 Cir. 1973). Finally, in Bushie v. Stenocord Corporation, 460 F.2d 116, 121 (9 Cir. 1972), the Court intimated, in referring to Lessig and Industrial Bldg. Materials, that something more than mere specific intent was required:

"In both of those cases, the attempted monopolization claim was founded upon a substantial claim of restraint of trade, from which we indicated the specific intent required for a claim of attempt to monopolize could be inferred. No such foundation is present here."

The rule in this Circuit has been clarified by Hallmark Industry v. Reynolds Metals Co., 489 F.2d 8, 11–13 (9 Cir. 1973). The Court in Hallmark commented that "[t]he Cornwell dictum cannot be read to require proof of any particular degree of market power as an independent and necessary element of at-

---

94. Since the decision in Lessig has been reaffirmed by this Circuit following the decision in Walker, Inc. v. Food Machinery, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), this Court need not address the question whether Walker Process, in effect, has overruled Lessig, although such an argument finds support in dictum in Walker Process. There the Supreme Court stated at 382 U.S. 177, 86 S.Ct. 350:

"To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure Food Machinery's ability to lessen or destroy competition."

tempt to monopolize, for such a requirement would be contrary to the holding in *Lessig,* more recently reaffirmed in Industrial Building Materials, *supra,* and Moore, *supra,*" 489 F.2d at 12, n. 3. On the question of the relevance of market power for a showing of attempt to monopolize, the Court explained at 489 F.2d 12–13:

> "Certainly market power may establish dangerous probability. However, *Lessig, Industrial Building Materials,* and *Moore, supra,* hold that dangerous probability may also be shown through proof of specific intent to set prices or exclude competition in a portion of the market without legitimate business purpose. This specific intent must be accompanied by predatory conduct directed to accomplishing the unlawful purpose. Ordinarily specific intent is difficult to prove and will be inferred from such anticompetitive conduct. Therefore evidence of market power may be relevant, but it is not indispensable where a substantial claim of restraint of trade is made."

The requirement in this Circuit, therefore, is that something more than specific intent is required to establish an attempt to monopolize. Either a dangerous probability of success must be demonstrated, by a showing of market power *or* other evidence, or the claim of an attempt to monopolize must in turn be based upon a substantial claim of restraint of trade. *Cf.* Dobbins v. Kawasaki Motors Corporation, U. S. A., 362 F.Supp. 54, 58–60 (D.Or.1973).

In this case, the Court's finding that Koratron's licensing practices constituted illegal tying arrangements itself shows that Adversaries' claim of an attempt to monopolize is founded upon a substantial claim of restraint of trade.[95] The great commercial success of the '432 process, combined with these illegal tying arrangements, convinces the Court that there was a dangerous probability of success[96] in that attempt to monopolize.

The Court also finds that the evidence establishes that Koratron had the specific intent to monopolize, "to destroy competition or build monopoly * * * ." Times-Picayune v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). See also Lessig v. Tidewater Oil Company, 327 F.2d 459, 474 (9 Cir. 1964), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). Specific intent includes "[a]n evil motive to accomplish that which the statute condemns * * *." Screws v. United States, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) (plurality opinion of Douglas, J.). *Cf.* Walker, Inc. v. Food Machinery, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed. 2d 247 (1965); Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 452 F.2d 579, 598–599 (7 Cir. 1971), cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

The Court finds that the tying arrangements and Koratron's enforcement of them,[97] the Dan River agreement,[98] and the Swede consent decree[99] are per-

---

95. Koratron will be given an opportunity to prove that its tying arrangements were justifiable under the rule of *Jerrold Electronics* and that the customer restrictions imposed upon its licensed textile mills and manufacturers of sundries were not unreasonable restraints of trade. See pp. 61–65, *supra.* If Koratron can show that these practices, during the entire period in which they were followed, did not constitute illegal restraints of trade, the Court will reconsider its finding of an attempt to monopolize.

96. On this point the Court follows Hallmark Industry v. Reynolds Metals Co., 489 F.2d

8, 12–13 (9 Cir. 1973), and Moore v. Jas. H. Matthews & Co., 473 F.2d 328, 332 (9 Cir. 1973), in holding that evidence other than market power can establish a dangerous probability of success. Moreover, where, as here, a patent which has achieved great commercial success is used in an attempt to monopolize, dangerous probability of success can almost be presumed.

97. See pp. 56–60, *supra.*

98. See pp. 49–52, *supra.*

99. See pp. 50–51, *supra.*

suasive and convincing evidence that during the time in question Koratron possessed the specific intent to extend unlawfully, in an attempt to monopolize, the power legally granted to it through the issuance of the ʼ432 patent. These practices and agreements, considered together, render it highly unlikely that Koratron was merely exercising innocent business judgment as to how it could best compete in the marketplace.

Therefore, the Court concludes that Koratron did violate § 2 of the Sherman Act by attempting to monopolize trade and commerce during the years in question.

## VIII. PATENT MISUSE

The rule of patent misuse developed from the traditional equitable principle of "clean hands", that a party may not invoke the equitable jurisdiction of a court unless he has demonstrated in his prior actions conduct beyond reproach. In the patent field, "the doctrine of misuse rests upon the principle that the holder of an exclusive patent privilege granted in furtherance of public policy may not claim protection of his grant by the court when such patent privilege is being used to subvert that policy." Laitram Corporation v. King Crab, Inc., 245 F.Supp. 1019, 1020 (D. Alaska 1965). *See also* Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 491–493, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Although an antitrust violation involving a patent comes clearly within the patent misuse doctrine, a showing of such a violation and actual lessening of competition is not required. Zenith Corp. v. Hazeltine, 395 U.S. 100, 140, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Trans-

wrap Corp. v. Stokes Co., 329 U.S. 637, 641, 67 S.Ct. 610, 91 L.Ed. 563 (1947); Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 494, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Berlenbach v. Anderson and Thompson Ski Co., 329 F.2d 782, 784 (9 Cir. 1964), cert. denied, 379 U.S. 830, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964). Generally, patent misuse will consist of efforts to enlarge the scope of a patent beyond its legally defined limits in terms of products or processes covered and to extend the seventeen-year enforcement period.[100]

A court of equity can thus deny the enforcement of the patent which has been misused until the abusive practices are terminated and the effects of those practices dissipated. B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367 (1942); Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 493, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Once the practices and their effects are purged, the patent once again is enforceable. There is no set time period for purging; the time will vary with the facts of each case. See Ansul Company v. Uniroyal, Inc., 306 F.Supp. 541, 560 (S.D.N.Y.1969), modified, 448 F.2d 872 (2 Cir. 1971), cert. denied, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972). The question of whether a purge has been accomplished is a factual matter and is "largely discretionary with the trial court." Preformed Line Products Co. v. Fanner Mfg. Co., 328 F. 2d 265, 279 (6 Cir. 1964), cert. denied, 379 U.S. 846, 85 S.Ct. 56, 279, 13 L.Ed. 2d 51 (1964).

Considering all the facts in this case,[101] the Court finds that Ko-

---

100. "[T]he public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention. It equally forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant." Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1942). *See also* Brulotte v. Thys Co., 379 U.S. 29, 32, 85 S.Ct. 176, 13 L.Ed.

2d 99 (1964) (use of royalty agreement projecting beyond patent expiration date *per se* unlawful); Solex Laboratories, Inc. v. Plastic Contact Lens Co., 268 F.2d 637, 641 (7 Cir. 1959) (use of court's findings and opinion to mislead trade concerning patent rights).

101. Koratron did not make as complete and open a disclosure in its presentation of prior art to the Patent Office as is desirable. See

ratron has misused its patent in that it violated § 1 of the Sherman Act by tying the use of unpatented Koratron-trademarked products to the granting of a license to utilize the '432 patent [102] and also by tying the rights under '432 to the use of Koratron's trademark.[103] Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 491–494, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Second, these tying arrangements, as well as the Dan River agreement and Swede consent decree, have been held to constitute an attempt to monopolize in violation of § 2 of the Sherman Act. As such, they also constitute patent misuse.[104] Until Koratron demonstrates to the satisfaction of this Court that these practices or similar ones are no longer followed and that their effects in the market have been dissipated the '432 patent will not be enforceable.[105]

## IX. CONCLUSION

With this opinion, which constitutes the Court's findings of fact and conclusions of law, the first part of this litigation comes to an end. Another pretrial conference will be held on April 26, 1974, at 1:30 p. m., to determine, *inter alia*, what issues will be tried at the next trial, what further discovery is required, and a schedule for that discovery and for the next trial. Counsel should prepare proposed agenda for that conference, including a list of those issues which are to be addressed in the next trial (e. g., damages, possible justification of the tying arrangements and customer limitations, purge of patent misuse). One week prior to the conference counsel should submit to the Court and circulate among themselves their proposed agenda.

pp. 45–49, *supra.* Perhaps the problem was one of carelessness rather than intentional non-disclosure, but applicants for the privilege of a patent monopoly should be precise and complete in their applications. Under the totality of the circumstances present here, however, Koratron's actions in these respects do not come within the doctrine of patent misuse. Beckman Instruments, Inc. v. Technical Develop. Corp., 433 F.2d 55, 62 (7 Cir. 1970), cert. denied, 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971).

102. See pp. 61–64, *supra.*

103. See pp. 63–66, *supra.*

104. On the question of patent misuse, the burden on other parties in the market to make their own business judgments about the scope and validity of a patent is not a strong consideration. Compare p. 53–55, *supra.* The patentee must itself maintain high standards of conduct and candor if it is to use its patent properly.

105. Therefore, along with the questions of possible justifications by Koratron for its tying arrangements and customer restrictions, Koratron must address the issue of purge of patent misuse in a further evidentiary proceeding.

# United States Patent Office

**2,974,432**
Patented Mar. 14, 1961

## 1

### 2,974,432

### PRESS-FREE CREASE RETAINED GARMENTS AND METHOD OF MANUFACTURE THERE-OF

William K. Warnock, Kentfield, and Frank G. Hubener, San Carlos, Calif., assignors to Koret of California, San Francisco, Calif., a corporation of California

Filed Feb. 20, 1956, Ser. No. 566,748

4 Claims. (Cl. 38—144)

The invention, in general, relates to garment manufacture and more particularly relates to an improved method of production of garments of variable sizes, types and styles which, despite numerous and repeated washings, are free from wrinkles, retain all pleating and creases made therein during manufacture, and require no pressing to afford presentable, attractive and neat appearing apparel.

In recent years, various methods have been developed in the art for treating fabrics to impart durable crease resistance to the fabrics. The majority of these methods involve the use of thermo-setting resins and, in the early stages of these developments, the fabric was impregnated with an aqueous solution of a single resin of this type, and dried at a temperature sufficiently high to effect polymerization of the resin or setting thereof in the fabric. Due to the harsh effects of the resins on the fibers, which were rendered unduly brittle, the tensile strength as well as tear strength of the fabric suffered considerably and garments made therefrom had but little life and durability. Later developments have overcome these disadvantages to some extent by impregnating the fabrics with an aqueous solution of a mixture of two or more thermosetting resins together with softeners and the like, drying the treated fabric, and thereafter curing or setting the mixed resins in the fabric by polymerization of the resins by heat either as the fabric is being dried or during a stage of mechanically pleating the same. However, garments made from fabrics containing resins which have thus been set cannot be given durable creases and substantially all garments manufactured in accordance with the foregoing methods of curing and setting the resin in the fabric previously to creasing must be carefully pressed after washing or cleaning and creases re-set therein by hand or mechanical pressing.

A primary object of our invention is to provide a method of manufacturing press-free crease retained garments having thermosetting resins therein which includes the step of polymerization of the contained resins after the garments have been completely finished and are otherwise ready to wear.

Another important object of the present invention is to provide press-free crease retained garments which will withstand numerous washings without loss of creases or pleats and which are free from wrinkles after drying and during wear.

A still further object of our present invention is to provide a method of the indicated nature for manufacturing press-free crease retained garments which is additionally characterized by controlling the quantity of the introduced non-polymerized resins so that the material of the garments can be easily handled during the cutting, sewing, pressing and otherwise finishing of the garments prior to the polymerization of the resins contained in the finished garments.

Other objects of our invention, together with some of the advantageous features thereof, will appear from the

## 2

following description of our preferred method of manufacture of garments of the type illustrated in the accompanying drawings. It is to be understood, however, that we are not to be limited to any precise form, style or design of garment nor to any precise fabric treated in accordance with our process, nor to any precise resin or mixture of resins of the thermo-setting type, as our invention, as defined in the appended claims can be embodied in a plurality and variety of forms and the process can be practiced in a plurality and variety of ways.

Referring to the drawings:

Fig. 1 is a sectional elevational view of an oven employed in our improved process, this view illustrating in full lines a treated garment suspended from a rack mounted on a portable truck.

Fig. 2 is a side elevational view of a garment treated in accordance with our improved process.

Fig. 3 is a fragmentary sectional view taken on the line 3—3 of Fig. 4.

Fig. 4 is a cross-sectional view taken on the line 4—4 of Fig. 2.

As illustrated in the accompanying drawings, a garment 11 is provided which is press-free and which retains its creases despite numerous washings, the fabric of the garment being impregnated with an initially water-soluble polymerizable resin 12. The fabric from which the garment 11 is made is cut to the shape and style of the end garment, is sewn; finished and then pressed to provide creases 13 and 14 therein. Thereafter, the garment 11, along with other similarly processed, is disposed on a portable rack 16, using a conventional garment hanger 17; the rack 16 being mounted conveniently upon a portable truck 18 for convenient transportation of garments and movement into and out of an oven 19 hereinafter described.

In accordance with our invention, we initially prepare an aqueous solution of a mixture of water-soluble thermosetting resins; the solution preferably but not necessarily containing a suitable textile softener, as well as a suitable deodorant. While there are a plurality of resins suitable for our purpose, as well as a number of textile softeners and deodorants all commercially available for making up the indicated aqueous solution, we have successfully employed the commercially available materials set out below in the amounts and percentages indicated to provide our press-free, crease-retained garments. And, while our process may be practiced for the production of garments made up from a variety of different textiles, we have had eminent success with washable pure cotton.

In preparing our preferred aqueous solution, we first provide a mixture of approximately three gallons of a thermosetting urea formaldehyde resin and approximately two gallons of a thermosetting methylated methylol melamine resin or a thermo-setting resin generally referred to in the art as a melamine formaldehyde resin. To this mixture, and for purposes of accelerating the curing of the resins, we add a small amount, say approximately three pints, of an organic acid-type catalyst. Further, approximately three pounds of any textile softener known to the textile art may be dissolved in water and added to the above mixture, and we may finally introduce approximately four pounds of a deodorant, dissolved in water, for inhibiting possible obnoxious odors in the completed garments; such a deodorant may be any deodorant known to the textile art. The foregoing mixture is then introduced with agitation into approximately twenty-five gallons of water to effect the desired quantitative aqueous solution. Thus, our solution for a volume of approximately one hundred gallons plus comprises, by volume, approximately 12 percent of a

2,974,433

**3**

thermosetting urea formaldehyde resin, approximately 8 percent of a thermosetting methylated methylol melamine resin, or of a so-called melamine formaldehyde resin, approximately 1½ percent of an organic acid-type catalyst, approximately 2½ percent of a textile softener and approximately 2½ percent of a deodorant, in approximately one hundred gallons of water.

Before impregnating any of the cotton fabrics with the aforementioned solution, we preferably thoroughly wash the fabrics in a suitable aqueous soap solution including a suitable detergent to remove starch, gelatine, glucose, dextrine, coloring matter or other impurities so as to avoid undue stiffening of the material, and thereafter rinse the washed fabrics thoroughly in clear rinse water.

The washed and rinsed fabrics are conveniently wound onto rolls and then each selected fabric is successively and continuously impregnated with the above-described solution by passing the fabric through a conventional dipping or padding machine, is stretched and sized on a standard tenter frame and simultaneously dried as it passes along the frame, and is finally rolled onto a suitable drum for transportation to a garment make-up room where the treated fabric is cut, sewed, finished and pressed to provide the completed garment prior to the final step of subjecting the finished garment to the action of heat in a garment-setting oven to effect polymerization and setting of the resins in the garment as an entirety. Preferably, we double-dip the fabrics in the above-described aqueous solution to insure approximately 100% pick-up of the solution by the fabric, and pass the impregnated fabric through squeegee rollers operating under forced pressure to extract excess solution.

In the padding step including squeezing of the fabric, approximately 70% to 80% by weight of the solution is retained in the fabric as it leaves the padding machine for passage through the tenter frame for stretching and setting to size as to width. Whenever it is desired to impart a mechanical finish to the fabric, a conventional flat nip calendar can be employed in conjunction with the tenter frame, the rolls of the calendar being heated to approximately 250° F. to 300° F. for effecting the mechanical finish. It is to be understood that a drying atmosphere of approximately 200° F. is maintained as the fabric is passed along the tenter frame; such drying atmosphere being substantially below the temperature required to cure, set or polymerize the resins on the fabric. That is to say, polymerization of the copolymers of the two resin forming ingredients of the solution with which the fabric is impregnated is deliberately avoided in our improved method during the stages of padding, stretching, finishing and drying.

The final or take-off roller upon which the fabric is rolled after passage through the tenter frame and flat nip calendar, if used, may or may not be heated depending upon the degree of crease resistance desired in the fabric and this is dependent upon the type of fabric being processed; heating of this final or take-off roller usually effecting an increase in the crease resistance of the treated fabric. Preferably, we so control the drying of the solution-impregnated fabrics as to retain approximately 2% to 8% of the moisture content over and above the natural moisture of the fabrics. The entire drum or roller with the processed or impregnated fabric containing the residual moisture content mentioned is then transferred to a garment preparation location for the usual steps of garment manufacture; it being understood that the fabric as worked upon by the garment makers contains unpolymerized or un-set resins.

After garments have been completed by cutting, sewing, finishing and pressing, which may include pleating by a mechanical pleating step, the entire garments are disposed in a garment-setting oven operating at a temperature with the garments contained therein for a sufficient time to effect complete polymerization and set-

**4**

ting of the resin in the garments to a water-insoluble state. Of course, the temperature ranges maintained in the garment-setting oven as well as the time ranges of exposure of the garments to the elevated temperatures depend upon the particular weight of the fabrics of which the garments are made as well as the styles of the garments. With relatively light-weight cotton garments, a temperature range of approximately 350° F. to 420° F., and a time of exposure of approximately 15 minutes, satisfactorily cures the contained resins and effects polymerization thereof to a water-insoluble state. For heavier fabrics, the temperature range maintained in the garment-setting oven is between 400° F. and 450° F. with garment exposure time of approximately 15 to 20 minutes.

The particular oven which we have successfully employed in our improved method, which is a gas-fired oven although other types may be used, has a capacity of approximately 90 of such garments as blouses, Bermuda shorts, jackets, pedal pushers and shorts, and of approximately 46 dresses, slacks, sport trousers, and the like. The usual controls are included for regulating the temperature of the garment-setting oven, including a throttling valve for adjusting the air and gas flow, and also including a high-limit valve for cutting off gas flow whenever the temperature reaches a predetermined high value, say 470° F. Suitable vents are provided in the oven for allowing escape of air as well as escape of vapors emanating from the heated polymerizable resins. The oven preferably includes a plurality of interiorly mounted thermo-couples arranged at various locations within the oven; such thermo-couples being electrically connected to an indicator for testing the temperature in the oven at such various locations and for indicating the necessity of any adjustments of air or gas flow that might be made to insure uniform heating of all garments placed in the oven.

Our improved method hereinabove described has been successfully practiced in connection with the production of thousands of garments in which creases as well as pleats have been formed. Cotton garments manufactured and processed in accordance with the foregoing steps have been submitted to a nationally recognized testing laboratory with the request that they be tested for their press-free crease retention qualities or properties. This laboratory machine-washed these garments in commercial-type washing machines and reported that after approximately thirty of such washings there was no wrinkling in the garments, creases were retained and were sharp, and no pressing of the garments was considered necessary.

It is to be understood that the appended claims are to be accorded a range of equivalents commensurate in scope with the advance made over the prior art.

We claim:

1. In a process of manufacturing garments unrestricted as to style, size, design and type wherein a garment fabric is impregnated with an aqueous solution of a polymerizable resin and the fabric partially dried at a temperature below the polymerization temperature of the resin so as to maintain the contained resin in an unpolymerized state and approximately 2% to 8% of moisture is retained in the fabric, the steps of cutting said fabric containing the resin in an unpolymerized state to the size, shape and style of desired garments, sewing said fabric to provide desired garment seams, finishing the cut and sewn fabric to completed garments of desired styles and designs, thereafter imparting a crease in each of the completed garments at random locations therein consistent with the designs and styles of the completed garments, and thereafter curing the impregnated, partially dried completed garments to insolubilize the contained resin in situ so that the completed garments

2,974,432

are press-free and the imparted creases therein are unaffected after repeated washings of the garments.

2. A method of manufacturing ready-to-wear press-free garments unrestricted as to size, shape, style or design and possessing crease-retention properties, said method comprising the steps of impregnating the fabric of which the garments are made with an aqueous solution of a polymerizable resin, extracting excess solution from the fabric to a predetermined extent causing the retention in the fabric of approximately 70 percent by weight of the resin, drying the fabric at a temperature insufficient to polymerize the contained resin and to an extent as to retain approximately 2 percent to 8 percent of moisture therein, making up from the resin-impregnated and moisture-containing fabric a number of ready-to-wear garments including the pressing of at least one crease in each thereof, and thereafter baking the made up garments in a garment-setting oven under temperatures ranging between 350° F. to 450° F. to polymerize and set the contained resin to a water-insoluble state whereby washable ready-to-wear press-free garments are provided with the imparted crease or creases retained therein after repeated washings of the garments.

3. A method of manufacturing ready-to-wear press-free garments unrestricted as to size, shape, style or design and possessing crease-retention properties, said method comprising the steps of providing an aqueous solution of a mixture of water-soluble polymerizable resins, impregnating the fabric of which the garments are made with said aqueous solution, extracting excess solution from the garments to a predetermined extent to leave approximately 70 percent by weight of the resins therein, drying the solution-impregnated fabric at a temperature insufficient to polymerize the contained resins and to an extent as to retain approximately 2 percent to 8 percent moisture therein, making up from the moisture-containing fabric a number of ready-to-wear garments including the pressing of at least one crease in each of the garments during the making up thereof, and thereafter baking the made up garments in a garment-setting oven under temperatures ranging between 350° F. and 400° F. to polymerize and set the contained resins to a water-insoluble state whereby washable ready-to-wear press-free garments are provided with the imparted crease or creases retained therein after repeated washings of the garments.

4. A method of manufacturing a ready-to-wear press-free crease-retained garment comprising the manufacturing steps of impregnating a fabric of which the garment is to be made with an aqueous solution of a polymerizable resin, extracting a portion of the solution from the fabric so as to retain therein a major amount by weight of the resin, thereafter partially drying the resin-impregnated fabric at a temperature below the polymerization temperature of the contained resin and to an extent to retain approximately 2 percent to 8 percent of moisture in the fabric, making up a garment unrestricted as to size, shape, style or design from the moisture-containing resin-impregnated fabric, imparting at least one crease into the garment during the making up thereof and prior to the completion thereof, finally curing the impregnated, partially-dried and made up garment to insolubilize the resin in situ, whereby a washable ready-to-wear press-free garment is provided with at least one imparted crease therein which is unaffected by repeated washings of the garment and with uncreased areas adjacent to as well as remote from a creased location of the garment which are press-free after repeated washings of the garment.

### References Cited in the file of this patent

UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 387,295 | Gessner | Aug. 7, | 1888 |
| 907,673 | Bechtold et al. | Dec. 22, | 1908 |
| 1,413,885 | Anderson | Apr. 25, | 1922 |
| 2,046,336 | Maywald | July 7, | 1936 |
| 2,288,212 | Segelin et al. | June 30, | 1942 |
| 2,440,573 | Brode | Apr. 27, | 1948 |
| 2,449,534 | Meyer | Sept. 14, | 1948 |
| 2,769,584 | Zinamon et al. | Nov. 6, | 1956 |
| 2,817,468 | Brown | Dec. 24, | 1957 |

FOREIGN PATENTS

| | | | |
|---|---|---|---|
| 540,086 | Great Britain | Oct. 6, | 1941 |
| 599,237 | Great Britain | Mar. 8, | 1948 |

March 14, 1961 W. K. WARNOCK ET AL 2,974,432
PRESS-FREE CREASE RETAINED GARMENTS
AND METHOD OF MANUFACTURE THEREOF
Filed Feb. 20, 1956

INVENTORS
WILLIAM K. WARNOCK
FRANK G. HUBENER
BY

ATTORNEY

EXHIBIT A

APPENDIX B

DAN RIVER AGREEMENT

AGREEMENT

THIS AGREEMENT made and entered into this 14th day of October, 1965, by and between DAN RIVER MILLS, INCORPORATED, a corporation of the Commonwealth of Virginia, having its principal place of business at Danville, Virginia, hereinafter referred to as DAN RIVER, and KORATRON COMPANY, INC., a corporation of California, having its principal place of business at 617 Mission Street, San Francisco, California, hereinafter referred to as KORATRON.

WITNESSETH:

WHEREAS, KORATRON is engaged in the business of licensing a process disclosed and claimed in United States Letters Patent 2,974,432, Canadian Patent 664,442, and other corresponding foreign patents, and of licensing its trademark KORATRON and certain know-how, said licensing all relating to the manufacture of press-free garments;

WHEREAS, DAN RIVER is engaged in the business of manufacturing and selling fabrics to the garment making trades, and one class of fabrics sold by DAN RIVER under the trademark DAN-PRESS is made by methods, procedures and know-how developed independently by DAN RIVER and more fully described hereinafter in ANNEX I, sometimes referred to hereinafter as the DAN-PRESS PROCESS:

WHEREAS, DAN-PRESS fabrics and garments made therefrom are competitive to those manufactured and sold under said aforementioned licenses of KORATRON;

WHEREAS, DAN RIVER is a licensee under KORATRON's trademark and in some instances offers the same base fabric to customers finished either under license from KORATRON or otherwise finished in accordance with the DAN-PRESS PROCESS;

WHEREAS, DAN RIVER has believed and continues to believe that its DAN-PRESS PROCESS does not infringe said KORATRON patent 2,974,432, and that the DAN-PRESS PROCESS is not the property of KORATRON and is in no way derived from KORATRON;

WHEREAS, KORATRON has instituted Civil Action 65–1405–S in the United States District Court for the Southern District of California against one of DAN RIVER's customers for DAN-PRESS fabrics charging infringement of said patent without specifying DAN-PRESS fabrics;

WHEREAS, DAN RIVER has numerous other customers, many of whom are also licensed by KORATRON, and who are manufacturing in large quantities garments from DAN-PRESS fabrics;

WHEREAS, DAN RIVER has indemnified many of its customers against claims based on patent rights arising out of their use of DAN-PRESS fabrics;

WHEREAS, DAN RIVER is unwilling to continue its present course of action as respects its customers without a resolution of its position in relation to KORATRON's past, present and future rights, and in pursuance of that unwillingness has, on October 8, 1965, notified KORATRON of its intention to file a suit on October 15, 1965, for a declaratory judgment to determine the respective rights of the parties hereto;

WHEREAS, the parties hereto desire to fully settle and amicably dispose of any and all controversies and disputes which have arisen and which may hereafter arise by reason of DAN RIVER's sale of DAN-PRESS fabrics and the manufacture of garments from said fabrics and the use and sale of said garments on account of the practice of the DAN-PRESS PROCESS;

NOW, THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00) to KORATRON by DAN RIVER in hand paid, receipt of which is hereby acknowledged, and the mutual covenants hereinafter undertaken, the parties hereto agree as follows:

1. KORATRON warrants that it is the owner of United States Letters Pat-

ent 2,974,432 and Canadian Patent 664,442 and has the sole right to sue for any past and future infringement thereof and the right to collect and receive any damages and other moneys for infringement thereof.

2. DAN RIVER warrants that it herein discloses its methods, procedures and know-how for the manufacture of DAN-PRESS fabrics and garments made therefrom, which methods, procedures and know-how are described in the document attached hereto as ANNEX I and forming a part hereof. A specific example thereof is described in the document attached hereto as ANNEX II and forming a part hereof.

3. KORATRON agrees to release and hereby releases DAN RIVER, customers of DAN RIVER, both direct and indirect, and any and all manufacturers, sellers or users of any and all garments made from DAN-PRESS fabrics manufactured by DAN RIVER in accordance with the methods, procedures and know-how defined in ANNEX I, from any and all claims for collection of royalties in any proceeding and from any and all claims of infringement of KORATRON's said patents arising out of the manufacture, use or sale of said DAN-PRESS fabrics or garments made from said fabrics, and, further to this end, KORA-TRON agrees to execute the General Release attached hereto as ANNEX III and forming a part hereof.

4. KORATRON, for itself, its successors and assigns, covenants and agrees not to sue or initiate arbitration proceedings or take any other action against DAN RIVER, and others specified below on account of any claims (for collection of royalties, charges of patent infringement or any other adverse action based directly or indirectly on KORA-TRON's patent rights defined below) arising out of the manufacture, use or sale of said DAN-PRESS fabric or garments made therefrom in accordance with the methods, procedures and know-how as defined in ANNEX I. The "others" specified in the last sentence include customers of DAN RIVER, both direct and indirect and both present and future and any and all manufacturers, sellers or users of garments made from DAN-PRESS fabric in accordance with the methods, procedures and know-how defined in ANNEX I. KORATRON's "patent rights" referred to above may be defined as United States Letters Patent 2,974,432, said Canadian Patent 664,442, any and all divisions, continuations, reissues and extensions of said patents and/or any United States patents and Canadian patents. KORA-TRON agrees to exercise its best efforts to prevent suit, in countries other than the United States and Canada, against DAN RIVER's customers of DAN-PRESS fabrics manufactured by DAN RIVER. Nothing herein shall operate to give KORATRON any right or license under any patent now or hereafter owned by DAN RIVER or to use methods, procedures and know-how disclosed in confidence by DAN RIVER herein except insofar as KORATRON may have employed such methods, procedures, and know-how prior to disclosure to it by DAN RIVER and to the extent that such information is now or may become public information.

5. DAN RIVER for itself, its successors or assigns agrees that, to the best of its knowledge, KORATRON is owner of United States Patent 2,974,432 and Canadian Patent 664,442 and that it will not institute proceedings of any kind regarding the validity of the aforesaid patents nor will it aid or abet or instigate others to institute proceedings of any kind regarding the validity of the aforesaid patents.

6. It is also agreed by and between the parties hereto that this Agreement can be pleaded as a complete defense in any action taken in breach of paragraphs 3, 4 or 5.

7. It is further agreed, by and between the parties hereto, that, with the sole exception of paragraph 10 below, they will not disclose the contents of this Agreement and/or Annexes thereto to persons other than officers of and attorneys for their respective organizations and will exercise their best efforts to prevent disclosure of the contents of

this Agreement and/or Annexes hereto to persons other than said officers and attorneys.

8. DAN RIVER agrees to use its best efforts to comply with the terms of paragraphs 5 and 7 hereof, but in the event of breach of said paragraphs for reasons beyond the control of DAN RIVER, KORATRON agrees that it shall not be relieved of its obligations hereunder.

9. The parties further agree that this Agreement shall be binding upon and inure to the benefits of each of the parties hereto, their successors and predecessors, their respective owners, their assigns, their respective subsidiaries in which they own at least fifty (50%) per cent of the voting shares and past, present and future assignees of Letters Patent 2,974,432 and those now or ever having the right to sue under said patent.

10. KORATRON further covenants and agrees that any and all of its successors and/or assigns will be notified of this Agreement prior to succession or assignment and that no assignment or transfer of ~~any of~~ (LAG 10/14/65 HAG) KORATRON's said patent rights will be made except subject to the terms of this Agreement.

11. This Agreement including ANNEXES I, II and III embodies the entire agreement between the parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers duly authorized hereunto as of the day and year first above written.

DAN RIVER MILLS,
INCORPORATED

By: /s/ L. Aubrey Goodson, Jr.
Vice President

KORATRON COMPANY, INC.

By: /s/ Herman A. Greenberg
President

## ANNEX I

Methods, Procedures And Know-How For The Manufacture Of DAN-PRESS Fabrics And Garments Made Therefrom

### (DAN-PRESS PROCESS)

DAN RIVER's process to make garments from DAN-PRESS fabrics comprises the steps of

(1) impregnating a fabric containing cellulose with an aqueous solution containing a chemical capable of producing wrinkle resistance and a catalyst therefor,

(2) heating said fabric to dry it to less than one (1%) per cent moisture on a bone dry fabric weight basis and, beyond mere drying, to effect reaction of said chemical to produce a rise in wrinkle resistance and to fix at least twenty (20%) per cent of said chemical in said fabric (DAN-PRESS fabric),

(3) cutting said fabric and making a garment therefrom,

(4) pressing to remove wrinkles and impart creases as desired, and

(5) thereafter heating the pressed garment to effect a further reaction of the chemical and set the garment in the pressed shape.

## ANNEX II

A Specific Example Of Methods, Procedures And Know-How Described In Annex I

A fabric containing cotton fibers, e. g., containing fifty (50%) per cent cotton and fifty (50%) per cent Fortrel polyester fibers, is impregnated to a wet pick up of 50% to 55% with an aqueous solution having the following formulation:

24% of a 50% solids aqueous solution of 1.3-dimethylol-4, 5-dihydroxy-imidazolidinone-2;

2% to 3% of a 60% solids aqueous solution of methylated methylolated melamine;

1% of polyethylene;

1% of a cationic softener;

0.075% of a non-ionic wetting agent;

0.075% of a castor oil-ethylene oxide condensate;

4.9% of a 50% solids aqueous solution of magnesium chloride hexahydrate (all percentages are based on weight).

The impregnated fabric is pre-dried to 20% (wt.) moisture in an infra-red pre-drier and then heated at 300° F. for about twenty (20) seconds to dry it to a moisture content below 1% based on the bone dry weight of the fabric and partially cure it to fix about 40 to 50% by weight of the resin in the fabric. The fabric is then inspected and rolled on tubes for shipment.

The cutter or garment manufacturer then cuts the fabric containing the partially cured fabric therein to the size, shape and style of the desired garment. Thereafter, the fabric is sewn to provide the desired garment seams and it is finished to the completed garment of the desired style and design. Then, a crease, if desired, is imparted to the garment at the locations consistent with the design and style of the completed garment. The completed garment is then cured for 2 minutes at 370° F. or 4 minutes at 340° F. or 8 minutes at 320° F. or 15 minutes at 300° F. to substantially insolubilize the resin in situ so that the completed garment is substantially press-free and the imparted crease or creases therein are substantially unaffected after repeated washings of the garment.

## ANNEX III

### General Release Of Dan River Mills, Incorporated

WHEREAS, DAN RIVER MILLS, INCORPORATED, hereinafter referred to as DAN RIVER, and KORATRON COMPANY, INC., hereinafter referred to as KORATRON, are each desirous of settling the differences between themselves, and, to that end, have, on the 14th day of October, 1965, executed the Agreement to which this Release is attached as ANNEX III.

NOW, THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00), in hand paid by DAN RIVER to KORATRON, receipt of which is hereby acknowledged by KORATRON, and for other good and valuable consideration, KORATRON does hereby release, remise and forever discharge DAN RIVER, its customers, and manufacturers, sellers and users of garments made from fabrics in accordance with the methods, procedures and know-how defined in ANNEX I to the Agreement to which this Release is attached as ANNEX III, jointly and severally, and, by these presents, does, for itself, its successors and assigns, hereby remise, release and forever discharge DAN RIVER, its respective successors and assigns, its customers, and all other manufacturers, sellers and users of garments made from said fabrics, of, and from all, and all manner of action and actions, cause and causes of actions, suits, debts, dues, sums of money, accounts, damages, controversies, claims and demands for collection of royalties, claims directly or indirectly charging patent infringement, any claims and demands whatsoever, in law or in equity, which against DAN RIVER, its customers, and all manufacturers, sellers and users of garments made from said fabrics, KORATRON now has, or which KORATRON, its successors and assigns, hereafter can, shall, or may have, or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the date of this Release arising out of and only out of the manufacture, use and/or sale of fabrics and garments made in accordance with methods, procedures and know-how defined in said ANNEX I.

IN WITNESS WHEREOF, KORATRON has caused this Release to be duly executed by its officer, duly authorized hereunto, this 14th day of October, 1965.

KORATRON COMPANY, INC.

By /s/ Herman A. Greenberg
President